ALLMTN,APPEAL,JD1,MAGR,NP ProSe,TERMED

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:23–cv–01875–GPG–KAS

Amarsingh v. Frontier Airlines

Assigned to: District Judge Gordon P Gallagher

Referred to: Magistrate Judge Kathryn A. Starnella

Demand: $115,000,000

Case in other court:  U.S. Court of Appeals, 10th Cir.,
                      24–01391

Cause: 42:1983 Civil Rights Act

Date Filed: 07/24/2023

Date Terminated: 09/24/2024

Jury Demand: Plaintiff

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

**Plaintiff**

**Kusmin L. Amarsingh**                     represented by    **Kusmin L. Amarsingh**
                                                              5 Magnolia Drive
                                                              Mary Esther, FL 32569
                                                              862–201–1305
                                                              PRO SE

V.

**Defendant**

**Frontier Airlines, Inc.**                 represented by    **Brian Timothy Maye**
                                                              Fitzpatrick Hunt & Pagano LLP
                                                              10 South LaSalle Street
                                                              Suite 3400
                                                              Chicago, IL 60603
                                                              312–728–4905
                                                              Email: brian.maye@fitzhunt.com
                                                              *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/24/2023 | 1 | COMPLAINT against Frontier Airlines, filed by Kusmin L. Amarsingh. (Attachments: # 1 Exhibit) (blaws) (Entered: 07/25/2023) |
| 07/24/2023 | 2 | AMENDED COMPLAINT against Frontier Airlines, filed by Kusmin L. Amarsingh. (Attachments: # 1 Exhibit) (blaws) (Entered: 07/25/2023) |
| 07/24/2023 | 3 | Case assigned to Magistrate Judge Kristen L. Mix. Text Only Entry. (blaws) (Entered: 07/25/2023) |
| 07/26/2023 | 4 | ORDER DIRECTING PLAINTIFF TO CURE DEFICIENCIES. If Plaintiff fails to cure the designated deficiencies **within thirty (30) days from the date of this order**, the action will be dismissed without further notice. The dismissal shall be without prejudice. By Magistrate Judge Kristen L. Mix on 7/26/2023. (jtorr, ) (Entered: 07/26/2023) |
| 07/28/2023 | 5 | |

| | | NOTICE of Change of Address/Contact Information by Plaintiff Kusmin L. Amarsingh. (jtorr, ) (Entered: 07/28/2023) |
|---|---|---|
| 07/28/2023 | 6 | CIVIL COVER SHEET by Plaintiff Kusmin L. Amarsingh. (jtorr, ) (Entered: 07/28/2023) |
| 07/31/2023 | 7 | REASSIGNING MAGISTRATE JUDGE. Due to the retirement of Magistrate Judge Kristen L. Mix, and with the permission of Chief Judge Brimmer pursuant to D.C. Colo. L. Civ. R. 40.1(a), this action is reassigned to Magistrate Judge Susan B. Prose. All future pleadings should be designated as 23–cv–01875–SBP. (Text only entry) (agarc, ) (Entered: 07/31/2023) |
| 08/07/2023 | 9 | Filing fee: $ 402.00, receipt number 107801. (blaws) (Entered: 08/08/2023) |
| 08/08/2023 | 8 | SECOND AMENDED COMPLAINT against Frontier Airlines, filed by Kusmin L. Amarsingh. (Attachments: # 1 Statement of Claims, # 2 Request for Relief)(cmadr, ) (Entered: 08/08/2023) |
| 08/09/2023 | 10 | MINUTE ORDER. Plaintiff's 8 second amended Complaint, filed August 8, 2023, is not signed. Pursuant to Rule 11(a) of the Federal Rules of Civil Procedure, "[e]very pleading, written motion, and other paper must be signed" and "[t]he court must strike an unsigned paper unless the omission is promptly corrected after being called to the... party's attention." Fed. R. Civ. P. 11(a). Plaintiff is directed to cure this deficiency on or before **September 1, 2023**, by submitting on the proper form an amended pleading that is signed. By Magistrate Judge Susan B. Prose on 8/9/2023. (jtorr, ) (Entered: 08/09/2023) |
| 08/10/2023 | 11 | AMENDED COMPLAINT against Frontier Airlines, Inc., filed by Kusmin L. Amarsingh.(jtorr, ) (Entered: 08/10/2023) |
| 08/14/2023 | 12 | MINUTE ORDER re: 11 Amended Complaint. The amended pleading does not include a Statement of Claims or Request for Relief. Although Plaintiff indicates a Statement of Claims and Request for Relief are attached, there are no attachments. Plaintiff is directed to cure this deficiency on or before **September 1, 2023**, by submitting on the proper form an amended pleading that is signed and that includes a statement of the claims she is asserting as well as a request for relief. By Magistrate Judge Susan B. Prose on 8/14/2023. (jtorr, ) (Entered: 08/14/2023) |
| 08/14/2023 | 13 | AMENDED COMPLAINT against Frontier Airlines, Inc., filed by Kusmin L. Amarsingh. (Attachments: # 1 Statement of Claims, # 2 Request for Relief)(jtorr, ) (Entered: 08/16/2023) |
| 08/14/2023 | 14 | AMENDED COMPLAINT against Frontier Airlines, Inc., filed by Kusmin L. Amarsingh.(jtorr, ) (Entered: 08/16/2023) |
| 08/17/2023 | 15 | ORDER DRAWING CASE by Magistrate Judge Susan B. Prose on 8/17/2023. This case is randomly reassigned to District Judge Gordon P. Gallagher and drawn to Magistrate Judge Kathryn A. Starnella for all further proceedings. All future pleadings should be designated as **23–cv–01875–GPG**. (jtorr, ) (Entered: 08/17/2023) |
| 08/17/2023 | 16 | Magistrate Judge consent form issued pursuant to 28 U.S.C. 636(c). (jtorr, ) (Entered: 08/17/2023) |
| 08/17/2023 | 17 | ORDER REFERRING CASE to Magistrate Judge Kathryn A. Starnella. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling |

| | | |
|---|---|---|
| | | conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other specifically–referred motions, and (4) conduct hearings, including evidentiary hearings, and submit proposed findings of fact and recommendations for rulings on dispositive motions. Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the magistrate judge or on the request of the parties by motion, this court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding. By District Judge Gordon P Gallagher on 8/17/2023. Text Only Entry (schap, ) (Entered: 08/17/2023) |
| 08/25/2023 | 18 | AFFIDAVIT OF SERVICE by Kusmin L. Amarsingh. Frontier Airlines, Inc. served on 8/21/2023, answer due 9/11/2023. (schap, ) (Entered: 08/28/2023) |
| 08/30/2023 | 19 | SUMMONS issued by Clerk. (schap, ) (Entered: 08/30/2023) |
| 09/07/2023 | 20 | NOTICE of Entry of Appearance by Brian Timothy Maye on behalf of Frontier Airlines, Inc.Attorney Brian Timothy Maye added to party Frontier Airlines, Inc.(pty:dft) (Maye, Brian) (Entered: 09/07/2023) |
| 09/07/2023 | 21 | WAIVER OF SERVICE Returned Executed by Frontier Airlines, Inc.. Frontier Airlines, Inc. waiver sent on 9/4/2023, answer due 11/3/2023. (Maye, Brian) (Entered: 09/07/2023) |
| 11/03/2023 | 22 | MOTION to Dismiss by Defendant Frontier Airlines, Inc.. (Attachments: # 1 Exhibit)(Maye, Brian) (Entered: 11/03/2023) |
| 11/03/2023 | 23 | CORPORATE DISCLOSURE STATEMENT. (Maye, Brian) (Entered: 11/03/2023) |
| 11/13/2023 | 24 | RESPONSE to 22 MOTION to Dismiss filed by Plaintiff Kusmin L. Amarsingh. (Attachments: # 1 Exhibit)(schap, ) (Entered: 11/15/2023) |
| 11/29/2023 | 25 | REPLY to Response to 22 MOTION to Dismiss filed by Defendant Frontier Airlines, Inc.. (Maye, Brian) (Entered: 11/29/2023) |
| 12/01/2023 | 26 | MOTION for Appointment of Counsel, by Plaintiff Kusmin L. Amarsingh. (angar, ) (Entered: 12/01/2023) |
| 12/01/2023 | 27 | MEMORANDUM regarding 22 MOTION to Dismiss filed by Frontier Airlines, Inc. AND 26 MOTION to Appoint Counsel filed by Kusmin L. Amarsingh. Motions referred to Magistrate Judge Kathryn A. Starnella, by District Judge Gordon P Gallagher on 12/1/2023. Text Only Entry (angar, ) (Entered: 12/01/2023) |
| 12/06/2023 | 28 | Request for Court to Consider Supplemental Evidence by Plaintiff Kusmin L. Amarsingh. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(schap, ) (Entered: 12/07/2023) |
| 12/08/2023 | 29 | MEMORANDUM regarding 28 MOTION for Order to filed by Kusmin L. Amarsingh. Motion referred to Magistrate Judge Kathryn A. Starnella, by District Judge Gordon P Gallagher on 12/8/2023. Text Only Entry (schap, ) (Entered: 12/08/2023) |
| 12/19/2023 | 30 | |

| | | |
|---|---|---|
| | | ORDER Denying 26 Motion to Appoint Counsel by Magistrate Judge Kathryn A. Starnella on 19 December 2023.(cmadr, ) (Entered: 12/19/2023) |
| 08/20/2024 | 31 | ORDER AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE by Magistrate Judge Kathryn A. Starnella on 20 August 2024. IT IS HEREBY ORDERED that the Motion to Dismiss 22 be GRANTED and the Complaint 14 be DISMISSED WITHOUT PREJUDICE. IT IS FURTHER ORDERED that Plaintiff's Request for the Court to Consider Supplemental Evidence 28 is DENIED AS MOOT. (cmadr, ) (Entered: 08/20/2024) |
| 08/20/2024 | 32 | ORDER by Magistrate Judge Kathryn A. Starnella on 20 August 2024. The Motion to Supplement 28 is DENIED AS MOOT. Text Only Entry. (Entered pursuant to ECF 31 )(cmadr, ) (Entered: 08/20/2024) |
| 08/20/2024 | 33 | AMENDED ORDER AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE by Magistrate Judge Kathryn A. Starnella on 20 August 2024. IT IS HEREBY RECOMMENDED that the Motion to Dismiss 22 be GRANTED and the Complaint 14 be DISMISSED WITHOUT PREJUDICE. IT IS ORDERED that Plaintiff's Request for the Court to Consider Supplemental Evidence 28 is DENIED AS MOOT. (cmadr, ) (Entered: 08/20/2024) |
| 08/21/2024 | 34 | ORDER finding as moot 31 Report and Recommendations in light of the 33 Amended Order and Recommendation. By District Judge Gordon P Gallagher on 8/21/2024. Text Only Entry(schap, ) (Entered: 08/21/2024) |
| 09/03/2024 | 35 | OBJECTION to 33 Report and Recommendations filed by Plaintiff Kusmin L. Amarsingh. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(schap, ) (Entered: 09/04/2024) |
| 09/04/2024 | 36 | OBJECTION to 33 Report and Recommendations filed by Plaintiff Kusmin L. Amarsingh. (schap, ) (Entered: 09/04/2024) |
| 09/18/2024 | 37 | RESPONSE to Objection to 33 RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE re 14 Amended Complaint filed by Kusmin L. Amarsingh, 22 MOTION to Dismiss filed by Frontier Airlines, Inc. filed by Defendant Frontier Airlines, Inc.. (Maye, Brian) (Entered: 09/18/2024) |
| 09/24/2024 | 38 | ORDER adopting Report and Recommendations re 33 Report and Recommendations and granting in part and denying in part 22 Motion to Dismiss by District Judge Gordon P Gallagher on 09/24/2024.(dclem) (Entered: 09/24/2024) |
| 09/24/2024 | 39 | FINAL JUDGMENT in favor of Frontier Airlines, Inc. and against Kusmin L. Amarsingh. Entered by the Clerk on 09/24/2024. (dclem) (Entered: 09/24/2024) |
| 10/03/2024 | 40 | MOTION for Reconsideration re 39 Judgment by Plaintiff Kusmin L. Amarsingh. (sphil, ) (Entered: 10/03/2024) |
| 10/06/2024 | 41 | ORDER denying 40 Motion for Reconsideration re 40 MOTION for Reconsideration re 39 Judgment filed by Kusmin L. Amarsingh. The motion for reconsideration or for further explanation is DENIED. The Court set forth its reasoning in the prior Order (D. 38). So Ordered. by District Judge Gordon P Gallagher on 10/6/24. Text Only Entry(Gallagher, Gordon) (Entered: 10/06/2024) |
| 10/07/2024 | 42 | NOTICE OF APPEAL as to 39 Judgment, 38 Order on Motion to Dismiss, Order on Report and Recommendations by Plaintiff Kusmin L. Amarsingh. (sphil, ) (Entered: 10/07/2024) |

| 10/08/2024 | 43 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 42 Notice of Appeal filed by Kusmin L. Amarsingh to the U.S. Court of Appeals. (Pro Se, Fee not paid and 1915 motion not filed,) (Attachments: # 1 Preliminary Record)(sphil, ) (Entered: 10/08/2024) |
|---|---|---|
| 10/08/2024 | 44 | USCA Case Number 24−1391 for 42 Notice of Appeal filed by Kusmin L. Amarsingh. (sphil, ) (Entered: 10/09/2024) |
| 10/31/2024 | 45 | USCA Appeal Fees received $ 605, receipt number 112325; Full Payment (USCA Case No. 24−1391) (efoga, ) (Entered: 11/01/2024) |

## AMARSINGH v. FRONTIER AIRLINES COMPLAINT

### UNITED STATES DISTRICT COURT 212 N. WAHSATCH AVENUE COLORADO SPRINGS, CO, 80903

**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
2:46 pm, Jul 24, 2023
**JEFFREY P. COLWELL, CLERK**

| | | |
|---|---|---|
| KUSMIN L. AMARSINGH | ) | |
| Plaintiff, Pro Se | ) | |
| | ) | CIVIL COMPLAINT |
| Vs | ) | CASE NUMBER:  _____ |
| | ) | Filing Date:  24 July 2023 |
| FRONTIER AIRLINES | ) | |
| Defendants | | |

---

## JURISDICTION

This Court has jurisdiction over this case, and is therefore the appropriate venue, because Frontier Airlines is headquartered in the State of Colorado.

## LAW

1. Now comes Kusmin Linda Amarsingh, appearing Pro Se, and being an attorney licensed in the State of Maryland, against Frontier Airlines, Inc (hereafter Frontier).  Frontier and its agents breached their contract with me by failing to provide fair and reasonable transport on an aircraft after I had substantially performed on said contract.  Frontier also breached their covenant of good faith and fair dealing, and failed to fulfill reasonable expectations, arising out of Frontier's failure to refund my full ticket prices for unused tickets.  Additionally, Frontier discriminated against me based on my race by racial profiling, in violation of:

The Racial Discrimination Act of 1975:

> (1) It is unlawful for a person to do any act involving a distinction, exclusion, restriction or preference based on race, colour, descent or national or ethnic origin which has the

Case 1:23-cv-01875-GPG-KAS    Document 1    Filed 07/24/23    Page 2 of 11

Appellate Case: 24-1391    Document: 10-1    Date Filed: 11/06/2024    Page: 7
AMARSINGH vs. FRONTIER AIRLINES                                    Page 2 of 10
COMPLAINT

purpose or effect of nullifying or impairing the recognition, enjoyment or exercise, on
an equal footing, of any human right or fundamental freedom in the political,
economic, social, cultural or any other field of public life.

§ 11  Access to places and facilities

It is unlawful for a person:

(a) to refuse to allow another person access to or use of any place or vehicle that
members of the public are, or a section of the public is, entitled or allowed to
enter or use, or to refuse to allow another person access to or use of any such
place or vehicle except on less favourable terms or conditions than those upon
or subject to which he or she would otherwise allow access to or use of that
place or vehicle;

(b) to refuse to allow another person use of any facilities in any such place **or
vehicle that are available to members of the public or to a section of the
public,** or to refuse to allow another person use of any such facilities except on
less favourable terms or conditions than those upon or subject to which he or
she would otherwise allow use of those facilities; or

(c) **to require another person to leave or cease to use any such place or vehicle
or any such facilities; by reason of the race, colour or national or ethnic
origin of that other person** or of any relative or associate of that other person.

Section 42 U.S.C. § 1981 of Airline Deregulation Act:

…which prohibits any air carrier from subjecting persons in air transportation to
discrimination on basis of race, color, national origin, sex, or ancestry they were
wrongfully removed from their flight on basis of their perceived religion, race, color,
and national origin**,** since statute focused directly on entity regulated**,** rather than on
individual protected. *See Oliver v. Joint Logistics Managers, Inc.,* 893 F.3d 408, 411

AMARSINGH vs. FRONTIER AIRLINES                                                    Page 3 of 10
COMPLAINT

(7th Cir. 2018) ("Section 1981 of the Civil Rights Act of 1866 'protects the right of all persons to make and enforce contracts regardless of *race*,'" *Carter* v. *Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015) (quoting in part 42 U.S.C. § 1981(a)) (emphasis added)).

## FACTS

1. On 13 June 2023 I arrived at the Philadelphia Airport to catch my flight from Philadelphia, connecting through Orlando, FL, and to my final destination, St. Louis, Missouri on Flight 1171 and 1211. I had traveled to Philadelphia to attend a funeral of a close family friend, and loved one. My fight to St. Louis was to reunite with my minor daughter who was missing me tremendously, my husband, and, my recently born Grandson, Jonah who I had yet to meet.

2. I checked into my flight online and had no bags other than a small backpack that fits comfortably under my seat. I arrived at Gate 6A well before the flight departure time, and waited to start the boarding process. As the time drew near to boarding, the Frontier Agents on duty, of which there were three, announced that the flight was overbooked by approximately 10 passengers. The lead agent, Mr. Tyron or Tyrone, announced that volunteers will be given a refund of their flight, a new flight. Subsequently the agent then announced that they would compensate volunteers $800.00 in addition to the flight refund and rebooking. Once again, there were no volunteers.

3. Subsequently, the boarding process started by zone number which is common practice. I approached the agent when my zone was called and provided my ID Card and Boarding Pass. I had not yet been assigned a seat, and my boarding pass stated "Seat: TBD (To Be Determined)". The agent then directed me to the back of the line because they were boarding passengers with assigned seats only. I requested a seat assignment and again was told I needed to wait until after the boarding process.

AMARSINGH vs. FRONTIER AIRLINES                                    Page 4 of 10
COMPLAINT

4.  There was a cluster of people and no real line, so I inquired from a group of passengers
whether they were also waiting for a seat assignment.  They responded in the affirmative. We
started talking about our travel plans, and the African American family of about 8 to 10 people
were traveling to Orlando as their final destination. Most of the party did not have assigned
seating and we shared our frustrations with each other. The passengers were or appeared to be
African American passengers, based their physical characteristics.  Similarly, the Frontier agents
on duty were or appeared to be African American, based once again on my observation.

5.  Among the people waiting for seat assignments were approximately six passengers, who
either were or appeared to be Hispanic, one male passenger, who was or appeared to be White,
and a gentleman who was or appeared to part of African American. Additionally, there was an
apparent Asian woman traveling with a child, accompanied by a white female.

6. After all passengers with seat assignments boarded, the Frontier agent asked the party of three,
with the child passenger, if one of the adults would give up their seat. The child and the adult
Asian female passenger were given seats and allowed to board. Next, the lead Frontier Agent,
Tyron(e) came out from behind the Frontier Counter and approached the party of 8-10 African
American passengers and ushered them on board. One of the young women I was speaking to
looked at me in a knowing manner as she boarded because we conversed on our travel plans,
and, the possibility we may not make the flight.  Additionally, she was in close enough proximity
to hear the Frontier agents yell at me and their treatment of me, and the other passengers who
were asked to remain seated.  Like me, her group did not have a seat assignment.   The Courts
have recognized that racial profiling is a violation of the Equal Protection Clause of the
Fourteenth Amendment to the United States Constitution.

7. Once all the African American passengers were boarded, the agents resumed their position
behind the Frontier counter. I once again approached the agents to inquire about my seat
assignment, and hoped to explain and impress upon the agents that my flight was a connecting
flight, and that there were no other alternative / feasible flights for my schedule for at least a

AMARSINGH vs. FRONTIER AIRLINES                                    Page 5 of 10
COMPLAINT

week. Rather than permit me to speak, one of the agents, a young African American female, with long blonde braids, kept interrupting me saying 'have a seat' 'have a seat' and kept saying about 25 more times.  She spoke at me in a loud voice as she stared right at me in a rude and very unprofessional manner.  I continued to speak in between her chants, so she changed her tune to 'I can hear you' 'I can hear you' she parroted them for some time without allowing me to get a word in.

8.  Of the passengers left without seats, none were African American, except the possible mixed-race gentleman I mentioned previously. The lead agent called that individual to the front of the line, and provided him alone with some information which I could not hear.  I did not have a phone with me, and before leaving I asked the young man to use his phone to call a taxi, and he kindly obliged.  After a few minutes the gentleman left the gate and went on his way. The rest of the passengers, approximately 5 Hispanic / Spanish Speaking passengers, two of Indian descent, myself being one, and one white male were told to have a seat and wait our turn.

9.  At no time did the Agents inform us of the status of the flight, and the monitor continued to say 'Delayed'. In fact the plane had already departed, but as the passengers were unaware of this we were under the impression that they would call us soon for seats.

10.  30 minutes after the flight departed, the Agents finally updated the to 'Departed'. There was a moment of quiet desperation and then everyone stated making their way towards the Frontier counter.  A number of the passengers could not speak English, but they were clearly asking for updates and for assistance on getting to their respective destination.  The Agents became irate and told everyone to sit down in a very loud voice.  The Indian female passenger asked me if I knew what was going on. I told her I did not and so she approached the counter to speak with the lead agent. I was standing within arm's length of her and the lead agent began yelling at her in what sounded like a mocking Indian accent and while pointing to each passenger in front of him asked her 'do you think you are more important than her, him, her.....etc'.

AMARSINGH vs. FRONTIER AIRLINES                                        Page 6 of 10
COMPLAINT


11.  The young woman was clearly distraught and told the agent she was traveling on an international flight with a connecting flight to Orlando then onto St. Louis. She was soft spoken and the lead agent kept on speaking in a raised and very unprofessional manner.  Like me, her request was met with more instructions to 'sit down' again in a commanding and extremely disrespectful manner'.

12. Among the left passengers, one male Hispanic passenger, who spoke limited English asked what he was supposed to do. The agent gave him a meal voucher and told him to return the following day and they would try to get him on a flight. He became irate and said, that is what you told me yesterday. He inquired whether tomorrow's flight was similarly overbooked, and the agents looked up the flight, and told him yes it was. He then told the agent he wanted a refund and that he would not come back the following day because the same thing would likely happen, for the third time.

13. Sometime later, the lead agent asked everyone for their name, email, and, phone number so that he can process refunds and compensation. He stated that we would all receive $400.00 plus the cost of our ticket. The two female attendants were supposed to process this for each passenger, but when I went to them they only offered to refund my flight or rebook my flight.

14.  I attempted to inform the remaining agents was the lead agent said, and asked that they could kindly get clarification from him. They refused to listen and instead insisted that they already heard what he said and that I  could only elect to receive a refund OR a new flight. One female agent was handing out a card with the link to Frontier's refund, with no other information or saying anything to anyone. She was very nonchalant and appeared to be bored.

15.  I again asked the lead agent to clarify for the benefit of everyone, particularly because it was very apparent that the other passengers, with the exception of the white male and myself, had little command of English.  The lead Frontier Agent then mumbled softly to the point I had to tilt my head into his personal space to hear him and he reiterated that we should receive

Case 1:23-cv-01875-GPG-KAS    Document 1    Filed 07/24/23    Page 7 of 11

Appellate Case: 24-1391    Document: 10-1    Date Filed: 11/06/2024    Page: 12

AMARSINGH vs. FRONTIER AIRLINES                                        Page 7 of 10
COMPLAINT

compensation AND a refund of our flight, because as he stated 'we were inconvenienced', along with a rebooked flight.

16. Shortly after the Lead Agent left the counter and walked away. There were three agents left at the counter. One male, a Mr. Rivera, and, two females including the young woman with the long blonde braids. I took a seat along with the other passengers and waited for approximately an hour.

17. I returned to the Counter and asked the remaining agents whether the Mr. Tyrone, the lead agent, was going to return with a check or money disbursement, and whether I am required to still wait at the gate. They advised me that he was not going to return and that I will receive an email with my refund information.

18. I therefore left the gate area and exited the Airport. I observed that there was only one passenger left waiting at the gate, the other young woman of Indian descent. She asked me to stay with her and appeared to still be distraught because of the male agent's treatment of her earlier on. Unfortunately, I could not because I did not have a phone and needed to wait outside for my ride back to my hotel.

19. The following day, I booked a flight with American Airlines taking me to Destin Florida, my home. I had no choice because there were no flights to St. Louis for at least another week with Frontier Airlines. As a result, I incurred costs associated with returning home rather than visiting St. Louis. Additionally, I had no choice but to cancel my flight from St. Louis was for my daughter and me. In total I lost approximately $1000.00 in flights, but more importantly lost the opportunity to attend my grandson's birth announcement and family reunion in his honor.

20. Subsequent to this incident, I filed two complaints with Frontier Airlines both of which were met with disregard and insistence that I was already refunded my flight. This is wholly untrue as I have not accepted nor received any money or compensation of any kind from Frontier Airlines.

AMARSINGH vs. FRONTIER AIRLINES                                                    Page 8 of 10
COMPLAINT

I have also filed a complaint with the Department of Transportation as that body is tasked with regulating instances of racial discrimination by Airlines.

## ARGUMENT

*I have a dream that one day this nation will rise up and live out the true meaning of its creed: 'we hold these truths to be self-evident – that all men are created equal'.*

*Martin Luther King Jr. – "I have a dream" speech, 1963*

1.  Frontier Airlines, by its Agents, under a theory of Agency Liability, did racially discriminate against me based on my race through racial profiling.  Under a theory of Agency Liability, a complaint must demonstrate that the Agents had authority to act on behalf of the Principal.  In the instant case, the Frontier Agents wore Frontier uniforms, and stood at the Frontier counter. They were in charge of boarding the plane, and had authority to select which passengers to board based on non-discriminatory characteristics.  Additionally, the Lead Agent in particular had actual authority to determine value of refund to each passenger / customer. Federal Rule of Civil Procedure 50(b).

2.  My flight ticket was a contract with Frontier Airlines that they would transport me from Philadelphia to St. Louis, Missouri on the date and time of my airline ticket, or within the period of my checking in.  By checking into my flight, I substantially performed on the contract. Although I did not contract for a specific seat, neither did many other passengers, and, I was still entitled to a seat and transport to my final destination unless I elected for a refund of my ticket which I did not.

3.  Frontier Airlines racially discriminated against me when it's Agents racially profiled passengers and excluded me because I was not or appeared to be African American.  I am clearly of Indian descent, and, my name on the passenger log, last name 'Amarsingh' is also telling as to my descent.  The Frontier agents had the passenger log in front of them during the boarding

AMARSINGH vs. FRONTIER AIRLINES                                         Page 9 of 10
COMPLAINT

process.  In fact, at one point, the lead agent called out my last name and the last name of the other Indian passenger who's appearance, Indian accent, and, her last name was also clearly of Indian descent, Chaudry or similar.  He called our names and we both walked to the front desk. He wrote something on the passenger log and asked us to take a seat.  Frontier Airline agents degraded me and deliberately humiliated me by yelling at me in a crowded airport because I was not African American.  Absolutely no one deserves to be treated in this manner, especially on the basis of race.

4. Frontier Airlines is under an obligation to provide airline transportation based on a rule of contract such that perform due diligence and make reasonable accommodations to provide transportation from point A, to point B.  Frontier Airlines disregarded the needs of its customers and based their decision on which passengers to assign seats based on race and preferential treatment based on race. As discussed in Facts above, there was another Frontier flight leaving Philadelphia into Orlando scheduled to depart a mere hour later. It therefore stands to reason that passengers with connecting flights, or in the instance of the one Hispanic male who had already been inconvenienced the day before, to take priority in seat assignments. I am a United States Citizen, a United States Army JAG Attorney, and a proud veteran.  None of this should matter when traveling.  The blatant disrespect, mistreatment, and disregard towards the non-African American passengers is a clear violation of the Civil Rights Act, and Airline Regulations.

### ADMINISTRATIVE ACTION – PRIOR TO FILING

1. On or about 15 June 2023, after arriving at my home and having access to my phone and computer, I contacted Frontier Airlines via their online chat service, and by email.  I do not have a copy of the chat, however, I have attached a copy of the email exchange between me and Frontier. Frontier insisted that I received compensation at the Airport, which is wholly untrue.  I intend on requesting the chats with Frontier during discovery.

AMARSINGH vs. FRONTIER AIRLINES                                      Page 10 of 10
COMPLAINT

2.  On the same day, I completed the online complaint form on the Department of Transportation website stating the facts as presented here, and requested their assistance.  I do not have a copy of this document; however, I will request it in discovery.

## RELIEF

1. In addition to the discovery stated above, I intend on requesting the release of the names and contact information of all passengers left behind on flight 1171 Philadelphia to Orlando, on 13 June 2023. A.

2.  I request compensation in the amount of $15 dollars should I be granted summary judgement. Should this case go to trial, I request $100 million dollars for fees, expenses, and, emotional distress caused by Frontier Airlines and its agents.

3.  I request discovery in this case, of all complaints filed against Frontier Airlines on the basis of race, or, any other discriminatory practice in violation of the laws cited above.  I also request discovery into the facts and circumstances of all passengers left behind on the flight, their contact information, their names, and, addresses.

4.  I request a jury in this case.

5. The facts presented here are irrefutable and discovery by Frontier of the passenger log, their tickets, in relation to the passengers left behind, will demonstrate in no uncertain terms that this case warrants summary judgement for the Plaintiff.  The relief sought here is reasonable for the harm caused, and, to send a clear message to Frontier and all airlines that they must ensure equal treatment of all passengers.

6.  As the facts are clear on its face, I request summary judgment.

AMARSINGH vs. FRONTIER AIRLINES                                    Page 11 of 10
COMPLAINT

*Kusmin L. Amarsingh*

KUSMIN L. AMARSINGH

Plaintiff, Attorney At Law

Pro Se

## AFFIDAVIT & CERTIFICATE OF SERVICE

I, Kusmin Linda Amarsingh, Esquire, appearing Pro Se, do certify that the above complaint is true in fact and law.  On 24 July 2023, I served a copy of this on Frontier Airlines at their headquarters at c/o Legal Department, 4545 Airport Way, Denver, Colorado 80239 via certified mail return receipt requested and emailed copies to Trista Miller, Director of Customer Care at Trista.Miller@flyfrontier.com and to Daniel Shurz, Senior Vice President at daniel.shurz@flyfrontier.com on 26 June 2023.

*Kusmin L. Amarsingh*

KUSMIN L. AMARSINGH

Plaintiff , Attorney At Law

Pro Se

M Gmail

Linda Amarsingh <lindaamarsingh@gmail.com>

**Frontier Airlines: Refund Request CRM:0009565**
2 messages

**Care, Customer** <CustomerCare@flyfrontier.com>                                         Sat, Jun 17, 2023 at 10:48 AM
To: CON-230605-000869 Amarsingh <lindaamarsingh@gmail.com>

Hello Kusmin,

Thank you for reaching out to Frontier Airlines about delayed on June 13, 2023 when you were traveling from Orlando to St. Louis. We're sorry to hear that you were unable to travel as planned.

I'm sorry that you feel unhappy about your experience with our staff at the Orlando's airport., and we assure you this is not the type of service we strive to provide. I'm sorry that happened to you.

Frontier wants you to have a great experience when you fly with us, so it's disappointing when we receive reports of anything less than that. I'm grateful you brought this to our attention, so we can share your feedback with our Airport leadership group who will follow up with their team to ensure your experience is not repeated.

On the other hand, regarding your compensation request, it shows that this has already been handled at the airport on the day of the disruption and the amount of $415.92 has been issued.

We appreciate your patience and hope to service your travel needs under better circumstances in the future.

Regards,

Susan
Reservations Specialist
Frontier Airlines

*********************************************

P.S. We want your feedback! Please fill out our survey and you will be entered to win 2 FREE round-trip tickets on Frontier Airlines up to a value of $400. Click the link to take the survey:
https://www.surveymonkey.com/r/5LJKB2K

*********************************************

------------------ Original Message ------------------
**From:** CON-230605-000869 Amarsingh <lindaamarsingh@gmail.com>;
**Received:** Thu Jun 15 2023 19:37:00 GMT-0600 (Mountain Daylight Time)
**To:** Customer Care <customercare@flyfrontier.com>; <customercare@flyfrontier.com>;
**Subject:** Re: Frontier Airlines : Refund Request CRM:0485903

CAUTION:This email originated from outside of Frontier. DO NOT CLICK on any links or attachments unless you recognize the sender and know the content of the message is safe. If in doubt, click the Report Phish button.

I was informed I would receive compensation, and, refunded.  I have not received either.

I would like a response please and update.

Sent from my iPhone

> On Jun 13, 2023, at 10:15 PM, Care, Customer <CustomerCare@flyfrontier.com> wrote:

> Here is your incident number: INC-230614-000481
> Your refund request will be reviewed. Please expect a response within 7 days for qualifying refund requests.

> Answers to the most common questions about refund requests can be found on our website https://www.flyfrontier.com/travel/travel-info/change-policy

> Customer Care

**Linda Amarsingh** <lindaamarsingh@gmail.com>                                         Wed, Jun 21, 2023 at 9:31 AM
To: "Care, Customer" <CustomerCare@flyfrontier.com>

I did not receive any compensation.  Where do I find this information?

Sent from my iPhone

> On Jun 17, 2023, at 10:48 AM, Care, Customer <CustomerCare@flyfrontier.com> wrote:

> [Quoted text hidden]

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
3:48 pm, Jul 24, 2023
JEFFREY P. COLWELL, CLERK

## AMARSINGH v. FRONTIER AIRLINES COMPLAINT

### UNITED STATES DISTRICT COURT 212 N. WAHSATCH AVENUE COLORADO SPRINGS, CO, 80903

| | | |
|---|---|---|
| KUSMIN L. AMARSINGH | ) | |
| Plaintiff, Pro Se | ) | |
| | ) | **AMMENDED CIVIL COMPLAINT** |
| Vs | ) | CASE NUMBER: _____ |
| | ) | Filing Date:  24 July 2023 |
| FRONTIER AIRLINES | ) | |
| Defendants | | |

---

### JURISDICTION

This Court has jurisdiction over this case, and is therefore the appropriate venue, because Frontier Airlines is headquartered in the State of Colorado.

### LAW

1. Now comes Kusmin Linda Amarsingh, appearing Pro Se, and being an attorney licensed in the State of Maryland, against Frontier Airlines, Inc (hereafter Frontier).  Frontier and its agents breached their contract with me by failing to provide fair and reasonable transport on an aircraft after I had substantially performed on said contract.  Frontier also breached their covenant of good faith and fair dealing, and failed to fulfill reasonable expectations, arising out of Frontier's failure to refund my full ticket prices for unused tickets, and failing to accommodate my more complicated travel plans ahead of those individuals with direct flights, particularly because there was another direct flight departing Philadelphia to Orlando in approximately one hour.  Conversely, my flight from Philadelphia to Orlando to St. Louis, was the only such flight for at least    to    days.  Additionally, Frontier discriminated against me based on my race by racially profiling me and subsequently deny me a seat because of my race, in violation of:

The Racial Discrimination Act of 1975:

AMARSINGH vs. FRONTIER AIRLINES                                        Page 2 of 10
COMPLAINT

(1)  It is unlawful for a person to do any act involving a distinction, exclusion, restriction
     or preference based on race, colour, descent or national or ethnic origin which has the
     purpose or effect of nullifying or impairing the recognition, enjoyment or exercise, on
     an equal footing, of any human right or fundamental freedom in the political,
     economic, social, cultural or any other field of public life.

§ 11  Access to places and facilities

     It is unlawful for a person:

     (a)  to refuse to allow another person access to or use of any place or vehicle that
          members of the public are, or a section of the public is, entitled or allowed to
          enter or use, or to refuse to allow another person access to or use of any such
          place or vehicle except on less favourable terms or conditions than those upon
          or subject to which he or she would otherwise allow access to or use of that
          place or vehicle;

     (b)  to refuse to allow another person use of any facilities in any such place **or
          vehicle that are available to members of the public or to a section of the
          public,** or to refuse to allow another person use of any such facilities except on
          less favourable terms or conditions than those upon or subject to which he or
          she would otherwise allow use of those facilities; or

     (c)  **to require another person to leave or cease to use any such place or vehicle
          or any such facilities; by reason of the race, colour or national or ethnic
          origin of that other person** or of any relative or associate of that other person.

Section 42 U.S.C. § 1981 of Airline Deregulation Act:

     …which prohibits any air carrier from subjecting persons in air transportation to
     discrimination on basis of race, color, national origin, sex, or ancestry they were
     wrongfully removed from their flight on basis of their perceived religion, race, color,

Case 1:23-cv-01875-GPG-KAS    Document 2    Filed 07/24/23    Page 3 of 11

Appellate Case: 24-1391    Document: 10-1    Date Filed: 11/06/2024    Page: 20
AMARSINGH vs. FRONTIER AIRLINES                                    Page 3 of 10
COMPLAINT

and national origin, since statute focused directly on entity regulated. *See Oliver v. Joint Logistics Managers, Inc.,* 893 F.3d 408, 411 (7th Cir. 2018) ("Section 1981 of the Civil Rights Act of 1866 'protects the right of all persons to make and enforce contracts regardless of *race*,'" *Carter* v. *Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015) (quoting in part 42 U.S.C. § 1981(a)) (emphasis added)).

## FACTS

1. On 13 June 2023 I arrived at the Philadelphia Airport to catch my flight from Philadelphia, connecting through Orlando, FL, and to my final destination, St. Louis, Missouri on Flight 1171 and 1211. I had traveled to Philadelphia to attend a funeral of a close family friend, and loved one. My flight to St. Louis was to reunite with my minor daughter who was missing me tremendously, my husband, and, my recently born Grandson, Jonah who I had yet to meet.

2. I checked into my flight online and had no bags other than a small backpack that fits comfortably under my seat. I arrived at Gate 6A well before the flight departure time, and waited to start the boarding process. As the time drew near to boarding, the Frontier Agents on duty, of which there were three, announced that the flight was overbooked by approximately 10 passengers. The lead agent, Mr. Tyron or Tyrone, announced that volunteers will be given a refund of their flight, and, a new flight. Subsequently the agent then announced that they would compensate volunteers $800.00 in addition to the flight refund and rebooking. Once again, there were no volunteers.

3. Subsequently, the boarding process started by zone number which is common practice. I approached the agent when my zone was called and provided my ID Card and Boarding Pass. I had not yet been assigned a seat, and my boarding pass stated "Seat: TBD (To Be Determined)". The agent then directed me to the back of the line because they were boarding passengers with assigned seats only. I requested a seat assignment and again was told I needed to wait until after the boarding process.

AMARSINGH vs. FRONTIER AIRLINES                                              Page 4 of 10
COMPLAINT

4.  There was a cluster of people and no real line, so I inquired from a group of passengers
whether they were also waiting for a seat assignment.  They responded in the affirmative. We
started talking about our travel plans, and the African American family of about 8 to 10 people
were traveling to Orlando as their final destination. Most of the party did not have assigned
seating and we shared our frustrations with each other. The passengers were or appeared to be
African American passengers, based their physical characteristics.  Similarly, the Frontier agents
on duty were or appeared to be African American, based once again on my observation.

5.  Among the people waiting for seat assignments were approximately six passengers, who were
or appeared to be Hispanic, one male passenger, who was or appeared to be White, and a
gentleman who was or appeared to partly African American. Additionally, there was an apparent
Asian woman traveling with a child, accompanied by a white female.

6. After all passengers with seat assignments boarded, the Frontier agent asked the party of three,
with the child passenger, if one of the adults would give up their seat. The child and the adult
Asian female passenger were given seats and allowed to board. Next, the lead Frontier Agent,
Tyron(e) came out from behind the Frontier Counter and approached the party of 8-10 African
American who were standing with me.  He started chatting and laughing with the group of
passengers and ushered them on board. One of the young women I was speaking to looked at me
in a knowing manner as she boarded because we conversed on our travel plans, and, the
possibility we may not make the flight.  Additionally, she and her entire group was in close
enough proximity to hear the Frontier agents yell at me and their treatment of me, and the other
passengers who were asked to remain seated.  Like me, her group did not have a seat
assignment.   The Courts have recognized that racial profiling is a violation of the Equal
Protection Clause of the Fourteenth Amendment to the United States Constitution.

7. Once all the African American passengers were boarded, the agents resumed their position
behind the Frontier counter. I once again approached the agents to inquire about my seat

Case 1:23-cv-01875-GPG-KAS   Document 2   Filed 07/24/23   Page 5 of 11

Appellate Case: 24-1391   Document: 10-1   Date Filed: 11/06/2024   Page: 22
AMARSINGH vs. FRONTIER AIRLINES                                    Page 5 of 10
COMPLAINT

assignment, and hoped to explain and impress upon the agents that my flight was a connecting flight, and that there were no other alternative / feasible flights for my schedule for at least a week. Rather than permit me to speak, one of the agents, a young African American female, with long blonde braids, kept interrupting me saying 'have a seat' 'have a seat' and kept saying this about 25 more times in a loud manner and as I was standing in front of her counter.  She spoke at me in a loud voice as she stared right at me in a rude and very unprofessionally.  I continued to speak in between her chants because I was certain she would understand that I needed to get on that flight because there were no others to St. Louis.  However, she changed her tune to 'I can hear you' 'I can hear you' she parroted them for some time without allowing me to get a word in.

8.  Of the passengers left without seats, none were African American, except the possible mixed-race gentleman I mentioned previously. The lead agent called that individual to the front of the line, and provided him alone with some information which I could not hear.  I did not have a phone with me, and before leaving I asked the young man to use his phone to call a taxi, and he kindly obliged.  After a few minutes the gentleman left the gate and went on his way. The rest of the passengers, approximately 5 Hispanic / Spanish Speaking passengers, two of Indian descent, myself being one, and one white male were told to have a seat and wait our turn.

9.  At no time did the Agents inform us of the status of the flight, and the monitor continued to say 'Delayed'. In fact the plane had already departed 30 minutes ago, but as the passengers were unaware of this we were under the impression that they would call us soon for seats.

10.  30 minutes after the flight departed, the Agents finally updated the monitor to 'Departed'. There was a moment of quiet desperation and then everyone started making their way towards the Frontier counter.  A number of the passengers could not speak English, but they were clearly asking for updates and for assistance on getting to their respective destination.  The Agents became irate and told everyone to sit down in a very loud voice.  The Indian female passenger asked me if I knew what was going on. I told her I did not and so she approached the counter to speak with the lead agent. I was standing within arm's length of her and the lead agent began

Case 1:23-cv-01875-GPG-KAS    Document 2    Filed 07/24/23    Page 6 of 11

Appellate Case: 24-1391    Document: 10-1    Date Filed: 11/06/2024    Page: 23
AMARSINGH vs. FRONTIER AIRLINES                                    Page 6 of 10
COMPLAINT

yelling at her in what sounded like a mocking Indian accent and while pointing to each passenger in front of him asked her 'do you think you are more important than her, him, her.....etc'.

11.  The young woman was clearly distraught and told the agent she was traveling on an international flight with a connecting flight to Orlando then onto St. Louis. She was soft spoken and the lead agent kept on speaking in a raised and very unprofessional manner.  Like me, her request was met with more instructions to 'sit down' again in a commanding and extremely disrespectful manner'.

12. Among the left passengers, one male Hispanic passenger, who spoke limited English asked what he was supposed to do. The agent gave him a meal voucher and told him to return the following day and they would try to get him on a flight. He became irate and said, that is what you told me yesterday. He inquired whether tomorrow's flight was similarly overbooked, and the agents looked up the flight, and told him yes it was. He then told the agent he wanted a refund and that he would not come back the following day because the same thing would likely happen, for the third time.

13. Sometime later, the lead agent asked everyone for their name, email, and, phone number so that he can process refunds and compensation. He stated that we would all receive $400.00 plus the cost of our ticket. The two female attendants were supposed to process this for each passenger, but when I went to them they only offered to refund my flight or rebook my flight.

14.  I attempted to inform the three agents who were supposed to process our refund, and compensation that in fact the lead agent said we would receive a new flight AND be compensated $400.  They absolutely refused to listen or allow me to speak once more.  The same Agent with the blonde braids resumed her chants of 'I heard you' 'I heard you'…  The processing Agents insisted that they already heard what Tyrone said and could only elect to receive a refund OR a new flight. One female agent was handing out a card with the link to

AMARSINGH vs. FRONTIER AIRLINES                                    Page 7 of 10
COMPLAINT

Frontier's refund, with no other information or saying anything to anyone. She was very nonchalant and appeared to be bored.

15.  I again asked the lead agent to clarify for the benefit of everyone, particularly because it was very apparent that of the remaining passengers I and the white male were strong English speakers.  The other passengers appeared Hispanic and had very little command of English.  The lead Frontier Agent then mumbled softly to the point I had to tilt my head into his personal space to hear him and he reiterated that we should receive compensation AND a refund of our flight, because as he stated 'we were inconvenienced', along with a rebooked flight.  The other processing agents heard him this time and told me to take a seat so they could process the payment.

16.  I took my seat and waited for an hour.  The lead agent left and the three other processing agents remained, one male, a Mr. Rivera, and, two females including the young woman with the long blonde braids. I took a seat along with the other passengers and waited for approximately an hour. They responded that Tyrone, the Lead, was not going to return and gave me a card with the Frontier refund link on it and said nothing else.  I asked whether this is the link I need to use to process a refund, the blonde responded in a rude manner 'mmmhhmmm'.

17.  I therefore left the gate area and exited the Airport. I observed that there was only one passenger left waiting at the gate by the time I left, the other young woman of Indian descent.  She asked me to stay with her and appeared to still be distraught because of the male agent's treatment of her earlier on. Unfortunately, I could not stay because I did not have a phone and needed to wait outside for my ride back to my hotel.

18. The following day, I booked a flight with American Airlines taking me to Destin Florida, my home.  I had no choice because there were no flights to St. Louis for at least another week with Frontier Airlines.  As a result, I incurred costs associated with returning home rather than visiting St. Louis. Additionally, I had no choice but to cancel my flight from St. Louis for my daughter

AMARSINGH vs. FRONTIER AIRLINES                                    Page 8 of 10
COMPLAINT

and myself. In total I lost approximately $1000.00 in flights, but more importantly lost the opportunity to attend my grandson's birth announcement and family reunion in his honor.

20. Subsequent to this incident, I filed two complaints with Frontier Airlines both of which were met with disregard and insistence that I was already received my flight. This is wholly untrue as I have not accepted nor received any money or compensation of any kind from Frontier Airlines. I have also filed a complaint with the Department of Transportation as that body is tasked with regulating instances of racial discrimination by Airlines.

## ARGUMENT

*I have a drea   that one da   this nation   ill rise    and live o  t the tr  e   eaning o  its creed 'we hold these truths to be self evident – that all men are created equal'.*

*Martin L  ther   ing Jr. – "I have a dream" speech, 1963*

1.  Frontier Airlines, by its Agents, under a theory of Agency Liability, did racially discriminate against me based on my race through racial profiling.  Under a theory of Agency Liability, a complaint must demonstrate that the Agents had authority to act on behalf of the Principal.  In the instant case, the Frontier Agents wore Frontier uniforms, and stood at the Frontier counter. They were in charge of boarding the plane, and had authority to select which passengers to board based on non-discriminatory characteristics.  Additionally, the Lead Agent in particular had actual authority to determine value of refund to each passenger / customer.  These facts establish that the Agents were in fact acting on behalf of Frontier Airlines.  Federal Rule of Civil Procedure 50(b).

2.  My flight ticket was a contract with Frontier Airlines that they would transport me from Philadelphia to St. Louis, Missouri on the date and time of my airline ticket, or within the period of my checking in.  By checking into my flight, I substantially performed on the contract. Although I did not contract for a specific seat, neither did many other passengers, and, I was still

AMARSINGH vs. FRONTIER AIRLINES                                              Page 9 of 10
COMPLAINT

entitled to a seat and transport to my final destination unless I elected for a refund of my ticket
which I did not.

3.  Frontier Airlines racially discriminated against me when it's Agents racially profiled
passengers and excluded me because I was not nor appeared to be African American.  I am
clearly of Indian descent, and, my name on the passenger log, last name 'Amarsingh' is also
telling as to my descent.  The Frontier agents had the passenger log in front of them during the
boarding process.  In fact, at one point, the lead agent called out my last name and the last name
of the other Indian passenger who's appearance, Indian accent, and, her last name was also
clearly of Indian descent.  I believe her last-name was Chaudry or similar sounding.  He called
our names and we both walked to the front desk.  He wrote something on the passenger log and
asked us to take a seat.  Frontier Airline agents degraded me and deliberately humiliated me by
yelling at me in a crowded airport because I was not African American.  Absolutely no one
deserves to be treated in this manner, especially on the basis of race.

4. Frontier Airlines is under an obligation to provide airline transportation based on a rule of
contract such that perform due diligence and make reasonable accommodations to provide
transportation from point A, to point B.  Frontier Airlines disregarded the needs of its customers
and based their decision on which passengers to assign seats based on race and preferential
treatment based on race. As discussed in Facts above, there was another Frontier flight leaving
Philadelphia into Orlando scheduled to depart a mere hour later. It therefore stands to reason that
passengers with connecting flights, or in the instance of the one Hispanic male who had already
been inconvenienced the day before, to take priority in seat assignments. I am a United States
Citizen, a United States Army JAG Attorney, and a proud veteran.  None of this should matter
when traveling.  The blatant disrespect, mistreatment, and disregard towards the non-African
American passengers is a clear violation of the Civil Rights Act, Airline Regulations, and of my
contract with Frontier.

AMARSINGH vs. FRONTIER AIRLINES                                                    Page 10 of 10
COMPLAINT

## ADMINISTRATIVE ACTION – PRIOR TO FILING

1. On or about 15 June 2023, after arriving home in Florida, and having access to my phone and computer, I contacted Frontier Airlines via their online chat service, and by email.  I do not have a copy of the chat, however, I have attached a copy of the email exchange between me and Frontier. Frontier insisted that I received compensation at the Airport, which is wholly untrue.  I intend on requesting the chats with Frontier during discovery.

2.  On the same day, I completed the online complaint form on the Department of Transportation website stating the facts as presented here, and requested their assistance.  I do not have a copy of this document; however, I will request it in discovery.

## RELIEF SOUGHT

1. In addition to the discovery stated above, I intend on requesting the release of the names and contact information of all passengers left behind on flight 1171 Philadelphia to Orlando, on 13 June 2023. A.

2.  I request compensation in the amount of $15 million dollars should I be granted summary judgement.  Should this case go to trial, I request $100 million dollars for fees, expenses, and, emotional distress caused by Frontier Airlines and its agents.

3.  I request discovery in this case, of all complaints filed against Frontier Airlines on the basis of race, or, any other discriminatory practice in violation of the laws cited above.  I also request discovery into the facts and circumstances of all passengers left behind on the flight, their contact information, their names, and, addresses.

4.  I request a jury in this case.

AMARSINGH vs. FRONTIER AIRLINES                                              Page 11 of 10
COMPLAINT

5. The facts presented here are irrefutable and discovery by Frontier of the passenger log, tickets/contracts with each passenger, and the lack of reasonable accommodation in relation to the passengers left behind, will demonstrate in no uncertain terms that this case warrants summary judgement for the Plaintiff.  The relief sought here is reasonable for the harm caused, and, to send a clear message to Frontier Airlines that they must ensure equal treatment of all passengers.

6.  As the facts are clear on its face, I request summary judgment.

*Kusmin L. Amarsingh*

KUSMIN L. AMARSINGH

Plaintiff, Attorney At Law

Pro Se

## AFFIDAVIT & CERTIFICATE OF SERVICE

I, Kusmin Linda Amarsingh, Esquire, appearing Pro Se, do certify that the above complaint is true in fact and law.  On 24 July 2023, I served a copy of this on Frontier Airlines at their headquarters at c/o Legal Department, 4545 Airport Way, Denver, Colorado 80239 via certified mail return receipt requested and emailed copies to Trista Miller, Director of Customer Care at Trista.Miller@flyfrontier.com and to Daniel Shurz, Senior Vice President at daniel.shurz@flyfrontier.com on 26 June 2023.

*Kusmin L. Amarsingh*

KUSMIN L. AMARSINGH

Plaintiff , Attorney At Law

Pro Se

Linda Amarsingh <lindaamarsingh@gmail.com>

**M** Gmail

## Frontier Airlines: Refund Request CRM:0009565

2 messages

**Care, Customer** <CustomerCare@flyfrontier.com>
To: CON-230605-000869 Amarsingh <lindaamarsingh@gmail.com>

Sat, Jun 17, 2023 at 10:48 AM

Hello Kusmin,

Thank you for reaching out to Frontier Airlines about delayed on June 13, 2023 when you were traveling from Orlando to St. Louis. We're sorry to hear that you were unable to travel as planned.

I'm sorry that you feel unhappy about your experience with our staff at the Orlando's airport., and we assure you this is not the type of service we strive to provide. I'm sorry that happened to you.

Frontier wants you to have a great experience when you fly with us, so it's disappointing when we receive reports of anything less than that. I'm grateful you brought this to our attention, so we can share your feedback with our Airport leadership group who will follow up with their team to ensure your experience is not repeated.

On the other hand, regarding your compensation request, it shows that this has already been handled at the airport on the day of the disruption and the amount of $415.92 has been issued.

We appreciate your patience and hope to service your travel needs under better circumstances in the future.

Regards,

Susan
Reservations Specialist
Frontier Airlines

********************************************

P.S. We want your feedback! Please fill out our survey and you will be entered to win 2 FREE round-trip tickets on Frontier Airlines up to a value of $400. Click the link to take the survey:
https://www.surveymonkey.com/r/5LJKB2K

********************************************

------------------- Original Message -------------------
**From:** CON-230605-000869 Amarsingh <lindaamarsingh@gmail.com>;
**Received:** Thu Jun 15 2023 19:37:00 GMT-0600 (Mountain Daylight Time)
**To:** Customer Care <customercare@flyfrontier.com>; <customercare@flyfrontier.com>;
**Subject:** Re: Frontier Airlines : Refund Request CRM:0485903

CAUTION:This email originated from outside of Frontier. DO NOT CLICK on any links or attachments unless you recognize the sender and know the content of the message is safe. If in doubt, click the Report Phish button.

I was informed I would receive compensation, and, refunded.  I have not received either.

I would like a response please and update.

Sent from my iPhone

> On Jun 13, 2023, at 10:15 PM, Care, Customer <CustomerCare@flyfrontier.com> wrote:

> Here is your incident number: INC-230614-000481
> Your refund request will be reviewed. Please expect a response within 7 days for qualifying refund requests.

> Answers to the most common questions about refund requests can be found on our website https://www.flyfrontier.com/travel/travel-info/change-policy

> Customer Care

**Linda Amarsingh** <lindaamarsingh@gmail.com>
To: "Care, Customer" <CustomerCare@flyfrontier.com>

Wed, Jun 21, 2023 at 9:31 AM

I did not receive any compensation.  Where do I find this information?

Sent from my iPhone

> On Jun 17, 2023, at 10:48 AM, Care, Customer <CustomerCare@flyfrontier.com> wrote:

> [Quoted text hidden]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
*8:36 am, Aug 08, 2023*
**JEFFREY P. COLWELL, CLERK**

Civil Action No.     1:2023cv01875
(To be supplied by the court)

Kusmin L. Amarsingh                          , Plaintiff

v.                                          **Jury Trial requested:**
                                            **(please check one)**
                                            _X__ Yes ___ No

 Frontier Airlines, Inc.                     , Defendant

*(List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names of the defendants listed in the above caption must be identical to those contained in Section B. Do not include addresses here.)*

---

## COMPLAINT

---

| NOTICE |
| --- |
| Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. **Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.** |

### A.     PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

 Kusmin L. Amarsingh, 5 Magnolia Drive, Mary Esther, FL 32569
 (Name and complete mailing address)

 862-201-1305;  lindaamarsingh@gmail.com
 (Telephone number and e-mail address)

**B.     DEFENDANT(S) INFORMATION**

*Please list the following information for each defendant listed in the caption of the complaint.  If more space is needed, use extra paper to provide the information requested.  The additional pages regarding defendants should be labeled "B.  DEFENDANT(S) INFORMATION."*

Defendant 1:   Frontier Airlines, 4545 Airport Way, Denver, CO 80239
                        (Name and complete mailing address)

                        (801) 401-9021.
                        (Telephone number and e-mail address if known)

**C.     JURISDICTION**

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

__x__   Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

        List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case.

         The Racial Discrimination Act of 1975, as embodied in the Equal Protection Clause, of the 14th Amendment, to the Consitution of the United States of America

__x__   Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

        Plaintiff is a citizen of the State of ____Florida_____.

        If Defendant 1 is an individual, Defendant 1 is a citizen of _____.

        If Defendant 1 is a corporation,

        Defendant 1 is incorporated under the laws of ____Colorado_____ (name of state or foreign nation).

        Defendant 1 has its principal place of business in ____Colorado_____ (name of state or foreign nation).

        (*If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant*.)

2

**D.  STATEMENT OF CLAIM(S):  SEE ATTACHMENT**

*State clearly and concisely every claim that you are asserting in this action.  For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim.  You do not need to cite specific legal cases to support your claim(s).  If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s).  Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

● The Statement of Claims are described in the attached, Statement of Claims.

**E.  REQUEST FOR RELIEF:  SEE ATTACHMENT**

*State the relief you are requesting or what you want the court to do.  If additional space is needed to identify the relief you are requesting, use extra paper to request relief.  Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

● The Request for relief is described in the attached, Request for Relief.

**F.      PLAINTIFF'S SIGNATURE**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct.  *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

_____
(Plaintiff's signature)


_____
(Date)

D. STATEMENT OF CLAIMS

**STATEMENT OF CLAIMS:**

1)    CLAIM 1:  Frontier Airlines breached their contract with me by failing to provide fair and reasonable transport on an aircraft after I had substantially performed on said contract. Frontier also breached their covenant of good faith and fair dealing, and failed to fulfill reasonable expectations, arising out of Frontier's failure to refund my full ticket prices for unused tickets, and, by failing to accommodate my more difficult travels plans ahead of passengers with a direct flight, particularly since there was another direct flight from Philadelphia to Orlando about an hour later.  My flight on the other hand, went from Philadelphia to Orlando to St. Louis.  Frontier did not have an available connecting or other flight that would accommodate my travel plans for at least a week.

2) CLAIM 2:  Frontier discriminated against me based on my race by racial profiling, in violation of: The Racial Discrimination Act of 1975: (1) It is unlawful for a person to do any act involving a distinction, exclusion, restriction or preference based on race, color, descent or national or ethnic origin which has the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise, on an equal footing, of any human right or fundamental freedom in the political, economic, social, cultural or any other field of public life. § 11 Access to places and facilities It is unlawful for a person: (a) to refuse to allow another person access to or use of any place or vehicle that members of the public are, or a section of the public is, entitled or allowed to enter or use, or to refuse to allow another person access to or use of any such place or vehicle except on less favourable terms or conditions than those upon or subject to which he or she would otherwise allow access to or use of that place or vehicle; (b) to refuse to allow another person use of any facilities in any such place or vehicle that are available to members of the public or to a section of the public, or to refuse to allow another person use of any such facilities except on less favourable terms or conditions than those upon or subject to which he or she would otherwise allow use of those facilities; or (c) to require another person to leave or cease to use any such place or vehicle or any such facilities; by reason of the race, colour or national or ethnic origin of that other person or of any relative or associate of that other person. Section 42 U.S.C. § 1981 of Airline Deregulation Act: …prohibits any air carrier from subjecting persons in air transportation to discrimination on basis of race, color, national origin, sex, or ancestry *See* Oliver v. Joint Logistics Managers, Inc., 893 F.3d 408, 411 (7th Cir. 2018) ("Section 1981 of the Civil Rights Act of 1866 'protects the right of all persons to make and

enforce contracts regardless of race,'" Carter v. Chi. State Univ., 778 F.3d 651, 657 (7th Cir. 2015) (quoting in part 42 U.S.C. § 1981(a)).

**FACTS:**

1.  On 13 June 2023 I arrived at the Philadelphia Airport to catch my flight from Philadelphia, connecting through Orlando, FL, and to my final destination, St. Louis, Missouri on Flight 1171 and 1211. I had traveled to Philadelphia to attend a funeral of a close family friend, and loved one.

2. My fight to St. Louis was to reunite with my minor daughter who was missing me tremendously, my husband, and, my recently born Grandson, Jonah who I had yet to meet.

3. I checked into my flight online and had no bags other than a small backpack that fits comfortably under my seat. I arrived at Gate 6A well before the flight departure time, and waited to start the boarding process. As the time drew near to boarding, the Frontier Agents on duty, of which there were three, announced that the flight was overbooked by approximately 10 passengers. The lead agent, Mr. Tyron or Tyrone, announced that volunteers will be given a refund of their flight, a new flight. Subsequently the agent then announced that they would compensate volunteers $800.00 in addition to the flight refund and rebooking. Once again, there were no volunteers.

4. Subsequently, the boarding process started by zone number which is common practice. I approached the agent when my zone was called and provided my ID Card and Boarding Pass. I had not yet been assigned a seat, and my boarding pass stated "Seat: TBD (To Be Determined)". The agent then directed me to the back of the line because they were boarding passengers with assigned seats only. I requested a seat assignment and again was told I needed to wait until after the boarding process. There was a cluster of people and no real line, so I inquired from a group of passengers whether they were also waiting for a seat assignment. They responded in the affirmative. We started talking about our travel plans, and the African American family of about 8 to 10 people were traveling to Orlando as their final destination. Most of the party did not have assigned seating and we shared our frustrations with each other. The passengers were or

2

appeared to be African American passengers, based on their physical characteristics. Similarly, the Frontier agents on duty were or appeared to be African American, based once again on my observation.

5. Among the people waiting for seat assignments were approximately six passengers, who either were or appeared to be Hispanic, one male passenger, who was or appeared to be White, and a gentleman who was or appeared to part of African American. Additionally, there was an apparent Asian woman traveling with a child, accompanied by a white female.

6. After all passengers with seat assignments boarded, the Frontier agent asked the party of three, with the child passenger, if one of the adults would give up their seat. The child and the adult Asian female passenger were given seats and allowed to board. Next, the lead Frontier Agent, Tyron(e) came out from behind the Frontier Counter and approached the party of 8-10 African American passengers and ushered them on board. One of the young women I was speaking to looked at me in a knowing manner as she boarded because we conversed on our travel plans, and, the possibility we may not make the flight. Additionally, she was in close enough proximity to hear the Frontier agents yell at me and their treatment of me, and the other passengers who were asked to remain seated. Like me, her group did not have a seat assignment. The Courts have recognized that racial profiling is a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

7. Once all the African American passengers were boarded, the agents resumed their position behind the Frontier counter. I once again approached the agents to inquire about my seat assignment, and hoped to explain and impress upon the agents that my flight was a connecting flight, and that there were no other alternative / feasible flights for my schedule for at least a week. Rather than permit me to speak, one of the agents, a young African American female, with long blonde braids, kept interrupting me saying 'have a seat' 'have a seat' and kept saying about 25 more times. She spoke at me in a loud voice as she stared right at me in a rude and very unprofessional manner. I continued to speak in between her chants, so she changed her tune to 'I can hear you' 'I can hear you' she parroted them for some time without allowing me to get a word in. 8. Of the passengers left without seats, none were African American, except the possible mixed race gentleman I mentioned previously. The lead agent called that individual to the front

of the line, and provided him alone with some information which I could not hear. I did not have a phone with me, and before leaving I asked the young man to use his phone to call a taxi, and he kindly obliged. After a few minutes the gentleman left the gate and went on his way. The rest of the passengers, approximately 5 Hispanic / Spanish Speaking passengers, two of Indian descent, myself being one, and one white male were told to have a seat and wait our turn.

8. At no time did the Agents inform us of the status of the flight, and the monitor continued to say 'Delayed'. In fact the plane had already departed, but as the passengers were unaware of this we were under the impression that they would call us soon for seats. 10. 30 minutes after the flight departed, the Agents finally updated the to 'Departed'. There was a moment of quiet desperation and then everyone stated making their way towards the Frontier counter. A number of the passengers could not speak English, but they were clearly asking for updates and for assistance on getting to their respective destination. The Agents became irate and told everyone to sit down in a very loud voice. The Indian female passenger asked me if I knew what was going on. I told her I did not and so she approached the counter to speak with the lead agent. I was standing within arm's length of her and the lead agent began yelling at her in what sounded like a mocking Indian accent and while pointing to each passenger in front of him asked her 'do you think you are more important than her, him, her.....etc'. The young woman was clearly distraught and told the agent she was traveling on an international flight with a connecting flight to Orlando then onto St. Louis. She was soft spoken and the lead agent kept on speaking in a raised and very unprofessional manner. Like me, her request was met with more instructions to 'sit down' again in a commanding and extremely disrespectful manner'.

9. Among the left passengers, one male Hispanic passenger, who spoke limited English asked what he was supposed to do. The agent gave him a meal voucher and told him to return the following day and they would try to get him on a flight. He became irate and said, that is what you told me yesterday. He inquired whether tomorrow's flight was similarly overbooked, and the agents looked up the flight, and told him yes it was. He then told the agent he wanted a refund and that he would not come back the following day because the same thing would likely happen, for the third time.

10. Sometime later, the lead agent asked everyone for their name, email, and, phone number so

4

that he can process refunds and compensation. He stated that we would all receive $400.00 plus the cost of our ticket. The two female attendants were supposed to process this for each passenger, but when I went to them they only offered to refund my flight or rebook my flight.

11. I attempted to inform the remaining agents was the lead agent said, and asked that they could kindly get clarification from him. They refused to listen and instead insisted that they already heard what he said and that I could only elect to receive a refund OR a new flight. One female agent was handing out a card with the link to Frontier's refund, with no other information or saying anything to anyone. She was very nonchalant and appeared to be bored.

12. I again asked the lead agent to clarify for the benefit of everyone, particularly because it was very apparent that the other passengers, with the exception of the white male and myself, had little command of English. The lead Frontier Agent then mumbled softly to the point I had to tilt my head into his personal space to hear him and he reiterated that we should receive compensation AND a refund of our flight, because as he stated 'we were inconvenienced', along with a rebooked flight. 16. Shortly after the Lead Agent left the counter and walked away. There were three agents left at the counter. One male, a Mr. Rivera, and, two females including the young woman with the long blonde braids. I took a seat along with the other passengers and waited for approximately an hour. 17. I returned to the Counter and asked the remaining agents whether the Mr. Tyrone, the lead agent, was going to return with a check or money disbursement, and whether I am required to still wait at the gate. They advised me that he was not going to return and that I will receive an email with my refund information. 18. I therefore left the gate area and exited the Airport. I observed that there was only one passenger left waiting at the gate, the other young woman of Indian descent. She asked me to stay with her and appeared to still be distraught because of the male agent's treatment of her earlier on. Unfortunately, I could not because I did not have a phone and needed to wait outside for my ride back to my hotel.

13. The following day, I booked a flight with American Airlines taking me to Destin Florida, my home. I had no choice because there were no flights to St. Louis for at least another week with Frontier Airlines. As a result, I incurred costs associated with returning home rather than visiting St. Louis. Additionally, I had no choice but to cancel my flight from St. Louis was for my

daughter and me. In total I lost approximately $1000.00 in flights, but more importantly lost the opportunity to attend my grandson's birth announcement and family reunion in his honor. 20. Subsequent to this incident, I filed two complaints with Frontier Airlines both of which were met with disregard and insistence that I was already refunded my flight. This is wholly untrue as I have not accepted nor received any money or compensation of any kind from Frontier Airlines. I have also filed a complaint with the Department of Transportation as that body is tasked with regulating instances of racial discrimination by Airlines.

14. Frontier Airlines, by its Agents, under a theory of Agency Liability, did racially discriminate against me based on my race through racial profiling. Under a theory of Agency Liability, a complaint must demonstrate that the Agents had authority to act on behalf of the Principal. In the instant case, the Frontier Agents wore Frontier uniforms, and stood at the Frontier counter. They were in charge of boarding the plane, and had authority to select which passengers to board based on non-discriminatory characteristics. Additionally, the Lead Agent in particular had actual authority to determine value of refund to each passenger / customer. Federal Rule of Civil Procedure 50(b).

15. My flight ticket was a contract with Frontier Airlines that they would transport me from Philadelphia to St. Louis, Missouri on the date and time of my airline ticket, or within the period of my checking in. By checking into my flight, I substantially performed on the contract. Although I did not contract for a specific seat, neither did many other passengers, and, I was still entitled to a seat and transport to my final destination unless I elected for a refund of my ticket which I did not. 3. Frontier Airlines racially discriminated against me when it's Agents racially profiled passengers and excluded me because I was not or appeared to be African American. I am clearly of Indian descent, and, my name on the passenger log, last name 'Amarsingh' is also telling as to my descent. The Frontier agents had the passenger log in front of them during the boarding. In fact, at one point, the lead agent called out my last name and the last name of the other Indian passenger who's appearance, Indian accent, and, her last name was also clearly of Indian descent, Chaudry or similar. He called our names and we both walked to the front desk. He wrote something on the passenger log and asked us to take a seat.

16. Frontier Airline agents degraded me and deliberately humiliated me by yelling at me in a

crowded airport because I was not African American. Absolutely no one deserves to be treated in this manner, especially on the basis of race.  Frontier Airlines is under an obligation to provide airline transportation based on a rule of contract such that perform due diligence and make reasonable accommodations to provide transportation from point A, to point B. Frontier Airlines disregarded the needs of its customers and based their decision on which passengers to assign seats based on race and preferential treatment based on race. As discussed in Facts above, there was another Frontier flight leaving Philadelphia into Orlando scheduled to depart a mere hour later. It therefore stands to reason that passengers with connecting flights, or in the instance of the one Hispanic male who had already been inconvenienced the day before, to take priority in seat assignments. I am a United States Citizen, a United States Army JAG Attorney, and a proud veteran. None of this should matter when traveling. The blatant disrespect, mistreatment, and disregard towards the non-African American passengers is a clear violation of the Civil Rights Act, and Airline Regulations.

17.  ADMINISTRATIVE ACTION – PRIOR TO FILING 1. On or about 15 June 2023, after arriving at my home and having access to my phone and computer, I contacted Frontier Airlines via their online chat service, and by email. I do not have a copy of the chat, however, I have attached a copy of the email exchange between me and Frontier. Frontier insisted that I received compensation at the Airport, which is wholly untrue. I intend on requesting the chats with Frontier during discovery. On the same day, I completed the online complaint form on the Department of Transportation website stating the facts as presented here, and requested their assistance. I do not have a copy of this document; however, I will request it in discovery.

E. REQUEST FOR RELIEF

**REQUEST FOR RELIEF:**

1.  In addition to the discovery stated above, I intend on requesting the release of the names and contact information of all passengers left behind on flight 1171 Philadelphia to Orlando, on 13 June 2023.

2.  I request compensation in the amount of $50 million dollars should I be granted summary judgement. Should this case go to trial, I request $100 million dollars for fees, expenses, and, emotional distress caused by Frontier Airlines and its agents. I request discovery in this case, of all complaints filed against Frontier Airlines on the basis of race, or, any other discriminatory practice in violation of the laws cited above. I also request discovery into the facts and circumstances of all passengers left behind on the flight, their contact information, their names, and, addresses. I request a jury in this case. The facts presented here are irrefutable and discovery by Frontier of the passenger log, their tickets, in relation to the passengers left behind, will demonstrate in no uncertain terms that this case warrants summary judgement for the Plaintiff.

3. The relief sought here is reasonable for the harm caused, and, to send a clear message to Frontier and all airlines that they must ensure equal treatment of all passengers. As the facts are clear on its face, I request summary judgment.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01875-SBP

KUSMIN L. AMARSINGH,

      Plaintiff,

v.

FRONTIER AIRLINES,

      Defendant.

---

## MINUTE ORDER

---

ORDER ENTERED BY MAGISTRATE JUDGE SUSAN PROSE

      Plaintiff's second amended Complaint (ECF No. 8) filed August 8, 2023, is not signed. Pursuant to Rule 11(a) of the Federal Rules of Civil Procedure, "[e]very pleading, written motion, and other paper must be signed" and "[t]he court must strike an unsigned paper unless the omission is promptly corrected after being called to the . . . party' s attention." Fed. R. Civ. P. 11(a). Plaintiff is directed to cure this deficiency on or before **September 1, 2023**, by submitting on the proper form an amended pleading that is signed.

Dated:   August 9, 2023

---

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
1:25 pm, Aug 10, 2023
**JEFFREY P. COLWELL, CLERK**

Civil Action No. _____1:2023cv01875_____

(To be supplied by the court)

_Kusmin L. Amarsingh_____, Plaintiff

v.

**Jury Trial requested:**
(please check one)
**_X__ Yes ___ No**

_Frontier Airlines, Inc._____, Defendant

*(List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names of the defendants listed in the above caption must be identical to those contained in Section B. Do not include addresses here.)*

---

## COMPLAINT

---

| NOTICE |
|---|
| Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. **Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.** |

## A.    PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

_Kusmin L. Amarsingh, 5 Magnolia Drive, Mary Esther, FL 32569_____

(Name and complete mailing address)

862-201-1305;  lindaamarsingh@gmail.com
(Telephone number and e-mail address)

**B.    DEFENDANT(S) INFORMATION**

*Please list the following information for each defendant listed in the caption of the complaint.  If more space is needed, use extra paper to provide the information requested.  The additional pages regarding defendants should be labeled "B.  DEFENDANT(S) INFORMATION."*

Defendant 1:    Frontier Airlines, 4545 Airport Way, Denver, CO 80239
(Name and complete mailing address)

(801) 401-9021.
(Telephone number and e-mail address if known)

**C.    JURISDICTION**

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

__x__    Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case.

The Racial Discrimination Act of 1975, as embodied in the Equal Protection Clause, of the 14th Amendment, to the Consitution of the United States of America

__x__    Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

Plaintiff is a citizen of the State of ___Florida_____.

If Defendant 1 is an individual, Defendant 1 is a citizen of _____.

If Defendant 1 is a corporation,

Defendant 1 is incorporated under the laws of _____Colorado_____ (name of state or foreign nation).

Defendant 1 has its principal place of business in _____Colorado_____ (name of state or foreign nation).

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

## D.   STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue this claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

● The Statement of Claims are described in the attached, Statement of Claims.

## E.   REQUEST FOR RELIEF

*State the relief you are requesting or what you want the court to do. If additional space is needed to identify the relief you are requesting, use extra paper to request relief. Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

● The Request for relief is described in the attached, Request for Relief.

## F.   PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified,

will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

*Kusmin L. Amarsingh*

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
 (Plaintiff's signature)


10 August 2023

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
 (Date)



(Revised February 2022)

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-01875-SBP

KUSMIN L. AMARSINGH,

      Plaintiff,

v.

FRONTIER AIRLINES,

      Defendant.

---

**MINUTE ORDER**

---

ORDER ENTERED BY MAGISTRATE JUDGE SUSAN PROSE

      This matter is before the Court on the amended pleading (ECF No. 11) filed by Plaintiff on August 10, 2023. The amended pleading (ECF No. 11) does not include a Statement of Claims or Request for Relief. Although Plaintiff indicates a Statement of Claims and Request for Relief are attached, there are no attachments. Plaintiff is directed to cure this deficiency on or before **September 1, 2023**, by submitting on the proper form an amended pleading that is signed and that includes a statement of the claims she is asserting as well as a request for relief.

Dated:   August 14, 2023

---

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO
08/14/2023
JEFFREY P. COLWELL, CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.      1:2023cv01875
(To be supplied by the court)

Kusmin L. Amarsingh                              , Plaintiff

v.                                                **Jury Trial requested:**
                                                  **(please check one)**
                                                  **_X__ Yes ___ No**

 Frontier Airlines, Inc.                         , Defendant

*(List each named defendant on a separate line.  If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names.  The names of the defendants listed in the above caption must be identical to those contained in Section B.  Do not include addresses here.)*

---

## COMPLAINT

---

| NOTICE |
|---|
| Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files.  Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number.  A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. <br><br> **Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.** |

## A.      PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address.  Failure to keep a current address on file with the court may result in dismissal of your case.*

 Kusmin L. Amarsingh, 5 Magnolia Drive, Mary Esther, FL 32569
  (Name and complete mailing address)

862-201-1305;  lindaamarsingh@gmail.com
(Telephone number and e-mail address)

## B.   DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint.  If more space is needed, use extra paper to provide the information requested.  The additional pages regarding defendants should be labeled "B.  DEFENDANT(S) INFORMATION."*

Defendant 1:   Frontier Airlines, 4545 Airport Way, Denver, CO 80239
                         (Name and complete mailing address)

                        (801) 401-9021.
                         (Telephone number and e-mail address if known)

## C.   JURISDICTION

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

___x___  Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case.

  The Racial Discrimination Act of 1975, as embodied in the Equal Protection Clause, of the 14th Amendment, to the Consitution to the United States of America

___x___  Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

Plaintiff is a citizen of the State of ____Florida_____.

If Defendant 1 is an individual, Defendant 1 is a citizen of _____.

If Defendant 1 is a corporation,

Defendant 1 is incorporated under the laws of ____Colorado_____ (name of state or foreign nation).

Defendant 1 has its principal place of business in _____Colorado_____ (name of state or foreign nation).

2

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

## D. STATEMENT OF CLAIM(S): SEE ATTACHMENT

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

● The Statement of Claims are described in the attached, Statement of Claims.

## E. REQUEST FOR RELIEF: SEE ATTACHMENT

*State the relief you are requesting or what you want the court to do. If additional space is needed to identify the relief you are requesting, use extra paper to request relief. Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

● The Request for relief is described in the attached, Request for Relief.

## F.    PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

_____
  (Plaintiff's signature)


_____
  (Date)

3

4

D. STATEMENT OF CLAIMS

**STATEMENT OF CLAIMS:**

1)   CLAIM 1:  Frontier Airlines breached their contract with me by failing to provide fair and reasonable transport on an aircraft after I had substantially performed on said contract. Frontier also breached their covenant of good faith and fair dealing, and failed to fulfill reasonable expectations, arising out of Frontier's failure to refund my full ticket prices for unused tickets, and, by failing to accommodate my more difficult travels plans ahead of passengers with a direct flight, particularly since there was another direct flight from Philadelphia to Orlando about an hour later.  My flight on the other hand, went from Philadelphia to Orlando to St. Louis.  Frontier did not have an available connecting or other flight that would accommodate my travel plans for at least a week.

2) CLAIM 2:  Frontier discriminated against me based on my race by racial profiling, in violation of: The Racial Discrimination Act of 1975: (1) It is unlawful for a person to do any act involving a distinction, exclusion, restriction or preference based on race, color, descent or national or ethnic origin which has the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise, on an equal footing, of any human right or fundamental freedom in the political, economic, social, cultural or any other field of public life. § 11 Access to places and facilities It is unlawful for a person: (a) to refuse to allow another person access to or use of any place or vehicle that members of the public are, or a section of the public is, entitled or allowed to enter or use, or to refuse to allow another person access to or use of any such place or vehicle except on less favourable terms or conditions than those upon or subject to which he or she would otherwise allow access to or use of that place or vehicle; (b) to refuse to allow another person use of any facilities in any such place or vehicle that are available to members of the public or to a section of the public, or to refuse to allow another person use of any such facilities except on less favourable terms or conditions than those upon or subject to which he or she would otherwise allow use of those facilities; or (c) to require another person to leave or cease to use any such place or vehicle or any such facilities; by reason of the race, colour or national or ethnic origin of that other person or of any relative or associate of that other person. Section 42 U.S.C. § 1981 of Airline Deregulation Act: …prohibits any air carrier from subjecting persons in air transportation to discrimination on basis of race, color, national origin, sex, or ancestry *See* Oliver v. Joint Logistics Managers, Inc., 893 F.3d 408, 411 (7th Cir. 2018)

("Section 1981 of the Civil Rights Act of 1866 'protects the right of all persons to make and enforce contracts regardless of race,'" Carter v. Chi. State Univ., 778 F.3d 651, 657 (7th Cir. 2015) (quoting in part 42 U.S.C. § 1981(a)).

**FACTS:**

1.  On 13 June 2023 I arrived at the Philadelphia Airport to catch my flight from Philadelphia, connecting through Orlando, FL, and to my final destination, St. Louis, Missouri on Flight 1171 and 1211. I had traveled to Philadelphia to attend a funeral of a close family friend, and loved one.

2. My fight to St. Louis was to reunite with my minor daughter who was missing me tremendously, my husband, and, my recently born Grandson, Jonah who I had yet to meet.

3. I checked into my flight online and had no bags other than a small backpack that fits comfortably under my seat. I arrived at Gate 6A well before the flight departure time, and waited to start the boarding process. As the time drew near to boarding, the Frontier Agents on duty, of which there were three, announced that the flight was overbooked by approximately 10 passengers. The lead agent, Mr. Tyron or Tyrone, announced that volunteers will be given a refund of their flight, a new flight. Subsequently the agent then announced that they would compensate volunteers $800.00 in addition to the flight refund and rebooking. Once again, there were no volunteers.

4. Subsequently, the boarding process started by zone number which is common practice. I approached the agent when my zone was called and provided my ID Card and Boarding Pass. I had not yet been assigned a seat, and my boarding pass stated "Seat: TBD (To Be Determined)". The agent then directed me to the back of the line because they were boarding passengers with assigned seats only. I requested a seat assignment and again was told I needed to wait until after the boarding process. There was a cluster of people and no real line, so I inquired from a group of passengers whether they were also waiting for a seat assignment. They responded in the affirmative. We started talking about our travel plans, and the African American family of about

2

8 to 10 people were traveling to Orlando as their final destination. Most of the party did not have assigned seating and we shared our frustrations with each other. The passengers were or appeared to be African American passengers, based on their physical characteristics. Similarly, the Frontier agents on duty were or appeared to be African American, based once again on my observation.

5. Among the people waiting for seat assignments were approximately six passengers, who either were or appeared to be Hispanic, one male passenger, who was or appeared to be White, and a gentleman who was or appeared to part of African American. Additionally, there was an apparent Asian woman traveling with a child, accompanied by a white female.

6. After all passengers with seat assignments boarded, the Frontier agent asked the party of three, with the child passenger, if one of the adults would give up their seat. The child and the adult Asian female passenger were given seats and allowed to board. Next, the lead Frontier Agent, Tyron(e) came out from behind the Frontier Counter and approached the party of 8-10 African American passengers and ushered them on board. One of the young women I was speaking to looked at me in a knowing manner as she boarded because we conversed on our travel plans, and, the possibility we may not make the flight. Additionally, she was in close enough proximity to hear the Frontier agents yell at me and their treatment of me, and the other passengers who were asked to remain seated. Like me, her group did not have a seat assignment. The Courts have recognized that racial profiling is a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

7. Once all the African American passengers were boarded, the agents resumed their position behind the Frontier counter. I once again approached the agents to inquire about my seat assignment, and hoped to explain and impress upon the agents that my flight was a connecting flight, and that there were no other alternative / feasible flights for my schedule for at least a week. Rather than permit me to speak, one of the agents, a young African American female, with long blonde braids, kept interrupting me saying 'have a seat' 'have a seat' and kept saying about 25 more times. She spoke at me in a loud voice as she stared right at me in a rude and very unprofessional manner. I continued to speak in between her chants, so she changed her tune to 'I

3

Case 1:23-cv-01875-GPG-KAS     Document 13-1     Filed 08/14/23     Page 4 of 7
Appellate Case: 24-1391     Document: 10-1     Date Filed: 11/06/2024     Page: 54

can hear you' 'I can hear you' she parroted them for some time without allowing me to get a word in. 8. Of the passengers left without seats, none were African American, except the possible mixed race gentleman I mentioned previously. The lead agent called that individual to the front of the line, and provided him alone with some information which I could not hear. I did not have a phone with me, and before leaving I asked the young man to use his phone to call a taxi, and he kindly obliged. After a few minutes the gentleman left the gate and went on his way. The rest of the passengers, approximately 5 Hispanic / Spanish Speaking passengers, two of Indian descent, myself being one, and one white male were told to have a seat and wait our turn.

8. At no time did the Agents inform us of the status of the flight, and the monitor continued to say 'Delayed'. In fact the plane had already departed, but as the passengers were unaware of this we were under the impression that they would call us soon for seats. 10. 30 minutes after the flight departed, the Agents finally updated the to 'Departed'. There was a moment of quiet desperation and then everyone stated making their way towards the Frontier counter. A number of the passengers could not speak English, but they were clearly asking for updates and for assistance on getting to their respective destination. The Agents became irate and told everyone to sit down in a very loud voice. The Indian female passenger asked me if I knew what was going on. I told her I did not and so she approached the counter to speak with the lead agent. I was standing within arm's length of her and the lead agent began yelling at her in what sounded like a mocking Indian accent and while pointing to each passenger in front of him asked her 'do you think you are more important than her, him, her.....etc'. The young woman was clearly distraught and told the agent she was traveling on an international flight with a connecting flight to Orlando then onto St. Louis. She was soft spoken and the lead agent kept on speaking in a raised and very unprofessional manner. Like me, her request was met with more instructions to 'sit down' again in a commanding and extremely disrespectful manner'.

9. Among the left passengers, one male Hispanic passenger, who spoke limited English asked what he was supposed to do. The agent gave him a meal voucher and told him to return the following day and they would try to get him on a flight. He became irate and said, that is what you told me yesterday. He inquired whether tomorrow's flight was similarly overbooked, and the agents looked up the flight, and told him yes it was. He then told the agent he wanted a refund

4

and that he would not come back the following day because the same thing would likely happen, for the third time.

10. Sometime later, the lead agent asked everyone for their name, email, and, phone number so that he can process refunds and compensation. He stated that we would all receive $400.00 plus the cost of our ticket. The two female attendants were supposed to process this for each passenger, but when I went to them they only offered to refund my flight or rebook my flight.

11. I attempted to inform the remaining agents was the lead agent said, and asked that they could kindly get clarification from him. They refused to listen and instead insisted that they already heard what he said and that I could only elect to receive a refund OR a new flight. One female agent was handing out a card with the link to Frontier's refund, with no other information or saying anything to anyone. She was very nonchalant and appeared to be bored.

12. I again asked the lead agent to clarify for the benefit of everyone, particularly because it was very apparent that the other passengers, with the exception of the white male and myself, had little command of English. The lead Frontier Agent then mumbled softly to the point I had to tilt my head into his personal space to hear him and he reiterated that we should receive compensation AND a refund of our flight, because as he stated 'we were inconvenienced', along with a rebooked flight. 16. Shortly after the Lead Agent left the counter and walked away. There were three agents left at the counter. One male, a Mr. Rivera, and, two females including the young woman with the long blonde braids. I took a seat along with the other passengers and waited for approximately an hour. 17. I returned to the Counter and asked the remaining agents whether the Mr. Tyrone, the lead agent, was going to return with a check or money disbursement, and whether I am required to still wait at the gate. They advised me that he was not going to return and that I will receive an email with my refund information. 18. I therefore left the gate area and exited the Airport. I observed that there was only one passenger left waiting at the gate, the other young woman of Indian descent. She asked me to stay with her and appeared to still be distraught because of the male agent's treatment of her earlier on. Unfortunately, I could not because I did not have a phone and needed to wait outside for my ride back to my hotel.

13. The following day, I booked a flight with American Airlines taking me to Destin Florida, my home. I had no choice because there were no flights to St. Louis for at least another week with Frontier Airlines. As a result, I incurred costs associated with returning home rather than visiting St. Louis. Additionally, I had no choice but to cancel my flight from St. Louis was for my daughter and me. In total I lost approximately $1000.00 in flights, but more importantly lost the opportunity to attend my grandson's birth announcement and family reunion in his honor. 20. Subsequent to this incident, I filed two complaints with Frontier Airlines both of which were met with disregard and insistence that I was already refunded my flight. This is wholly untrue as I have not accepted nor received any money or compensation of any kind from Frontier Airlines. I have also filed a complaint with the Department of Transportation as that body is tasked with regulating instances of racial discrimination by Airlines.

14. Frontier Airlines, by its Agents, under a theory of Agency Liability, did racially discriminate against me based on my race through racial profiling. Under a theory of Agency Liability, a complaint must demonstrate that the Agents had authority to act on behalf of the Principal. In the instant case, the Frontier Agents wore Frontier uniforms, and stood at the Frontier counter. They were in charge of boarding the plane, and had authority to select which passengers to board based on non-discriminatory characteristics. Additionally, the Lead Agent in particular had actual authority to determine value of refund to each passenger / customer. Federal Rule of Civil Procedure 50(b).

15. My flight ticket was a contract with Frontier Airlines that they would transport me from Philadelphia to St. Louis, Missouri on the date and time of my airline ticket, or within the period of my checking in. By checking into my flight, I substantially performed on the contract. Although I did not contract for a specific seat, neither did many other passengers, and, I was still entitled to a seat and transport to my final destination unless I elected for a refund of my ticket which I did not. 3. Frontier Airlines racially discriminated against me when it's Agents racially profiled passengers and excluded me because I was not or appeared to be African American. I am clearly of Indian descent, and, my name on the passenger log, last name 'Amarsingh' is also telling as to my descent. The Frontier agents had the passenger log in front of them during the

Case 1:23-cv-01875-GPG-KAS    Document 13-1    Filed 08/14/23    Page 7 of 7

Appellate Case: 24-1391    Document: 10-1    Date Filed: 11/06/2024    Page: 57

boarding. In fact, at one point, the lead agent called out my last name and the last name of the other Indian passenger who's appearance, Indian accent, and, her last name was also clearly of Indian descent, Chaudry or similar. He called our names and we both walked to the front desk. He wrote something on the passenger log and asked us to take a seat.

16. Frontier Airline agents degraded me and deliberately humiliated me by yelling at me in a crowded airport because I was not African American. Absolutely no one deserves to be treated in this manner, especially on the basis of race. Frontier Airlines is under an obligation to provide airline transportation based on a rule of contract such that perform due diligence and make reasonable accommodations to provide transportation from point A, to point B. Frontier Airlines disregarded the needs of its customers and based their decision on which passengers to assign seats based on race and preferential treatment based on race. As discussed in Facts above, there was another Frontier flight leaving Philadelphia into Orlando scheduled to depart a mere hour later. It therefore stands to reason that passengers with connecting flights, or in the instance of the one Hispanic male who had already been inconvenienced the day before, to take priority in seat assignments. I am a United States Citizen, a United States Army JAG Attorney, and a proud veteran. None of this should matter when traveling. The blatant disrespect, mistreatment, and disregard towards the non-African American passengers is a clear violation of the Civil Rights Act, and Airline Regulations.

17. ADMINISTRATIVE ACTION – PRIOR TO FILING 1. On or about 15 June 2023, after arriving at my home and having access to my phone and computer, I contacted Frontier Airlines via their online chat service, and by email. I do not have a copy of the chat, however, I have attached a copy of the email exchange between me and Frontier. Frontier insisted that I received compensation at the Airport, which is wholly untrue. I intend on requesting the chats with Frontier during discovery. On the same day, I completed the online complaint form on the Department of Transportation website stating the facts as presented here, and requested their assistance. I do not have a copy of this document; however, I will request it in discovery.

7

57

E. REQUEST FOR RELIEF

**REQUEST FOR RELIEF:**

1.  In addition to the discovery stated above, I intend on requesting the release of the names and contact information of all passengers left behind on flight 1171 Philadelphia to Orlando, on 13 June 2023.

2.  I request compensation in the amount of $50 million dollars should I be granted summary judgement. Should this case go to trial, I request $100 million dollars for fees, expenses, and, emotional distress caused by Frontier Airlines and its agents. I request discovery in this case, of all complaints filed against Frontier Airlines on the basis of race, or, any other discriminatory practice in violation of the laws cited above. I also request discovery into the facts and circumstances of all passengers left behind on the flight, their contact information, their names, and, addresses. I request a jury in this case. The facts presented here are irrefutable and discovery by Frontier of the passenger log, their tickets, in relation to the passengers left behind, will demonstrate in no uncertain terms that this case warrants summary judgement for the Plaintiff.

3. The relief sought here is reasonable for the harm caused, and, to send a clear message to Frontier and all airlines that they must ensure equal treatment of all passengers. As the facts are clear on its face, I request summary judgment.

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
08/14/2023
JEFFREY P. COLWELL, CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.        1:2023cv01875

Kusmin L. Amarsingh                                      , Plaintiff

v.                                                      **Jury Trial requested:**
                                                        **(please check one)**
                                                        **_X__ Yes ___ No**

 Frontier Airlines, Inc.                                , Defendant

*(List each named defendant on a separate line.  If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names.  The names of the defendants listed in the above caption must be identical to those contained in Section B.  Do not include addresses here.)*

---

## COMPLAINT

---

| NOTICE |
|---|
| Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files.  Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number.  A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.<br><br>**Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.** |

## A.    PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address.  Failure to keep a current address on file with the court may result in dismissal of your case.*

 Kusmin L. Amarsingh, 5 Magnolia Drive, Mary Esther, FL 32569
  (Name and complete mailing address)

862-201-1305;  lindaamarsingh@gmail.com
(Telephone number and e-mail address)

**B.      DEFENDANT(S) INFORMATION**

*Please list the following information for each defendant listed in the caption of the complaint.  If more space is needed, use extra paper to provide the information requested.  The additional pages regarding defendants should be labeled "B.  DEFENDANT(S) INFORMATION."*

Defendant 1:    Frontier Airlines, 4545 Airport Way, Denver, CO 80239
                            (Name and complete mailing address)

                         801-401-9021.
                            (Telephone number and e-mail address if known)

**C.      JURISDICTION**

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

___x___  Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

          List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case.

           The Racial Discrimination Act of 1975, as embodied in the Equal Protection Clause, of the 14th Amendment, to the Consitution of the United States of America

___x___  Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

          Plaintiff is a citizen of the State of ____Florida_____.

          If Defendant 1 is an individual, Defendant 1 is a citizen of _____.

          If Defendant 1 is a corporation,

          Defendant 1 is incorporated under the laws of ____Colorado_____ (name of state or foreign nation).

          Defendant 1 has its principal place of business in _____Colorado_____ (name of state or foreign nation).

2

(*If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.*)

## D. STATEMENT OF CLAIM(S):

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

1) CLAIM 1: Frontier Airlines breached their contract with me by failing to provide fair and reasonable transport on an aircraft after I had substantially performed on said contract. Frontier also breached their covenant of good faith and fair dealing, and failed to fulfill reasonable expectations, arising out of Frontier's failure to refund my full ticket prices for unused tickets, and, by failing to accommodate my more difficult travels plans ahead of passengers with a direct flight, particularly since there was another direct flight from Philadelphia to Orlando about an Hour after my flight. My flight on the other hand, went from Philadelphia to Orlando to St. Louis. Frontier did not have an available connecting or other flight that would accommodate my travel plans for at least a week.

2) CLAIM 2: Frontier discriminated against me based on my race by racial profiling, in violation of: The Racial Discrimination Act of 1975: (1) It is unlawful for a person to do any act involving a distinction, exclusion, restriction or preference based on race, color, descent or national or ethnic origin which has the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise, on an equal footing, of any human right or fundamental freedom in the political, economic, social, cultural or any other field of public life. § 11 Access to places and facilities It is unlawful for a person: (a) to refuse to allow another person access to or use of any place or vehicle that members of the public are, or a section of the public is, entitled or allowed to enter or use, or to refuse to allow another person access to or use of any such place or vehicle except on less favourable terms or conditions than those upon or subject to which he or she would otherwise allow access to or use of that place or vehicle; (b) to refuse to

3

allow another person use of any facilities in any such place or vehicle that are available to members of the public or to a section of the public, or to refuse to allow another person use of any such facilities except on less favourable terms or conditions than those upon or subject to which he or she would otherwise allow use of those facilities; or (c) to require another person to leave or cease to use any such place or vehicle or any such facilities; by reason of the race, colour or national or ethnic origin of that other person or of any relative or associate of that other person. Section 42 U.S.C. § 1981 of Airline Deregulation Act: …prohibits any air carrier from subjecting persons in air transportation to discrimination on basis of race, color, national origin, sex, or ancestry See Oliver v. Joint Logistics Managers, Inc., 893 F.3d 408, 411 (7th Cir. 2018). Section 1981 of the Civil Rights Act of 1866; protects the right of all persons to make and enforce contracts regardless of race" Carter v. Chi. State Univ., 778 F.3d 651, 657 (7th Cir. 2015) (quoting in part 42 U.S.C. § 1981(a)).

FACTS:

1. On 13 June 2023 I arrived at the Philadelphia Airport to catch my flight from Philadelphia, connecting through Orlando, FL, and to my final destination, St. Louis, Missouri on Flight 1171 and 1211. I had traveled to Philadelphia to attend a funeral of a close family friend, and loved one.

2. My fight to St. Louis was to reunite with my minor daughter who was missing me tremendously, my husband, and, my recently born Grandson, Jonah who I had yet to meet.

3. I checked into my flight online and had no bags other than a small backpack that fits comfortably under my seat. I arrived at Gate 6A well before the flight departure time, and waited to start the boarding process. As the time drew near to boarding, the Frontier Agents on duty, of which there were three, announced that the flight was overbooked by approximately 10 passengers. The lead agent, Mr. Tyron or Tyrone, announced that volunteers will be given a refund of their flight, a new flight. Subsequently the agent then announced that they would compensate volunteers $800.00 in addition to the flight refund and rebooking. Once again, there were no volunteers.

4

4. Subsequently, the boarding process started by zone number which is common practice. I approached the agent when my zone was called and provided my ID Card and Boarding Pass. I had not yet been assigned a seat, and my boarding pass stated &quot;Seat: TBD (To Be Determined).

5.  The agent then directed me to the back of the line because they were boarding passengers with assigned seats only. I requested a seat assignment and again was told I needed to wait until after the boarding process. There was a cluster of people and no real line, so I inquired from a group of passengers whether they were also waiting for a seat assignment. They responded in the affirmative. We started talking about our travel plans, and the African American family of about 8 to 10 people were traveling to Orlando as their final destination. Most of the party did not have assigned seating and we shared our frustrations with each other. The passengers were or appeared to be African American passengers, based on their physical characteristics. Similarly, the Frontier agents on duty were or appeared to be African American, based once again on my observation.

6. Among the people waiting for seat assignments were approximately six passengers, who either were or appeared to be Hispanic, one male passenger, who was or appeared to be White, and a gentleman who was or appeared to part of African American. Additionally, there was an apparent Asian woman traveling with a child, accompanied by a white female.

7. After all passengers with seat assignments boarded, the Frontier agent asked the party of three, with the child passenger, if one of the adults would give up their seat. The child and the adult Asian female passenger were given seats and allowed to board. Next, the lead Frontier Agent, Tyron(e) came out from behind the Frontier Counter and approached the party of 8-10 African American passengers and ushered them on board. One of the young women I was speaking to looked at me in a knowing manner as she boarded because we conversed on our travel plans, and, the possibility we may not make the flight. Additionally, she was in close enough proximity to hear the Frontier agents yell at me and their treatment of me, and the other passengers who were asked to remain seated. Like me, her group did not have a seat assignment. The Courts have

5

recognized that racial profiling is a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

8. Once all the African American passengers were boarded, the agents resumed their position behind the Frontier counter. I once again approached the agents to inquire about my seat assignment, and hoped to explain and impress upon the agents that my flight was a connecting flight, and that there were no other alternative / feasible flights for my schedule for at least a week. Rather than permit me to speak, one of the agents, a young African American female, with long blonde braids, kept interrupting me saying &#39;have a seat&#39; &#39;have a seat&#39; and kept saying about 25 more times. She spoke at me in a loud voice as she stared right at me in a rude and very unprofessional manner. I continued to speak in between her chants, so she changed her tune to 'I can hear you' 'I can hear you' she parroted them for some time without allowing me to get a word in.

9. Of the passengers left without seats, none were African American, except the possible mixed race gentleman I mentioned previously. The lead agent called that individual to the front of the line, and provided him alone with some information which I could not hear. I did not have a phone with me, and before leaving I asked the young man to use his phone to call a taxi, and he kindly obliged. After a few minutes the gentleman left the gate and went on his way. The rest of the passengers, approximately 5 Hispanic / Spanish Speaking passengers, two of Indian descent, myself being one, and one white male were told to have a seat and wait our turn.

10. At no time did the Agents inform us of the status of the flight, and the monitor continued to say. In fact the plane had already departed, but as the passengers were unaware of this we were under the impression that they would call us soon for seats. 10. 30 minutes after the flight departed, the Agents finally updated the monitor to 'Departed'. There was a moment of quiet desperation and then everyone stated making their way towards the Frontier counter. A number of the passengers could not speak English, but they were clearly asking for updates and for assistance on getting to their respective destination. The Agents became irate and told everyone to sit down in a very loud voice. The Indian female passenger asked me if I knew what was going on. I told her I did not and so she approached the counter to speak with the lead agent.

I was standing within arm&#39;s length of her and the lead agent began yelling at her in what sounded like a mocking Indian accent and while pointing to each passenger in front of him asked her do you think you are more important than her, him, her.....etc&#39;. The young woman was clearly distraught and told the agent she was traveling on an international flight with a connecting flight to Orlando then onto St. Louis. She was soft spoken and the lead agent kept on speaking in a raised and very unprofessional manner. Like me, her request was met with more instructions to 'sit down' again in a commanding and extremely disrespectful manner.

11. Among the left passengers, one male Hispanic passenger, who spoke limited English asked what he was supposed to do. The agent gave him a meal voucher and told him to return the following day and they would try to get him on a flight. He became irate and said, that is what you told me yesterday. He inquired whether tomorrow's flight was similarly overbooked, and the agents looked up the flight, and told him yes it was. He then told the agent he wanted a refund and that he would not come back the following day because the same thing would likely happen, for the third time.

12. Sometime later, the lead agent asked everyone for their name, email, and, phone number so that he can process refunds and compensation. He stated that we would all receive $400.00 plus the cost of our ticket. The two female attendants were supposed to process this for each passenger, but when I went to them they only offered to refund my flight or rebook my flight.

13. I attempted to inform the remaining agents was the lead agent said, and asked that they could kindly get clarification from him. They refused to listen and instead insisted that they already heard what he said and that I could only elect to receive a refund OR a new flight. One female agent was handing out a card with the link to Frontier's refund, with no other information or saying anything to anyone. She was very nonchalant and appeared to be bored.

14. I again asked the lead agent to clarify for the benefit of everyone, particularly because it was very apparent that the other passengers, with the exception of the white male and myself, had little command of English. The lead Frontier Agent then mumbled softly to the point I had to tilt my head into his personal space to hear him and he reiterated that we should receive

compensation AND a refund of our flight, because as he stated 'we were inconvenienced', along with a rebooked flight. Shortly after the Lead Agent left the counter and walked away. There were three agents left at the counter. One male, a Mr. Rivera, and, two females including the young woman with the long blonde braids. I took a seat along with the other passengers and waited for approximately an hour.

15. I returned to the Counter and asked the remaining agents whether the Mr. Tyrone, the lead agent, was going to return with a check or money disbursement, and whether I am required to still wait at the gate. They advised me that he was not going to return and that I will receive an email with my refund information. I therefore left the gate area and exited the Airport. I observed that there was only one passenger left waiting at the gate, the other young woman of Indian descent. She asked me to stay with her and appeared to still be distraught because of the male agent's treatment of her earlier on.  Unfortunately, I could not because I did not have a phone and needed to wait outside for my ride back to my hotel.

16. The following day, I booked a flight with American Airlines taking me to Destin Florida, my home. I had no choice because there were no flights to St. Louis for at least another week with Frontier Airlines. As a result, I incurred costs associated with returning home rather than visiting St. Louis. Additionally, I had no choice but to cancel my flight from St. Louis was for my daughter and me. In total I lost approximately $1000.00 in flights, but more importantly lost the opportunity to attend my grandson&#39;s birth announcement and family reunion in his honor.

17. Subsequent to this incident, I filed two complaints with Frontier Airlines both of which were met with disregard and insistence that I was already refunded my flight. This is wholly untrue as I have not accepted nor received any money or compensation of any kind from Frontier Airlines. I have also filed a complaint with the Department of Transportation as that body is tasked with regulating instances of racial discrimination by Airlines

18  Frontier Airlines, by its Agents, under a theory of Agency Liability, did racially discriminate against me based on my race through racial profiling. Under a theory of Agency Liability, a complaint must demonstrate that the Agents had authority to act on behalf of the Principal. In the

8

instant case, the Frontier Agents wore Frontier uniforms, and stood at the Frontier counter. They were in charge of boarding the plane, and had authority to select which passengers to board based on non-discriminatory characteristics. Additionally, the Lead Agent in particular had actual authority to determine value of refund to each passenger / customer. Federal Rule of Civil Procedure 50(b).

19. My flight ticket was a contract with Frontier Airlines that they would transport me from Philadelphia to St. Louis, Missouri on the date and time of my airline ticket, or within the period of my checking in. By checking into my flight, I substantially performed on the contract. Although I did not contract for a specific seat, neither did many other passengers, and, I was still entitled to a seat and transport to my final destination unless I elected for a refund of my ticket which I did not. Frontier Airlines racially discriminated against me when it's Agents racially profiled passengers and excluded me because I was not or appeared to be African American. I am clearly of Indian descent, and, my name on the passenger log, last name 'Amarsingh' is also telling as to my descent. The Frontier agents had the passenger log in front of them during the boarding. In fact, at one point, the lead agent called out my last name and the last name of the other Indian passenger who's appearance, Indian accent, and, her last name was also clearly of Indian descent, Chaudry or similar. He called our names and we both walked to the front desk. He wrote something on the passenger log and asked us to take a seat.

20. Frontier Airline agents degraded me and deliberately humiliated me by yelling at me in a crowded airport because I was not African American. Absolutely no one deserves to be treated in this manner, especially on the basis of race. Frontier Airlines is under an obligation to provide airline transportation based on a rule of contract such that perform due diligence and make reasonable accommodations to provide transportation from point A, to point B. Frontier Airlines disregarded the needs of its customers and based their decision on which passengers to assign seats based on race and preferential treatment based on race. As discussed in Facts above, there was another Frontier flight leaving Philadelphia into Orlando scheduled to depart a mere hour later. It therefore stands to reason that passengers with connecting flights, or in the instance of the one Hispanic male who had already been inconvenienced the day before, to take priority in seat assignments. I am a United States Citizen, a United States Army JAG Attorney, and a proud

9

veteran. None of this should matter when traveling. The blatant disrespect, mistreatment, and disregard towards the non-African American passengers is a clear violation of the Civil Rights Act, and Airline Regulations.

2. ADMINISTRATIVE ACTION – PRIOR TO FILING 1. On or about 15 June 2023, after arriving at my home and having access to my phone and computer, I contacted Frontier Airlines via their online chat service, and by email. I do not have a copy of the chat, however, I have attached a copy of the email exchange between me and Frontier. Frontier insisted that I received compensation at the Airport, which is wholly untrue. I intend on requesting the chats with Frontier during discovery. On the same day, I completed the online complaint form on the Department of Transportation website stating the facts as presented here, and requested their assistance. I do not have a copy of this document; however, I will request it in discovery.

**E.  REQUEST FOR RELIEF:**

*State the relief you are requesting or what you want the court to do.  If additional space is needed to identify the relief you are requesting, use extra paper to request relief.  Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

1. In addition to the discovery stated above, I intend on requesting the release of the names and contact information of all passengers left behind on flight 1171 Philadelphia to Orlando, on 13 June 2023.

2. I request compensation in the amount of $15 million dollars should I be granted summary judgement. Should this case go to trial, I request $100 million dollars for fees, expenses, and, emotional distress caused by Frontier Airlines and its agents. I request discovery in this case, of all complaints filed against Frontier Airlines on the basis of race, or, any other discriminatory practice in violation of the laws cited above. I also request discovery into the facts and circumstances of all passengers left behind on the flight, their contact information, their names, and, addresses. I request a jury in this case. The facts presented here are irrefutable and discovery by Frontier of the passenger log, their tickets, in relation to the passengers left behind, will demonstrate in no uncertain terms that this case warrants summary judgement for the Plaintiff.

3. The relief sought here is reasonable for the harm caused, and, to send a clear message to Frontier and all airlines that they must ensure equal treatment of all passengers. As the facts are clear on its face, I request summary judgment.

## F.    PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct.  *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

*Kusmin L. Amarsingh*
_____
  (Plaintiff's signature)

August 14 2023
_____
  (Date)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 1:23-cv-01875-GPG-KAS

KUSMIN L. AMARSINGH

      Plaintiff,                         Hon. Gordon P. Gallagher

v.

FRONTIER AIRLINES, INC.,

      Defendant.

---

### DEFENDANT FRONTIER AIRLINES, INC.'S
### MOTION TO DISMISS WITH PREJUDICE

---

      Defendant, Frontier Airlines, Inc., by its undersigned counsel, brings the instant Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6), and in support thereof states as follows:

### I.    INTRODUCTION

      Plaintiff Kusmin L. Amarsingh filed an Amended Complaint ("Complaint") alleging that Frontier Airlines, Inc. ("Frontier") improperly denied her a seat on an overbooked flight. She attempts to state claims for breach of contract and racial discrimination but fails to plead sufficient facts to support either cause of action. Moreover, because the allegations demonstrate that she cannot plead viable claims under any circumstances, the Court should dismiss her Complaint with prejudice.

### II.    BACKGROUND

      Plaintiff's first claim is for breach of contract for "failing to provide fair and reasonable transport on an aircraft after [she] had substantially performed on said contract." Dkt. 14 at 3. Plaintiff's second claim is that Frontier "discriminated against [her] based on [her] race by racial

profiling," thus violating the Racial Discrimination Act of 1975[1] and 42 U.S.C. § 1981. Plaintiff

demands "compensation in the amount of $15 million dollars" if she prevails on summary

judgment. Should the case go to trial, Plaintiff requests "$100 million dollars for fees, expenses,

and, emotional distress." *Id*. at 10.

In support of her claims, Plaintiff alleges the following:

On June 13, 2023, Plaintiff arrived at the "Philadelphia Airport" to catch a Frontier flight

to St. Louis, Missouri, with a connecting flight through Orlando, Florida. Dkt. 14 at 4. After

Plaintiff arrived at her gate, she learned that "the flight was overbooked by approximately 10

passengers." *Id.* A Frontier agent offered volunteers "$800.00 in addition to the flight refund and

rebooking," but no passengers, including Plaintiff, accepted the offer. *Id.*

Plaintiff did not pay for a seat assignment, and, therefore, she waited with the others who

also did not have seat assignments, which included a family of approximately 8-10 African

American people, "most" of whom "did not have assigned seating." *Id.* at 5.

> Among the people waiting for seat assignments were approximately six passengers,
> who either were or appeared to be Hispanic, one male passenger, who was or
> appeared to be White, and a gentleman who was or appeared to part of African
> American. Additionally, there was an apparent Asian woman traveling with a child,
> accompanied by a white female. *Id.*

After all passengers with seat assignments boarded the plane, the Asian woman traveling

with a child was allowed to board. *Id.* Next, the family of approximately 8-10 African Americans

("most" of whom did not have assigned seats) was allowed to board. *Id.* The flight then departed

without the remaining people who had no seat assignments. *Id.* at 6-7. Plaintiff claims that no

African American people were denied boarding, "except the possible mixed-race gentleman [she]

---

[1] Note that the Racial Discrimination Act of 1975 is an *Australian* law. Act No. 52 of 1975, Racial Discrimination Act 1975 [Australia], 11 June 1975.

mentioned previously." *Id.* at 6. She further claims that those who did not board consisted of "approximately 5 Hispanic / Spanish Speaking [*sic*] passengers, two of Indian descent, [her]self being one, and one white male." *Id.* at 6. According to Plaintiff, there were "no other alternative/feasible flights for my schedule for at least a week." *Id.*

A Frontier agent stated that the passengers who were denied boarding "would all receive $400.00 plus the cost of our ticket." *Id.* at 7. However, the agents in charge of dispensing compensation told Plaintiff she "could only elect to receive a refund OR a new flight." *Id.* She complained that the passengers who were denied boarding were told they would receive "compensation AND a refund of our flight" due to being "inconvenienced." *Id.* at 8. An agent then passed out cards with links to Frontier's refund processing website. *Id.* at 7.

After being advised that she would receive an email with her refund information, Plaintiff left the airport. *Id.* She states, however, that she elected not to receive a refund of her ticket. *Id.* at 9. She then booked a flight with American Airlines to her hometown of Destin, Florida the next day. *Id.* Plaintiff subsequently complained to Frontier and was told her flight was already refunded. She claims, "I have not accepted nor received any money or compensation of any kind from Frontier Airlines." *Id.*

### III.    LEGAL STANDARD

A defendant may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss then, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007). "Nor does the complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Hakeem v. Denver Pub. Sch.*, Civil Action No. 20-cv-00083-PAB-KLM, 2020 U.S. Dist. LEXIS 133184, at *8 (D. Colo. July 7, 2020) (internal citations omitted). The federal pleading standard demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Twombly*, 550 U.S. at 555. The factual allegations must go beyond the sheer possibility that a defendant has acted unlawfully. *Id.* at 557.

## IV.    <u>ARGUMENT</u>

A *pro se* plaintiff's pleadings are sometimes construed generously and with leniency. *See Griffin v. Hickenlooper*, Civil Action No. 11-cv-03380-REB-BNB, 2013 U.S. Dist. LEXIS 36874, at *1 (D. Colo. Mar. 18, 2013). However, no such leniency is warranted here, as Plaintiff alleges she is "a United States Army [Judge Advocate General] Attorney." Dkt. 14 at 9. With this in mind, it should be apparent to Plaintiff that both of her claims fail as a matter of law.

### A.    **Plaintiff cannot state a viable claim for breach of contract.**

A party claiming breach of contract must plead and prove: (1) the existence of a contract; (2) performance by the plaintiff or justification for nonperformance; (3) failure to perform by the defendant; and (4) resulting damages. *Lodge at Mt. Vill. Owner Ass'n, Inc. v. Eighteen Certain Underwriters of Lloyd's of London*, 591 F. Supp. 3d 1008, 1014 (D. Colo. 2022). Not only does Plaintiff fail to allege these basic elements, the terms of the applicable contract defeat her claim.

The contract at issue is Frontier's Contract of Carriage ("Contract"), a copy of which is attached as **Exhibit A**. *See Cocona, Inc. v. Singtex Industrial Co.*, No. 14-cv-01593-MJW, 2014 U.S. Dist. LEXIS 144184, at *2-3 (D. Colo. Oct. 9, 2014) (noting that if a document is central to the plaintiff's claim, the defendant can properly submit an indisputably authentic copy to be considered on a motion to dismiss). The Contract applies "to all tickets issued for travel on flights

operated by or for Frontier… whether such ticket was sold by Frontier or its authorized agents or whether such ticket is used." Ex. A, Section 1.

Plaintiff incorrectly asserts that her ticket "was a contract with Frontier Airlines that they would transport [her] from Philadelphia to St. Louis, Missouri on the date and time of [her] airline ticket, or within the period of my checking in." Dkt. 14 at 9. In fact, Plaintiff's allegations establish that she was a "Standby Passenger" and was able to board the flight "subject to availability of seat space at departure time and only after all passengers having confirmed reservations for the flight have been boarded." Ex. A, p. 2. Moreover, the Contract expressly states: "Frontier will use reasonable efforts to transport passengers and baggage to the purchased destination, but published schedules, flight times, aircraft types, seat assignments, and similar details set forth in the ticket or Frontier's published schedules *are not guaranteed and form no part of this Contract of Carriage*." Ex. A, Section 17, p. 20 (emphasis added).

Section 18 of the Contract governs the terms of "Denied Boarding Compensation." Section 18(D) states that a passenger who is denied boarding "will be transported on Frontier's next available flight on which space is available and at no additional charge." *Id.* Plaintiff claims Frontier "did not have an available connecting or other flight that would accommodate my travel plans for at least a week." Dkt. 14 at 3. She further claims there were "no other alternative/feasible flights for my schedule for at least a week." *Id.* at 6. Plaintiff, therefore, cancelled her flight and booked a ticket the next day with American Airlines. *Id.* at 8.

Contrary to Plaintiffs' claims, nothing in the Contract guaranteed that Frontier would "accommodate her travel plans" to fit her particular "schedule" on June 13, 2023. Rather, Plaintiff was entitled to transport on the next available flight on which space was available. While it seems unlikely that no such flights were available for an entire week, Plaintiff fails to explain how such

an accommodation would violate Section 18(D) of the Contract. Thus, it is apparent that Frontier performed its obligations under the Contract and Plaintiff chose to fly with a different airline for her own specific scheduling reasons.

Moreover, Section 18(C) of the Contract provides the terms for financially compensating a passenger who is involuntarily denied boarding, and Plaintiff fails to allege that Frontier violated this condition. She alleges that, at different times, Frontier agents offered her $800 (*id.* at 4) and $400 (*id.* at 7) in addition to refunding the cost of her ticket, but that she never "elected for a refund of [her] ticket." *Id.* at 9. That Plaintiff chose not to accept Frontier's offers undermines any argument that Frontier failed to perform a contractual obligation which resulted in her sustaining damages. For all of these reasons, Frontier asks that the Court dismiss Plaintiff's breach of contract claim with prejudice.

**B.    Plaintiff's racial discrimination claim fails as a matter of law.**

**1.    Plaintiff cannot state a claim for discrimination under 42 U.S.C. §1981 as Frontier's actions did not interfere with contractual rights.**

To establish a *prima facie* case of discrimination under §1981 in a non-employment context, a plaintiff must show: (1) that she is a member of a protected class; (2) that defendant had the intent to discriminate on the basis of her race; and (3) that the discrimination interfered with a protected activity as defined in §1981. See *Reynolds v. School Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1532 (10th Cir. 1995). The protected activities defined in § 1981 include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The Tenth Circuit requires a plaintiff to identify "the actual loss of a contract," or interference with a protected activity under such contract, to state a § 1981 claim. *Shawl v. Dillard's Inc.,* 17 F. App'x

908, 911-12 (10th Cir. 2001) (holding that despite the rude conduct of the salesperson, the plaintiff could not show an "actual contract loss" caused by the allegedly discriminatory behavior).

As discussed above, Frontier did not breach the Contract at issue in this case. It follows that Plaintiff cannot identify an actual loss of a contract or interference with a protected activity under such contract. For this reason alone, the Court should dismiss Plaintiffs' claim for racial discrimination under 42 U.S.C. § 1981.

     **2.**       **Plaintiff cannot plausibly state a claim under 42 U.S.C. §1981.**

A successful claim under 42 U.S.C. § 1981 requires showing "purposeful" and intentional discrimination on the basis of race. *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982). Here, in addition to the reasons stated above, Plaintiff's claim for racial discrimination fails because she cannot show that Frontier intentionally discriminated against her based on her race, and that the alleged discrimination was the "but-for" cause of the alleged interference with a protected activity. *See Comcast Corp. v. National Association of African American-Owned Media*, 140 S. Ct. 1009, 1019, 206 L. Ed. 2d 356 (2020).

Plaintiff claims that "most" of the group of approximately 8-10 African American people did not have assigned seating. Dkt 14 at 5. "Among the people waiting for seat assignments were approximately six passengers, who either were or appeared to be Hispanic, one male passenger, who was or appeared to be White, and a gentleman who was or appeared to part of African American. Additionally, there was an apparent Asian woman traveling with a child, accompanied by a white female." (Emphasis added) *Id.* Plaintiff also asserts that another "woman of Indian descent" was denied boarding. *Id.* at 8.

According to Plaintiff, the group of approximately 8-10 African American people was allowed to board the aircraft, along with the "apparent Asian woman travelling with a child." *Id.*

at 5. The only reasonable inference to be drawn from these allegations is that the African American family was allowed to board because some of them had purchased tickets with assigned seats, and the rest of the family was accommodated so the family could travel together. This left only two more seats available, which were given to the Asian woman travelling with a child.

Viewing Plaintiff's allegations in the light most favorable to her, she was denied boarding along with 10 other people, consisting of: 6 Hispanic individuals, 2 Caucasian individuals, 1 African American gentleman, and 1 other woman of Indian descent. Plaintiff's complaint is essentially that she was not given preferential treatment over all the other passengers with diverse racial backgrounds, including the family of 8-10 African American people – not that she was denied boarding because of her Indian descent. In other words, she claims that she should have been given a seat assignment at the expense of someone who had already boarded. Moreover, it cannot be overlooked that § 1981 affords all persons the same rights to make and enforce contracts as are "enjoyed by white citizens." 42 USC § 1981(a). The fact that at least two white people were also denied boarding forecloses Plaintiff from recovering under § 1981 in the first instance.

Most critically, however, is the fact that Plaintiff has alleged race-neutral reasons for not receiving a seat assignment: (1) she elected <u>not</u> to pay to receive a seat assignment at the time she booked her flight (or anytime thereafter), and (2) the flight was overbooked by ten (10) people. This is fatal to her Section 1981 claim. See *Mohsen Sharifi Takieh v. Banner Health*, 515 F. Supp. 3d 1026, 1035 (D. Ariz. 2021) (applying the but-for causation test, courts have ruled that a §1981 claim is rendered implausible if the complaint identifies an "independent, non-discriminatory reason" for the alleged contractual impairment); *Astre v. McQuaid*, 804 F. App'x 665, 667 (9th Cir. 2020) (same) (quoting *FCS Advisors, LLC v. Missouri*, 929 F.3d 618, 622 (8th Cir. 2019)).

In *Astre*, a plaintiff bringing claims under §1981 expressly alleged that she resigned from her job after her employer lost funding due to a lack of community support. *Id.* at 666-67; see *Astre v. McQuaid*, No. 3:18-CV-00138-WHO, 2018 U.S. Dist. LEXIS 184189, 2018 WL 5617226, at *3 (N.D. Cal. Oct. 26, 2018). Considering that race-neutral explanation, the Ninth Circuit determined that the plaintiff's other allegations did "not give rise to a plausible inference that [a defendant's] alleged racially discriminatory actions caused [an] alleged impairment to [the plaintiff's] contractual relationship." *Astre*, 804 F. App'x at 667. The Ninth Circuit thereby concluded that the plaintiff's § 1981 claims were implausible and affirmed the lower court's dismissal of the claims with prejudice. *Id.* at 667-68.

Similarly, in *Domino v. Kentucky Fried Chicken*, the court concluded that the plaintiff failed to state a §1981 claim because the plaintiff did not adequately plead that racial animus was the but-for cause of an alleged contractual impairment. 2020 U.S. Dist. LEXIS 182265, at *2 (N.D. Cal. Oct. 1, 2020). The plaintiff alleged that a defendant-restaurant's employees repeatedly used racial slurs and treated a patron of a different race more favorably under similar circumstances. *Id.* But, the plaintiff also alleged that the defendant's employees identified him as someone who had previously complained about the quality of the restaurant's food and as someone who entered the restaurant on a prior occasion without making a purchase. *Id.* at *1-2. Thus, because the plaintiff alleged that "the employees were also motivated by previous, personal interactions with [the] [p]laintiff," the court dismissed the plaintiff's §1981 claim. *Id.* at *2.

In *Banner Health*, a doctor from the Middle East brought a §1981 lawsuit claiming his Physicians Services Agreement (PSA) with a network of hospitals was revoked on the basis of his race. *Banner Health*, 515 F. Supp. 3d at 1035. The district court dismissed the §1981 claim after determining that the plaintiff's own allegations gave rise to an inference that his alleged contractual

impairments were caused by his prior contentious relationships with the other doctors. *Id.* at 1036. "The reasonable inference to be drawn from these allegations is that Defendants were motivated, in part, by their previous encounters with Dr. Sharifi, not his race." *Id.* The allegations, therefore, did not give rise to a plausible inference that racial animus was the but-for cause of Banner's decision to revoke Dr. Sharifi's agreement. *Id.* Thus, because Dr. Sharifi failed to adequately plead that but for his race, he would not have suffered the loss of a legally protected right, the Court found that Dr. Sharifi's § 1981 claims implausible. *Id.*; see *Comcast Corp.*, 140 S. Ct. at 1019.

Here, Plaintiff's claim of discrimination is no better, and likewise "does not draw all reasonable inferences from the facts stated." See *Doe v. Colo. Cmty. Coll. Sys.*, 2020 U.S. Dist. LEXIS 161892, *13 (motion to dismiss granted with prejudice where the plaintiffs asserted an unfounded and conclusory charge of discrimination). If anything, reasonable inferences taken from the allegations in Plaintiff's Compliant contradict her claim of discrimination. To start, Plaintiff tellingly omits any discussion of the similarly situated customers (with diverse backgrounds) who were also not transported due to the overbooking, including an African American passenger, Hispanic passengers and Caucasian passengers. Further, of the customers who were allowed to board, but who did not pay for seat assignments, they were traveling in groups, inferring that Frontier may have attempted to keep groups together whenever possible and rebook flights for those who, like Plaintiff, were traveling alone.

Plaintiff cannot demonstrate that race was the but-for cause of her alleged injury. *Comcast Corp.,* 140 S. Ct. at 1014 ("[A] plaintiff must demonstrate that, but for the defendant's unlawful conduct, [the] alleged injury would not have occurred."). If anything, the allegations in the Complaint shows that racial animus was <u>not</u> the reason that Plaintiff was not transported on the subject flight. *Vu Phan v. State Farm Ins. Co.,* Civil Action No. 16-cv-03111-GPG, 2017 U.S.

Dist. LEXIS 189172, at *7 (D. Colo. May 25, 2017)("Plaintiff does not allege any facts to suggest that any defendant intended to discriminate against him on the basis of his race. Rather, it appears certain defendants did not do what the plaintiff wanted them to do, thus the plaintiff is assuming it was because of his race, without other indication. These allegations are insufficient to meet the requirements of Rule 8 in setting forth plausible factual allegations supporting a claim of racial discrimination."). Indeed, it is undisputed in this case that Plaintiff was not transported because (1) she elected not to pay for a seat assignment, and (2) there were 10 more people with reservations than there were seats available on the flight. Had Plaintiff purchased a seat assignment, or if the flight had not been overbooked, she would have been transported by the subject flight.

Plaintiff has not proffered enough factual content to raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 555. She merely assumes that the other passengers were permitted to board, and she and nine others were not, because of intentional racial discrimination. This is, of course, belied by her allegations that there were race-neutral reasons the ten (10) customers could not be transported, and that similarly situated passengers were treated the same as Plaintiff. Accordingly, Plaintiff's allegations do not rise to a plausible inference that racial animus was the but-for cause of her not being transported by the subject flight, and her claim should be dismissed with prejudice. *Colo. Cmty. Coll. Sys.*, 2020 U.S. Dist. LEXIS 161892, at *16 ("The chasm is simply too great between the facts pled and the inference Plaintiffs ask this Court to make.").

### 3.    Plaintiff improperly brings a claim under Australian law

Plaintiff improperly brings her second count for discrimination under "The Racial Discrimination Act of 1975, as embodied in the Equal Protection Clause, of the 14th Amendment, to the Consitution [*sic*] of the United States of America." *Id.* at 2. However, the Racial

Discrimination Act of 1975 is an Australian law. Act No. 52 of 1975, Racial Discrimination Act 1975 [Australia], 11 June 1975.  Accordingly, it has no bearing on this matter.

## V.    **CONCLUSION**

For the foregoing reasons, Frontier Airlines, Inc., respectfully requests that this Court enter an Order dismissing the Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6), and for such further relief as this Court deem just and reasonable.

Respectfully submitted this 3rd day of November, 2023.

/s/  Brian T. Maye

Brian T. Maye
HINSHAW & CULBERTSON LLP
151 North Franklin Street, Suite 2500
Chicago, Illinois 60606
Phone: (312) 345-0700
Email: bmaye@hinshawlaw.com

**Attorneys for Defendant,
Frontier Airlines, Inc.**

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2023, I caused the foregoing to be electronically filed with the United States District Court for the District of Colorado using the CM/ECF system.

/s/  Brian T. Maye_____

# FRONTIER AIRLINES  Contract of Carriage

**Effective Date:**    04/10/23

# EXHIBIT A

**FRONTIER**

**CONTRACT OF CARRIAGE**                                               Rev83 04/10/23

## Table of Contents

| Section | Subject | Page |
|---|---|---|

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2. Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
3. Refusal to Transport and Special Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
4. International Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
5. Child Passengers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
6. Service Animals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
7. Smoking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
8. Tickets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
9. Ticket Validity and Itinerary Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
10. Check-in Times . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
11. Fares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
12. Checked Baggage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
13. Carry-On Baggage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
14. Conditions and Charges for Special Items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
15. Limitations of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
16. Claim Limits and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
17. Failure to Operate on Schedule or Failure to Carry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
18. Denied Boarding Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
19. Refunds; No-Show Cancellations and Service Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
20. Currency and Mode of Payment and Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
21. Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
22. Contingency Plan for Extended Tarmac Delays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**FRONTIER**

**CONTRACT OF CARRIAGE**                                        Rev83 04/10/23

## 1.  Introduction

The following terms and conditions as well as such additional terms and conditions presented on Frontier Airlines' website, fare rules, published schedules or printed on or in any ticket or ticket-less travel authorization apply to all tickets issued for travel on flights operated by or for Frontier Airlines, Inc. ("Frontier"), as well as that transportation, regardless of whether such ticket was sold by Frontier or its authorized agents or whether such ticket is used ("Contract of Carriage").

This document is available for public inspection at all Frontier locations. Copies may be obtained by visiting the Frontier's web site at www.FlyFrontier.com or by writing to: Frontier Airlines, Inc., Customer Relations, 4545 Airport Way, Denver, CO 80239.

## 2.  Definitions

A. **Codeshare** -- A marketing and business arrangement in which two airlines "share" the same flight (which might include connecting legs). One airline places its designator code and flight number on a flight operated by the other airline, and markets and sells tickets for that shared flight as part of its published schedule.

B. **Code** -- The U.S. Internal Revenue Code of 1986, as amended.

C. **DOT** -- U.S. Department of Transportation.

D. **FAA** -- U.S. Federal Aviation Administration.

E. **Fare Rules** -- The rules and requirements associated with a ticket.

F. **IATA** -- International Air Transport Association.

G. **No-Show Cancellation** -- The automatic cancellation of a passenger's ticket upon such passenger failing to either (i) check-in for such passenger's flight, or (ii) board such passenger's flight, in either instance within the required times. The automatic cancellation will apply to all subsequent flights, including return flights, on the itinerary. Presentation of a ticket by someone other than the named passenger renders the ticket void and the ticket will then be treated as a No-Show Cancellation for all purposes of this Contract of Carriage. (See section 19. )

H. **Qualified Individual with a Disability** -- An individual with a disability who: (i) has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities; (ii) has a record of such an impairment; or, (iii) is regarded as having such an impairment, as further defined in 14 CFR 382.5.

I. **Standby Passenger** -- A passenger boarded subject to availability of seat space at departure time and only after all passengers having confirmed reservations for the flight have been boarded.

J. **Stopover** -- An intentional interruption in a passenger's trip in excess of 4 hours at a point between the place of departure and the final destination.

K. **STRETCH Seat** - A seat located in the front rows and exit rows of certain Frontier aircraft that have additional legroom. These seats are made available to passengers for a fee.

L. **Ticket** -The record of agreement, including electronic tickets, for passenger air transportation provided by the airline under certain terms and conditions to the passenger as described on the ticket, in the fare rules, and in this Contract of Carriage.

M. **TSA** -- U.S. Transportation Security Administration.

**Introduction**                                        Pg. 2 of 25

**FRONTIER**

CONTRACT OF CARRIAGE                                                  Rev83 04/10/23

## 3.  Refusal to Transport and Special Conditions

A.  Frontier may refuse to provide transportation to any person and may require that a passenger leave an aircraft or be removed from an aircraft for the following reasons, in which case Frontier will provide a refund of the amount paid for their ticket, which will be the limit of Frontier's liability.

  1)  Government Request -- To comply with a government requisition of space or request for emergency transportation (e.g., in connection with national defense or natural disaster (actual, threatened, or reported)).

  2)  No Seat for Safety Assistant - If a passenger requires a safety assistant (see section 3. B.6) and there is not a seat available on the applicable flight and, thus, both the passenger and the safety assistant are denied transportation. For purposes of determining whether a seat is available for a safety assistant, the safety assistant is deemed to have checked in at the same time as the individual with the disability.

B.  Frontier may refuse to provide transportation to any person and may require that a passenger leave an aircraft or be removed from an aircraft for the following reasons, in which case no refund will be due and Frontier will have no further liability.

  1)  Government Direction - To comply with a direction of a government official acting in their official capacity to remove or not provide transportation to a specific individual.

  2)  Identification -- The passenger refuses to produce a government-issued identification as required by Frontier's representatives or as required by law.

  3)  *MyFrontier* Account; Card on File - The passenger refuses to create a *MyFrontier* account or have a credit or debit card on file with Frontier, each of which is active at the time of travel. Any fees owed to Frontier may be unilaterally charged by Frontier using the card or other method of payment that is on file with Frontier.

  4)  Balance Due - If at the time of travel there is any balance unpaid to Frontier for ticket or optional services charges, the ticket and all optional services may be canceled, whether or not a passenger has been notified of such cancellation.

  5)  Passports/Visas -- The passenger intending to travel across any international border fails to possess and present all valid documents (passports, visas, certificates, etc.) required by the laws of the countries from, over, or into which the passenger will fly, which will in all cases be the passenger's exclusive responsibility.

  6)  Failure to Check In or Appear - The passenger fails to check-in for their flight within the required times or appear for boarding of that flight within the required times. (The ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 20)).

  7)  Special Medical Requirements -- The passenger will be refused transport if the passenger requires medical equipment be used in flight or services (i) not provided by Frontier, (ii) that may not be used in flight, or (iii) does not have sufficient supplies therefor. The foregoing includes any medical equipment that would require use of power from the aircraft, medical equipment for which the passenger does not have sufficient batteries for the duration of the flight plus unexpected delays. Passengers must be able to sit in a single seat with the seat in the full and upright position, which precludes passengers that must lie flat or that must be transported on a stretcher. Frontier does not provide medical oxygen.

---

**FRONTIER**

**CONTRACT OF CARRIAGE**                                                    Rev83 04/10/23

*EXCEPTION:* A respiratory device (e.g., ventilator, respirator, CPAP machine or Portable Oxygen Concentrator) is considered an assistive device and is permitted as carry-on or checked baggage at no charge provided that all batteries must be transported in carry-on baggage and must be packaged in a manner that protects them from physical damage and short circuits, and provided that if the device is to be used in flight: (i) the passenger must carry enough fully-charged batteries to power the device throughout the entire journey including all ground time (between connections), the duration of the flight and for unexpected delays, (ii) the device must be approved by the FAA with stickers indicating such, and (iii) prior to traveling, the passenger must complete the Portable Oxygen Concentrator Medical Authorization (form 30881) available on Frontier's website or obtain a medical statement from the passenger's physician addressing the points on the POC Medical Authorization form.

*NOTE:* Passengers are referred to 14 CFR Part 121, SFAR No. 106 for regulations regarding and a list of Portable Oxygen Concentrators that are approved for use on aircraft.

8) Qualified Individual with a Disability -- If transportation is refused because the passenger fails to comply with the following: Qualified individuals with a disability will be transported in accordance with the conditions and requirements of 14 C.F.R. § 382 unless the carriage of such individuals may impair the safety of the flight or violate Federal Aviation Regulations. Pursuant to 14 C.F.R. § 382.113, Frontier does not provide certain extensive in flight special services such as assistance in actual eating, assistance within the lavatory or at the individual's seat with elimination functions, or provision of medical services. Moreover, pursuant to 14 C.F.R. § 382.29, a qualified individual with a disability may be required to be accompanied by a safety assistant as a condition of being provided air transportation in any of the following circumstances: (i) when the individual, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from employees, including the required safety briefing, (ii) when the individual has a mobility impairment so severe that the individual is unable to assist in the passenger's own evacuation of the aircraft, (iii) when the individual has both severe hearing and severe vision impairments, if the individual cannot establish some means of communication with employees adequate to permit transmission of the required safety briefing, (iv) on the day of departure, if it is determined that an individual meeting the criteria of (i), (ii) or (iii) must travel with a safety assistant, contrary to the individual's self-assessment that the passenger is capable of traveling independently, the safety assistant will not be charged to accompany the individual with a disability.

9) Prisoners - Frontier will not transport any prisoners under any circumstances.

10) Proper Attire - Any passenger who is barefoot and over 3 years of age, unless required to be barefoot for medical reasons, or who is not otherwise fully clothed in clothing that is not lewd or obscene, threatening, intimidating, or would be objectionable to reasonable persons.

11) Malodorous Condition - Any passenger who has a severe or offensive body odor that is not due to a disability.

12) Intoxication - Any passenger who appears to be intoxicated or under the influence of drugs.

---

**Refusal to Transport and Special Conditions**                        **Pg. 4 of 25**

**FRONTIER**

**CONTRACT OF CARRIAGE**                                                    Rev83 04/10/23

13) Communicable Disease or Infection - A passenger who has a communicable disease or infection (that is known or reasonably believed to pose a direct threat to the health or safety of others in the course of flight) may be denied boarding by Frontier. If such a passenger presents a medical certificate dated within 10 days of the date of the flight for which it is being presented that includes specific conditions under which the individual can travel and not pose a direct threat to the health and safety of other persons, transportation will be provided to such individual unless it is not reasonable or feasible to implement the conditions set forth in the medical certificate as necessary to prevent the transmission of the disease or infection to other persons in the normal course of flight. Unacceptable measures include, but are not limited to: a required separation between the passenger and other persons, use of medical equipment not permitted to be used on the aircraft, or a requirement that any other passenger wear protective gear.

   a) 2019 Novel Coronavirus (COVID-19) – Frontier may screen passengers during the check-in and boarding process, and may deny boarding to passengers who Frontier reasonably believes do not meet Frontier's COVID-19 screening measures. Screening will include, but is not limited to: completion of a health acknowledgment, required wearing of facial coverings, and submission to a temperature check. Notwithstanding Section 11 above, a passenger who presents a medical certificate dated within 10 days of the date of the flight for which it is being presented may be denied boarding if, on the planned date of travel, the passenger fails to meet Frontier's COVID-19 screening measures.

14) Refusal or Inability to Sit - Any passenger who is unwilling or unable to sit in an upright position during takeoff and landing with the seat belt fastened.

15) Failure to Follow Instructions - Any passenger who refuses to obey instructions from an employee or crewmember.

16) Use of Ticket Issued to Other Person - Any passenger who attempts to use a ticket not issued to that person. Transfer of a ticket by a passenger to another person is not permitted. (This ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 20)).

17) Interference - Any passenger who interferes with any member of the flight crew in pursuit of their duties or attempts to do so.

18) Smoking - Any passenger who smokes or attempts to smoke on an aircraft.

19) Weapon - Any passenger who, except as permitted by law (see 49 C.F.R. § 1544.219), wears or has on or about their persons concealed or unconcealed, deadly or dangerous weapons.

20) Purchase in Violation of Contract of Carriage - Any passenger that purchases a ticket in violation of this Contract of Carriage or any fare rule. In addition, Frontier may (i) invalidate the tickets or any other that may have been purchased in the same manner, (ii) cancel any remaining portion of the passenger's itinerary, or (iii) confiscate any unused portions of the ticket.

21) General Refusal - Any person whom Frontier has informed is not permitted to purchase transportation from Frontier.

C. Refusal to Sell Transportation - Frontier may refuse to sell transportation to any person, including the following, and may inform such persons that they are not permitted to purchase transportation from Frontier:

   1) Refusal to Comply - A person who refuses to comply with instruction given by employees or representatives prohibiting the solicitation of items for sale or purchase, including airline tickets, passes, or travel award certificates.

   2) Prior Conduct - A person who has disrupted airline operations, mistreated employees, or has not complied with Frontier's policies or otherwise violates this Contract of Carriage.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                          Rev83 04/10/23

    3)  Misconduct - A person who has committed a fraudulent act against Frontier.

D.  Customer of Size - If, in Frontier's sole judgment, a passenger is unable to sit in an aircraft seat without lifting either or both armrests and occupying all or a portion of the adjacent seats, or encroaching into the aisle or adjacent seats, the passenger will be required to purchase a ticket for an additional seat (or more, if required to accommodate the passenger) at the price then applicable. If sufficient, contiguous seats are not available, the passenger will be given the option to switch to flights on which such seats are available (for which applicable fees will apply) or be given a refund.

E.  Allergies (Peanut, Pet, or Chemical) - Items are not removed from the aircraft to accommodate a passenger's allergy to a particular food, substance, or chemical. A variety of snacks are served on board many flights, including products that may contain peanuts or other nuts. A "peanut-free" or "chemical-free" environment cannot be provided to passengers onboard the aircraft. Passengers are advised to consult a healthcare professional regarding the risks of onboard exposure to any allergen.

F.  Pregnancy - Passengers who are pregnant are urged to consult with their doctor on whether it is safe to travel by air, including with due consideration to the possibility of turbulence, cabin pressurization, significantly increased risk of deep vein thrombosis associated with pregnancy, and lack of ready access to medical care. This is particularly important for women in their ninth month of pregnancy, who are urged to obtain an examination from their physician shortly before flying to confirm air travel will be safe. Women with a history of complications or premature delivery should not fly if pregnant. By traveling with Frontier, pregnant women acknowledge and accept these risks. Different policies for passengers who are pregnant may apply on any leg of a codeshare flight that is operated by the codeshare airline.

G.  Electronic Surveillance of Passengers and Baggage - Passengers and their baggage are subject to inspection, including via electronic means, with or without the passenger's consent or knowledge.

H.  Diversion While in Flight or Return to Gate- In the event that Frontier is required to divert an aircraft while in flight or return to gate because a passenger requires medical attention or due to the passenger's conduct, the passenger may be required to reimburse Frontier for the costs that Frontier incurs, including the cost to accommodate other passengers. The amount due will be as determined by Frontier.

## 4.  International Transportation

A.  Compliance with Regulations - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements of countries to be flown from, into, or over. Frontier is not liable for any aid or information given by any agent or employee to any passenger in connection with obtaining necessary documents or complying therewith (including as may be provided in this Contract of Carriage) or the consequences to any passenger resulting from the passenger's failure to obtain such documents or to comply with such laws, regulations, orders, demands, requirements, or instructions.

B.  Compliance with Foreign Country Regulations regarding Importation of Goods - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements of countries to be flown from, into, or over. Frontier is not liable for the consequences to any passenger resulting from the passenger's failure to comply with such laws, regulations, orders, demands, requirements, or instructions.

C.  Customs Inspection - If required, a passenger must attend the inspection of the passenger's baggage, checked or unchecked, by customs or other government officials. Frontier accepts no responsibility to the passenger if they fail to observe this condition.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                    Rev83 04/10/23

D. Government Regulation - No liability shall attach to Frontier if, based on what it understands to be applicable law, government regulation, demand, order, or requirement, it refuses to carry passenger. If, however, it is ultimately determined that Frontier was incorrect, the limit of its liability will be to refund the amount paid for the ticket on which transportation was refused.

E. International Operations - Frontier is required to make an attempt to obtain emergency contact information from a passenger traveling into or out of a foreign country. If a passenger refuses to provide emergency contact information, Frontier will document the attempt and may require the passenger to sign the document.

F. Indemnification - A passenger shall indemnify Frontier for any loss, damage, or expense suffered or incurred by Frontier by reason of the passenger's failure to possess any required travel documents or other failure to comply with the provisions of this section, including the applicable fare if Frontier is required to transport the passenger home from a country. Frontier is not liable to the passenger for loss or expense due to the passenger's failure to comply with this provision.

G. Baggage Limitation - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements regarding baggage size and weight limitations of countries to be flown from, into, or over. Frontier is not liable for the consequences to any passenger resulting from the passenger's failure to comply with such laws, regulations, orders, demands, requirements, or instructions.

## 5.   Child Passengers

A. Accompanied Children -- Children from 7 days through 14 years of age may travel with another passenger who is at least 15 years old.

B. Unaccompanied Children

   1) Frontier does not allow children under the age of 15 years old to travel unaccompanied; they must be accompanied by a passenger who is at least 15 years old. Passengers who are 15 years old or older may travel on Frontier without an adult companion. A birth certificate, official school ID, or other form of ID may be requested for age verification purposes if the child's age appears questionable.

      *NOTE:    Passengers under age 18 traveling without both parents may need additional documentation to travel across international borders, depending on the country's requirements.*

C. Infant and Child Fares (except as otherwise provided in a specific fare rule) are as follows:

   1) Infants under 2 years of age are accepted, without charge, when the infant does not occupy a separate seat and is accompanied by a fare-paying passenger at least 15 years old. A birth certificate may be requested for age verification purposes if the infant's age appears questionable.

      *NOTE:    Due to supplemental equipment considerations, the number of infants accepted per flight may be limited based on aircraft type.*

   2) One adult may accompany up to two infants under the age of 2.

      a) When an adult passenger is traveling with two infants under 2 years of age, a seat must be purchased for at least one infant. The fare is the same as an adult fare.

   3) Children 7 days - 14 years of age occupying a seat are charged the same fare as an adult passenger.

      *NOTE:    Passengers under age 2 traveling as lap children (not purchasing a seat) are subject to international taxes. These taxes must be paid prior to boarding the originating departure flight.*

**FRONTIER**

CONTRACT OF CARRIAGE                                                      Rev83 04/10/23

D. Child Restraint Systems - Frontier accepts infant and child restraint systems (car seat or harness) approved for air travel that fit in the applicable aircraft seat with the arm rest down that meet the following requirements:

1) Approved seats manufactured to U.S. standards between January 1, 1981, and February 25, 1985, must bear the label: "This child restraint system conforms to all applicable Federal motor vehicle safety standards."

2) Seats manufactured to U.S. standards on or after February 26, 1985, must bear two labels: (i) "This child restraint system conforms to all applicable Federal motor vehicle safety standards" and (ii) "THIS RESTRAINT IS CERTIFIED FOR USE IN MOTOR VEHICLES AND AIRCRAFT" in red lettering.

3) Seats not meeting the above criteria must bear a label or markings showing: (i) the seat was approved by a foreign government, (ii) the seat was manufactured under the standards of the United Nations, (iii) the seat or child restraint device furnished by the certificate holder was approved by the FAA through Type Certificate or Supplemental Type Certificate, or (iv) the seat or child restraint device was approved by the FAA in accordance with 14 C.F.R § 21.8(d), or FAA Technical Standard Order C-100b, or a later version.

NOTE 1:    *A child under the age of 2 must be held in the passenger's lap or be seated in an approved car seat for taxi, takeoff, and landing.*

NOTE 2:    *Frontier encourages all adults traveling with infants under 2 years of age to secure the infant in an approved car seat or harness in the infant's own purchased seat.*

4) Child Harness - The FAA-approved AMSafe Aviation C.A.R.E.S. child harness device may be used on-board the aircraft. It is designed for children weighing between 22 and 44 pounds (between 10 and 20 kilograms) and must bear the label "FAA Approved in accordance with 14 CFR 21.305(d) approved for aircraft use only."

5) Car Seats - A car seat may be used by a child between the ages of 7 days and 2 years if seat space is available after boarding, even if a seat has not been purchased for the child. A car seat may be used by any child when a separate seat has been purchased. To use a car seat onboard the aircraft:

a) It must bear manufacturer labels identifying approval for aircraft use, as described in subsection (1) and (2) above.

b) It must have a solid seat and solid back.

c) It must have restraint straps installed to hold the child in the car seat.

d) The child may not exceed the weight limitation of the car seat.

e) It may not be placed in the emergency exit rows, in the seats immediately in front of or behind the exit rows, or in any seat that has an airbag seatbelt installed.

f) Window seats are the preferred location for a car seat, so it does not impede a passenger's movement or egress into the aisle. Other seat assignments are permitted provided the car seat is not obstructing the egress of any passenger.

g) It must be secured by a seat belt at all times.

6) Booster Seats - Booster seats may be carried onboard aircraft but must be stowed in an overhead compartment or underneath the seat for takeoff and landing. Once the aircraft has reached cruising altitude, the passenger may use the seat during the flight. The booster seat must be stowed when the aircraft begins its descent.

**Child Passengers**                                                      **Pg. 8 of 25**

**FRONTIER**

C O N T R A C T   O F   C A R R I A G E                                    Rev83 04/10/23

## 6.  Service Animals

A.  General - The following categories of service animals are allowed in the cabin without charge:

   1)  Trained service dogs that assist passengers with disabilities. Passengers traveling with a service dog must complete and submit the Department of Transportation Service Animal Air Transportation Form, attesting to the dog's health, behavior, and training. For reservations booked more than 48 hours prior to travel, passengers must submit the completed form no later than 48 hours prior to travel. For reservations booked less than 48 hours prior to travel, passengers must submit the completed form in person to a Customer Service Agent upon arrival at the airport. Only dogs will be accepted as trained service animals. The animal must be at least 4 months old. The passenger is required to keep the animal under control at all times, with the animal on a leash or harness while in the boarding area and onboard the aircraft. Psychiatric support animals are recognized as trained service animals. Comfort animals, companionship animals, or any other non-task-trained animals are not recognized as service animals. Service animals in training will not be accepted.

   2)  Service Animals trained in explosive detection, contraband search, or search and rescue on active duty and traveling for that purpose will be accepted for travel. The passenger must present credible documentation the animal is traveling for that purpose.

B.  Seating - The passenger may sit anywhere, except in an emergency exit row, provided the animal does not obstruct an aisle or egress of passengers in an emergency evacuation. The animal must fit under the seat or on the passenger's lap. If the passenger is seated in row 1, the animal will not be allowed on the passenger's lap. The animal may not occupy a seat. An animal that cannot or does not comply with the foregoing will not be accepted.

C.  International - Restrictions for travel with an animal to international destinations vary by country. Frontier recommends contacting the appropriate embassy or consulate before purchasing a ticket for travel with a service animal or emotional support animal. Different policies may apply on any leg of a codeshare flight that is operated by the codeshare airline.

D.  Oxygen - No oxygen will be administered to a service animal in the event of an emergency.

## 7.  Smoking

A.  Smoking is prohibited on all flights.

B.  Federal law prohibits tampering with, disabling, or destroying any smoke detector installed in an aircraft lavatory.

C.  The use of electronic smoking devices is prohibited at all times on all aircraft.

## 8.  Tickets

A.  A passenger is entitled to transportation only upon presentation of a valid electronic ticket (e-ticket). The ticket entitles the passenger to transportation between the point of origin and the destination.

   *NOTE:*    *Paper tickets are not issued on Frontier ticket stock. Only electronic tickets are issued for travel on Frontier. However, paper tickets from other airlines may be accepted for travel at Frontier's discretion.*

**FRONTIER**

**CONTRACT OF CARRIAGE**                                                      Rev83 04/10/23

B.  Tickets are honored only in the order in which they are issued.

C.  The following practices are prohibited:

   1)  Back to Back Ticketing -- The purchase or use of portions of tickets from two or more tickets issued as round-trip fares or other scheme for circumventing minimum stay requirements.

   2)  Throwaway Ticketing -- The purchase or use of round-trip tickets for one-way travel.

   3)  Hidden City/Point Beyond Ticketing -- The purchase or use of a ticket from a point before the passenger's actual origin or to a point beyond the passenger's actual destination.

D.  A ticket which has not been properly issued or paid for, or which has been altered, mutilated, or improperly issued by an unauthorized party is not valid for travel or refund.

E.  The purchaser of a ticket and the passenger intending to use it are responsible for ensuring that the ticket accurately states the name of the **passenger**.

F.  A ticket may only be used by the person named on the ticket. Frontier is not liable to the purchaser of a ticket if the ticket is used by someone other than the person named on the ticket. Tickets may not be purchased for the transport of items of baggage that are too large to be stowed safely in a suitable baggage compartment in the aircraft cabin or under a passenger seat (such as, but not limited to, musical instruments, electronic equipment).

G.  Presentation of a ticket by someone other than the named passenger renders the ticket void. The ticket is subject to confiscation, and the ticket will then be treated as a No-Show Cancellation for all purposes of this Contract of Carriage. (See section 19. )

H.  An additional processing fee may apply to each ticket purchased or changed via Frontier's reservation center.

## 9.  Ticket Validity and Itinerary Changes

A.  Period of Validity

   1)  Tickets issued by Frontier are valid for transportation only on the flights and dates shown on the ticket and have no value and are not valid for transportation thereafter. If a passenger cancels a ticket before the scheduled flight departure time, the value of the ticket less a service fee and certain other carrier charges will be retained for 90 days from the date of cancellation of the ticket in the form of a credit. The credit has no cash or refund value and may only be applied to subsequent tickets on Frontier flights for the same passenger as the original ticket. In the case of a No-Show Cancellation, see section 19.

   2)  Except as required by law or as provided in this Contract of Carriage, Frontier shall have no obligation of any kind to reschedule any passengers who cancels a ticket before the scheduled flight departure time or to provide them with any refund or other credit for unused tickets.

   3)  Except as required by law or as provided in this Contract of Carriage, in the case of a No-Show Cancellation, Frontier shall have no obligation of any kind to reschedule any such passengers on any other flight, and the rules respecting No-Show Cancellations shall apply (see section 19. ).

B.  Except for tickets purchased for travel within 7 days (168 hours) of purchase, all tickets may be canceled within twenty-four (24) hours of the purchase and a full refund will be given. After that time, except for tickets and services that are purchased as refundable, all tickets and optional charges or services are non-refundable.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                    Rev83 04/10/23

## 10. Check-in Times

A.  Airport Check-In - It is the passenger's responsibility to arrive at the airport, taking into consideration travel time both to and within the applicable airport, with enough time to complete check-in, to drop off any checked bags with a Frontier representative or Frontier-provided system, and to complete processing through the security check point.

B.  Passengers can check in beginning 2 hours before departure at Frontier's airport check-in counters or 24 hours before departure at www.FlyFrontier.com or on the Frontier mobile app, if the reservation is eligible for online or mobile app check-in.

C.  Check-In Times

    1)  For domestic flights (originating and to a destination within the United States), the passenger must be checked in with a printed boarding pass or a Frontier mobile app boarding pass in-hand at least 45 minutes prior to scheduled departure whether or not checking bags.

        a)  Effective August 16, 2023, all passengers must be checked in with a printed boarding pass or a Frontier mobile app digital boarding pass in-hand, and with checked bags, if any, presented to and accepted by a Frontier representative or Frontier-provided system, at least 60 minutes prior to scheduled departure.

    2)  For international flights, the passenger must be checked in with a printed boarding pass or a Frontier mobile app digital boarding pass in-hand and with checked bags, if any, presented to and accepted by a Frontier representative or Frontier-provided system, at least 60 minutes prior to scheduled departure.

D.  Time Limit for Checking Bags - Baggage to be checked must be presented at the airport within the minimum check-in time. Passengers who present baggage after the minimum check-in time may be refused transport. At some airports, the counter may close at the check-in cut-off time, in such cases, passenger and baggage check-in are not permitted after the check-in deadline. In the event that baggage is accepted after the minimum check-in time, the passenger will be liable for any costs and fees for the bag to be delivered in the event that it is not carried on the same flight.

E.  Availability for Boarding - Tickets and seat assignments are subject to cancellation for passengers who fail to make themselves available for boarding at the departure gate at least 20 minutes prior to scheduled departure.

F.  Failure to Check In or Appear - If a passenger fails to check in or board the flight within the required time, the ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 20).

G.  Misconnected Passengers - The ticket of any passenger who does not meet the minimum check-in time due to the late arrival of an inbound connecting flight operating by Frontier will be accommodated on the next available flight operated by Frontier to the same destination. Frontier will not provide transportation on another airline or reimburse the cost of transportation purchased from another airline. The ticket of any passenger who does not meet the minimum check-in time due to the late arrival of an inbound connecting flight operated by any other airline will be canceled and no refund or accommodation on another flight will be due unless available and purchased at the applicable price by the passenger.

## 11. Fares

A.  Fares apply for transportation only between the airports for which they are published.

**FRONTIER**

CONTRACT OF CARRIAGE                                      Rev83 04/10/23

B. When a passenger requires connecting service with arrival at one airport and departure from another airport, transportation between those airports must be arranged by and at the expense of the passenger.

C. Fares are subject to change without notice until a ticket is issued.

## 12. Checked Baggage

A. Fees applicable to checked baggage:

   1) Baggage fees apply to each checked bag.

   2) Active U.S. military personnel, with Common Access Card (CAC), may check two bags at no charge for all types of tickets. Overweight and oversize charges for the first two free bags are also waived. This policy is for active U.S. military personnel only and does not extend to family members or traveling companions.

B. Baggage Allowance Exceptions - The following may be checked or carried on at no charge and do not count toward the passenger's baggage allowance.

   1) Medical Assistive Devices - Canes, crutches, braces, wheelchairs, etc. for the use of the passenger. There is no limit to the number of mobility aids a passenger may check. Medical assistive devices must be packed separately, in protective packaging, for baggage fees to be waived.

   2) Wheelchairs - In compliance with federal law, wheelchairs or other types of mobility devices for the passenger are accepted as checked baggage in addition to the passenger's baggage allowance at no additional charge. Certain Frontier aircraft can accommodate up to two wheelchairs up to 40 inches (101 cm) high, 50 inches (127 cm) long, 13 inches (33 cm) wide, and weighing no more than 70 pounds (31 kilograms) in the cabin of the aircraft on a first-come, first-served basis. Wheelchairs carried in the cabin of the aircraft will be brought to the front of the aircraft after all other passengers have deplaned.

   3) Essential Infant or Child Items - Child restraint devices, car seats, strollers, diaper bags, and other essential baby items when the infant is traveling. These items must be packed separately, in protective packaging, for baggage fees to be waived.

C. Acceptable Baggage - Frontier will accept for transportation as baggage such personal property necessary or appropriate for the wear, use, comfort, or convenience of the passenger for the purpose of the trip, subject to the following:

   1) Checked Baggage Size and Weight:

      a) Excess baggage charge will be applied to any checked baggage that exceeds the standard weight or dimension. Standard baggage size is defined as maximum of 62 inches (157 cm) in linear dimension (height plus length plus width).

      Standard baggage weight is defined as:

      – For tickets purchased before January 18, 2022, maximum of 50 pounds (22.6 kilograms).
      – For tickets purchased on or after January 18, 2022, and travel completed before March 1, 2022, maximum of 50 pounds (22.6 kilograms).
      – For tickets purchased on or after January 18, 2022, and travel on or after March 1, 2022, maximum of 40 pounds (18.1 kilograms).

      b) Baggage weighing 100 or more pounds (45 kilograms) or exceeding 110 linear inches will not be accepted, with the exception of assistive devices or musical instruments.

   2) The TSA website maintains a list of items that passengers are not permitted to check in baggage. See www.tsa.gov for a complete list. Baggage containing any items on that list will not be accepted.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                                     Rev83 04/10/23

3) An item for transportation not suitably packaged to withstand ordinary handling and turbulence, or of a size, weight, or character that renders it unsuitable for transportation will not be accepted.

4) The passenger is responsible for ensuring that all items packed in checked baggage are properly packaged and padded to resist handling and turbulence. (Refer to section 16. )

5) All baggage is subject to inspection by Frontier. Frontier is not, however, obligated to perform an inspection. Frontier will refuse to transport or will remove baggage if the passenger refuses to submit the baggage for inspection.

6) Frontier will not accept baggage or other personal property for storage.

7) Frontier will check baggage only when the passenger presents a valid ticket for transportation on the applicable flight.

8) The passenger's name, address, and telephone number must appear on the baggage.

9) Frontier has the right to refuse to transport baggage on any flight other than the one carrying the passenger.

10) Baggage will not be checked:

   a) To a point that is not reflected on the passenger's ticket.

   b) Other than the passenger's destination on the applicable flight, but if the flight is a connecting flight, to the final destination, but if that connecting flight is scheduled to depart from an airport different from the one at which the passenger is scheduled to arrive then only to the destination of the first leg.

11) Live animals are not accepted as checked baggage.

12) Agricultural items, perishable items, or products that do not conform with customs or agricultural government law at the flight's destination will not be accepted.

13) Frontier will not accept for carriage any restricted/hazardous materials as defined in the DOT Hazardous Materials Regulations (49 C.F.R. §§ 171-177) and IATA Dangerous Goods Regulations. Examples of such goods are (i) liquor products over 140 proof, (ii) gasoline-powered tools, (iii) compressed gases, (iv) corrosives (such as acids and wet batteries), (v) explosives (such as dynamite and fireworks), (vi) flammables (such as matches and lighter fuels), (vii) poisons, and (viii) magnetic and radioactive materials. Electronic smoking devices (commonly referred to as e-cigarettes or personal vaporizers) pose a safety risk and are not permitted in checked baggage. These items are permitted in carry-on baggage. Spare lithium batteries are not allowed in checked baggage.

14) Perishable items must be packaged properly such that they cannot leak through their packaging. (Refer to section 16. )

D. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 13. Carry-On Baggage

A. Passengers are permitted up to two carry-on items:

1) One free personal item not larger than 8" x 14" x 18" (20 cm x 35 cm x 45 cm) that must fit within the personal item portion of the bag sizer.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                                    Rev83 04/10/23

2) One carry-on item not larger than 10"H x 16"W x 24"L (25 cm x 40 cm x 114 cm) and weighing not more than 35 pounds (15 kilograms) that may be placed in the overhead compartment or under the seat. A fee for the carry-on item may apply based on the ticket type purchased. Active U.S. military personnel, with Common Access Card (CAC), may take a carry-on item free of charge for all types of tickets.

3) The size and weight of an item may be measured using manual or automated methods. If a bag sizer is used, items must fit completely into the applicable portion, including any wheels and handles, and without the passenger using undue force, as determined at Frontier's sole direction. If an item exceeds allowed dimensions, the item may be gate checked or considered to be a carry-on item, in each case to which the applicable fee will apply. Any fees owed may be unilaterally charged by Frontier using the card or other method of payment that is on file with Frontier.

B. The TSA website maintains a list of items that passengers are not permitted to carry onboard an aircraft. See www.tsa.gov for a complete list. Carry-on items containing any items on that list will not be accepted.

C. The passenger is responsible for all items brought on board the aircraft. Items must be stored under a seat or in the overhead compartment.

D. Use of Portable Electronic Devices (PEDs)

1) Small authorized PEDs are devices under 2 pounds and are of a size that can easily be placed in a seat pocket along with the other materials that are normally found in the seat pocket (Passenger Safety Information Card, Menu or airsickness bag). They include devices like tablets, readers, and mobile phones and may be used during all phases of flight when in airplane mode including taxi, takeoff, and landing. However, if using them during taxi, takeoff, and landing, you must secure these devices by holding them, putting them in your pocket or holster, or placing them in a seatback pocket.

2) Large authorized PEDs are devices 2 pounds or more such as full-size laptops. They must be turned off and stowed during taxi, takeoff, and landing. You may stow them under the seat in front of you or in an overhead compartment. These devices may be used above 10,000 feet when authorized by a Flight Attendant announcement.

3) On all flights operating outside U.S. airspace, PEDs cannot be used during taxi, takeoff, and landing, but may be used in airplane mode above 10,000 feet when authorized by a Flight Attendant announcement.

E. Sound Emitting Devices - Portable electronic devices that emit sound (e.g., music or video players or games) may be used only with headphones and provided the sound, even via the headphones, cannot be heard by others.

F. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 14. Conditions and Charges for Special Items

The following items are accepted as checked or carry-on baggage, subject to the conditions specified and payment of applicable fees.

*NOTE:* *Refer to the Sports Equipment and Special/Fragile Items chart hosted at* www.FlyFrontier.com *for other items which have specific packaging or other requirements which need to be met in order to be transported by air. All items listed on the Sports Equipment and Special/Fragile Items chart are subject to baggage fees. Baggage fees for excess, oversize, and overweight are cumulative and all may be assessed on one item.*

A. Firearms -- Firearms are accepted as checked baggage on flights within the United States, but not international flights. Carriage of any firearm is subject to the following conditions:

---

**Conditions and Charges for Special Items**                          **Pg. 14 of 25**

**FRONTIER**

**CONTRACT OF CARRIAGE**                                               Rev83 04/10/23

1) In accordance with federal law, a passenger who presents baggage that contains a firearm must (i) ensure the firearm is unloaded, (ii) pack the firearm in a lockable, hard-sided container, (iii) declare the firearm unloaded at the time of check-in, and (iv) sign a "Firearms Unloaded" declaration.

2) If the firearm is in a locked, hard-sided container INSIDE a piece of checked baggage, the declaration must be placed inside the checked baggage and proximate to, but not inside of, that container.

3) If the firearm is in a locked, hard-sided container, but NOT INSIDE a piece of checked baggage, the declaration must be placed inside the container.

4) After screening, the passenger must lock the firearm container and retain the key or combination.

5) The passenger must make arrangements for and assume full responsibility for complying with any applicable laws, customs and government regulations, or restrictions of the state or territory to which the firearm is being transported.

B. Ammunition - Ammunition for firearms (whether or not the firearm is also being carried) is accepted as checked baggage on flights within the United States, but not international flights, subject to the following conditions:

1) The ammunition must be securely packed in the original manufacturer's packaging, fiber (such as cardboard), wood, or metal boxes or other sturdy and durable packaging providing sufficient cartridge separation.

2) Each passenger is allowed up to 11 pounds (4.9 kilograms) of ammunition.

3) Loaded ammunition clips and magazines must also be securely boxed.

4) Ammunition may be packed with the firearm.

C. Live Animals -- Frontier accepts live animals only in the cabin of the aircraft, not as checked baggage. The transportation of live animals is subject to fees for carriage and the terms and conditions below.

EXCEPTION:  See separate rules with respect to service animals referred to in *6. Service Animals*.

1) Only the following animals are permitted:

a) Domestic Flights -- Domesticated dogs, cats, rabbits, guinea pigs, hamsters, or small household birds.

b) International Flights -- Domesticated dogs and cats.

2) The passengers carrying the animal are responsible for making arrangements and assuming full responsibility for complying with any applicable laws, customs and other governmental regulations, requirements or restrictions of the country, state or territory to which the animal is being transported.

3) The passengers carrying the animal are responsible for paying any import/export fees, duties, or taxes that may apply as well as any fines for failing to comply with applicable law.

4) International - Restrictions for travel with an animal to international destinations vary by country. Frontier recommends contacting the appropriate embassy or consulate before purchasing a ticket for travel.

5) The passengers carrying the animal are responsible for making advance reservations because no more than ten pet containers will be accepted per flight.

6) No passenger may carry more than one pet container.

7) The animal must remain in a pet container at all times and may not be fed while onboard the aircraft.

8) The pet container must be large enough for the pet to stand, turn around, and lie down in a natural position and fit underneath the seat in front of the passenger.

---

**Pg. 15 of 25**                                    **Conditions and Charges for Special Items**

**FRONTIER**

**CONTRACT OF CARRIAGE**                                    Rev83 04/10/23

9) The animal may not disrupt other passengers and the passenger must be able to quiet the animal without removing it from the container.

10) The container counts toward the carry-on baggage allowance.

11) No oxygen will be administered to an animal in the event of an emergency.

D. Human Remains:

1) Crematory remains (human or animal) may be transported as carry-on or checked baggage subject to the following conditions:

   a) The container must be made of a material such as wood or plastic that can be successfully screened by the TSA. If the container cannot be screened, it will not be allowed.

   b) If the container is checked, it must be sufficiently packaged in a well-insulated and sturdy container.

   c) If the container is carried onboard the flight, it counts toward the passenger's carry-on allowance and it must meet carry-on baggage dimensions.

2) Human remains in caskets are not accepted.

E. Dry Ice (frozen carbon dioxide) -- Dry ice may be carried under the following conditions:

1) A maximum of 5.5 pounds (2.5 kilograms) of dry ice per passenger is accepted in checked or carry-on baggage.

2) The cooler or package must permit the release of carbon dioxide gas. Styrofoam containers are not accepted.

F. Bicycle - Bicycles may be carried under the following conditions:

1) The handlebars must be fixed sideways, and the pedals removed or wrapped in plastic foam or similar material and the entire bicycle is encased in a hard-sided case.

2) Bicycles may only be carried as checked baggage.

3) A fee applies for each bicycle checked as baggage.

4) Bicycles are excluded from baggage liability unless packaged in a hard-sided case.

G. Special Items - The following items may exceed carry-on baggage dimensions but may be taken as a carry-on item (and count toward the carry-on bag allowance) as long as they fit in the overhead bin: fishing rods, tennis rackets, wedding attire, poster tubes, and musical instruments. If any such items are comprised of more than one piece, they must be packaged together to be considered one item. The carry-on bag fee applies.

H. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 15. Limitations of Liability

A. Consequential Damages – Unless it is specifically stated otherwise in this Contract of Carriage, or as required by any applicable law, Frontier is not liable for any indirect, special, or consequential damages arising out of or resulting from transportation provided, delay in transportation, or any failure to provide transportation.

**FRONTIER**

C O N T R A C T   O F   C A R R I A G E                                    Rev83 04/10/23

B. International Transportation – With respect to international transportation, as defined in the following referenced conventions, as applicable, Frontier's liability will be limited as specified in, as and if applicable, (i) the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw, October 12, 1929, as amended ("Warsaw Convention"), but subject to the Agreement entered into by Frontier pursuant to 14 C.F.R. Part 203 or (ii) the Convention for the Unification of Certain Rules for International Carriage by Air, signed at Montreal, May 28, 1999 ("Montreal Convention").

## 16. Claim Limits and Procedures

A. Limitations of Liability

1) Domestic Flights – With respect to domestic flights (i.e., those flights originating and ending within the United States) without any scheduled stops outside of the United States, or international flights to which neither the Warsaw Convention or the Montreal Convention apply, Frontier's limit of liability, if any, for the loss, damage or delay in the carriage of checked baggage shall be limited to $3,800 for all bags checked under a single ticketed passenger's name. Frontier will not be liable for:

i)   The following items included in checked baggage, with or without the knowledge of Frontier:

- alcohol
- antiques
- art, paintings
- art supplies
- artifacts
- bags made from lightweight material not designed for shipping
- blueprints
- books
- business documents
- CDs
- cell phones
- Cigars, cigarettes, electronic cigarettes, vape pens
- collectibles
- computer equipment (including hardware, software and all accessories)
- dentures
- drugs prohibited by federal or state law
- DVDs
- eyeglasses
- files
- food/perishables
- fragile articles or other similar valuable items and commercial effects
- hand and power tools
- heirlooms
- irreplaceable items
- jewelry
- keys
- machinery and its parts
- manuscripts
- medication
- money
- natural fur products
- negotiable papers/ instruments
- optics
- orthodontics
- orthotics
- photographic/video/ electronic equipment and accessories
- precious metals or stones
- publications
- samples
- securities
- silverware
- sound reproduction equipment
- sunglasses
- surgical supports
- toys

ii)  Articles strapped, taped, or tied to other pieces of baggage, which may become separated as a result of normal handling during transportation

iii) Damage to the following items when not packed in a hard-sided case or other packing that is suitable for the item:

- Prosthetic devices
- Medical equipment
- Musical instruments

**FRONTIER**

**CONTRACT OF CARRIAGE**                                                    Rev83 04/10/23

- Recreational or sporting equipment
- Baby items including car seats and strollers

iv) Damage to handles, straps, wheels, and zippers arising from normal wear and tear caused by ordinary handling of baggage

v) Damage arising from ordinary wear and tear, such as cuts, scratches, scuffs, stains, dents, punctures, marks, and dirt

vi) Damage resulting from over-packing or misuse

vii) Damage arising from liquids on or in baggage; including weather (e.g., rain, snow)

2) International Flights/Montreal Convention – With respect to international flights to which the Montreal Convention applies, Frontier's limit of liability, if any, for the loss, damage or delay in the carriage of baggage (whether checked or carry-on) shall be limited to 1,288 Special Drawing Rights per ticketed passenger. The conversion rate, available at www.imf.org, in effect on the date of loss will be used for determining maximum liability amount.

3) International Flights/Warsaw Convention – With respect to international flights to which the Warsaw Convention applies, Frontier's limit of liability, if any, for the loss, damage or delay of (i) checked baggage shall be limited to 17 Special Drawing Rights per pound, or actual value, whichever is less, (ii) carry-on baggage shall be limited to 332 Special Drawing Rights or actual value, whichever is less. The conversion rate, available at www.imf.org, in effect on the date of loss will be used for determining maximum liability amount. Absent evidence to the contrary, bags will be presumed to weigh 20 pounds.

4) Frontier does not accept declarations of higher value or accept fees based on such declarations.

5) Subject to the above specified limits of liability, Frontier will compensate a passenger whose baggage has been lost, damaged or delayed for reasonable, documented direct damages up to the specified limit of liability, provided the passenger has made reasonable effort to minimize the amount of damage and provided documentation of the loss. The compensation due for lost or damaged property will be determined by the lesser of the documented original purchase price less applicable depreciation or the cost to make repairs.

6) Frontier's liability for wheelchairs, mobility aids, and assistive devices used by a passenger with a disability if lost or damaged by Frontier shall be up to the original purchase price of the device without regard to the above limitations of liability.

7) Passengers who incur incidental expenses as a result of delayed baggage delivery will be reimbursed per established DOT guidelines, subject to the above limitations of liability (as applicable). Any amounts paid to the passenger for incidental expenses will be deducted from the total loss amount prior to check issuance.

8) Frontier will not be liable for loss or damage to carry-on baggage unless such damage is caused by Frontier's or its agent's negligence, which does not include damage resulting from turbulence, shifting of items during flight, or ordinary handling, including placing the baggage in overhead compartments or under seats.

9) Frontier's employees and agents are not liable to passengers.

B. Time Limit to Make Claims and Procedures

**FRONTIER**

1) With respect to domestic flights and those international flights to which the Montreal Convention does not apply, any claim based on damage, delay, or loss of baggage must be reported to Frontier within 4 hours of the arrival of the flight on which the loss or damage is claimed to have occurred. Claims for pilferage may be made up to 24 hours after flight arrival. Any documentation required to support the claim must be submitted within 30 days from the date the requesting passenger receives the claim form packet from Frontier; Frontier will not be liable if the completed claims are not submitted, with documentation, within that time period.

2) With respect to international flights to which the Montreal Convention applies, in the case of baggage damage, the person entitled to delivery must submit in writing to Frontier as soon as possible after discovery of the damage, and at the latest in writing 7 days from receipt of checked baggage and in the case of delay or loss, complaints must be made at the latest within 21 days from the date on which the baggage has been placed at the passenger's disposal or should have been placed at the passenger's disposal in the case of loss. All claims must be made in writing and must be accompanied by supporting documentation. Any subsequent request for documentation from Frontier must be provided to Frontier within 21 days of the request.

## 17. Failure to Operate on Schedule or Failure to Carry

A. Liability Limited - Frontier will use reasonable efforts to transport passengers and baggage to the purchased destination, but published schedules, flight times, aircraft types, seat assignments, and similar details set forth in the ticket or Frontier's published schedules are not guaranteed and form no part of this Contract of Carriage. Frontier may substitute alternate aircraft, change schedules, delay or cancel flights, change seat assignments, and alter or omit stopping places shown on the ticket as required by its operations in Frontier's sole discretion. Frontier's obligations for failure to operate any flight, failure to operate a flight according to its schedule, or for changing the schedule or type of equipment used on any flight, with or without notice to the passenger, are set forth below.

B. Force Majeure - In the occurrence of a force majeure event, Frontier may cancel, divert, or delay any flight without liability except to provide a refund for the unused portion of the ticket.

C. Delay, Misconnection, or Cancellation - In the event (i) a passenger's flight is canceled, (ii) a passenger is denied boarding because an aircraft with lesser capacity is substituted, (iii) a passenger misses a connecting Frontier flight due to a delay or cancellation of a Frontier flight (but not flights of other carriers), (iv) a passenger is delivered to a different destination because of the omission of a scheduled stop to which the passenger held a ticket, to the extent possible, Frontier will provide transportation on its own flights at no additional charge to the passenger's original destination or equivalent destination as provided herein. Frontier will have no obligation to provide transportation on another carrier. If Frontier cannot provide the foregoing transportation, Frontier shall, if requested, provide a refund for the unused portion of the passenger's ticket in lieu of the transportation under the foregoing. The foregoing shall be the limit of Frontier's liability for the matters covered by this provision.

D. For purposes of involuntary reroute (a diversion), use this link https://www.flyfrontier.com/travel/travel-info/travel-policies#same-day-flight-changes and see under the title Same Day Flight Changes section of the flyfrontier.com page for the groups of cities that are considered to be the same point. If Frontier is able to provide transportation to one of the specified alternative cities, Frontier has met its obligation for transport to the final destination.

E. Schedule Change Prior to Day of Travel -- When a passenger's itinerary is changed because of a modification in Frontier's schedule, arrangements will be made to:

**FRONTIER**

C O N T R A C T   O F   C A R R I A G E                                              Rev83 04/10/23

1) Transport the passenger over its own route system to the destination; or

2) In the event Frontier determines that the schedule modification is significant, Frontier shall, if requested, provide passengers a refund of the cost of the unused portion of the ticket.

F. Extended Onboard Ground Delays -- In accordance with FAA regulations, Frontier maintains and complies with a separate Contingency Plan for Lengthy Tarmac Delays. Frontier's Contingency Plan for Lengthy Tarmac Delays may be found on Frontier's website at https://az832049.vo.msecnd.net/media/1567/f9-contingency-plan-for-extended-tarmac-delays-2015.pdf. Frontier's Contingency Plan for Lengthy Tarmac Delays is subject to change without notice and is not part of this Contract of Carriage.

## 18. Denied Boarding Compensation

When a seat cannot be provided due to an inadequate number of seats for the number of passengers holding confirmed reservations (overbooking), the actions described in this section will be taken.

A. Voluntary -- Passengers on a flight with an overbooking will be encouraged to voluntarily relinquish their seats in exchange for alternate travel and for compensation in the form of an Electronic Travel Voucher for future transportation to be booked within 365 days on Frontier. The request and selection of volunteers will be in a manner determined solely by Frontier.

B. Involuntary -- If insufficient passengers volunteer, passengers who cannot be accommodated on the flight will be denied boarding and Frontier will provide transportation on a Frontier flight to the same destination. After a passenger's boarding pass is collected or scanned and accepted by the gate agent, and the passenger has boarded, a passenger may be removed from a flight only for safety or security reasons or in accordance with Section 3 of this Contract of Carriage.

C. Amount of Compensation -- Frontier will compensate a passenger for involuntary-denied boarding based on the new arrival time after the originally scheduled arrival time as follows:

| Domestic | International | Compensation |
|---|---|---|
| New arrival time within :59 | New arrival time within :59 | No Compensation |
| New arrival time within 1 - 1:59 | New arrival time within 1 - 3:59 | 200% (2x) of the one-way fare, not to exceed $775 |
| New arrival time 2 hours or more | New arrival time 4 hours or more | 400% (4x) of the one-way fare, not to exceed $1550 |

NOTE 1:    *Frontier is not obligated to provide compensation for denied boarding when an aircraft of lesser capacity is substituted due to operational or safety reasons.*

NOTE 2:    *No compensation will be due if boarding is denied for reasons other than overbooking (e.g., pursuant to applicable law or other provisions of this Contract of Carriage).*

D. Onward Transportation for Passengers Denied Boarding

1) A passenger denied boarding, voluntarily or involuntarily, pursuant to this section, will be transported on Frontier's next available flight on which space is available and at no additional charge.

2) If a passenger who has been denied boarding, voluntarily or involuntarily, pursuant to this section, wishes to modify the travel date, if space is available, a ticket will be provided for travel within 72 hours at no additional charge.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                          Rev83 04/10/23

E. Electronic Travel Voucher

1) Involuntary Denied Boarding - Frontier may offer passengers denied boarding involuntarily an Electronic Travel Voucher good for transportation on Frontier in lieu of cash compensation otherwise due under this section. Passengers may decline such offer in favor of the applicable cash compensation. The Electronic Travel Voucher has no refund value, will expire 365 days from date of issuance, is not transferable, cannot be applied to group travel (more than nine passengers on a booking), and may be used towards a booking with multiple people as long as the passenger to whom it is issued is present in the same booking. Electronic Travel Vouchers can be applied to ancillary services (e.g., seats, baggage), fees, and taxes. If a ticket purchased with an Electronic Travel Voucher costs less than the amount of the voucher, no residual value remains. Changes to a ticket purchased with an Electronic Travel Voucher may result in a change fee and any additional fare difference based on the rules of the issued ticket.

2) Voluntary Denied Boarding - Frontier may offer passengers who volunteer for denied boarding an Electronic Travel Voucher good for transportation on Frontier. The Electronic Travel Voucher has no refund value, will expire 365 days from date of issuance, is not transferable, cannot be applied to group travel (more than nine passengers on a booking), and may be used towards a booking with multiple people as long as the passenger to whom it is issued is present in the booking. Electronic Travel Vouchers can be applied to ancillary services (e.g., seats, baggage) and fees; no taxes will be covered by the Electronic Travel Voucher. If a ticket purchased with an Electronic Travel Voucher costs less than the amount of the voucher, no residual value remains. Changes to a ticket purchased with an Electronic Travel Voucher may result in a change fee and any additional fare difference based on the rules of the issued ticket.

F. Time of Offer and Payment of Compensation

1) The offer of compensation for overbooking will be made by Frontier on the day and at the place where the failure to provide confirmed space occurred. If accepted, compensation will be given to the passenger. If the alternative transportation arranged for the passenger's convenience departs before the payment can be made, payment will be made by mail or other means within 24 hours after the denied boarding occurs.

2) Acceptance of any Denied Boarding Compensation constitutes full compensation for damages incurred by the passenger as a result of Frontier's failure to provide the passenger with a confirmed seat.

## 19. Refunds; No-Show Cancellations and Service Charges

A. The provisions of this Section (20.A) shall apply with respect to refunds for tickets under this Contract of Carriage:

1) All refunds will be subject to government laws, rules, regulations, or orders of the country in which the ticket was originally purchased and of the country in which the refund is being made.

2) The first portion of any amount refunded will be the full amount of government-imposed taxes and fees, as well as certain carrier charges applied to the ticket purchase.

3) If applicable, cancellation fees or service charges will be assessed in a separate transaction and netted against the refunded amount.

4) No Use - If no portion of the ticket has been used, the refund amount will be equal to the fare, plus any ancillary purchases (checked or carry-on bag, seat assignments, etc.), all government-imposed charges, taxes, and fees, and certain carrier charges paid for the ticket issued to the passenger.

5) Partial use - If a portion of the ticket has been used:

**FRONTIER**

**CONTRACT OF CARRIAGE**                                    Rev83 04/10/23

    a)  One-way ticket: If travel was terminated at an intermediate or stopover point, the refund amount will be equal to the amount of the fare and all ancillary purchases (checked or carry-on bag, seat assignments, etc.) paid from the point of termination to the destination or to the point at which transportation is to resume and will be the lowest one-way fare for the class of service paid for minus any discount, plus all government-imposed charges, taxes, and fees and certain carrier charges, as proportionately attributable, which shall be reasonably determined by Frontier.

    b)  Round-trip ticket purchased: the refund amount will be equal to the amount of the fare and ancillary purchases (checked or carry-on bag, seat assignments, etc.) paid on the unused portion of the ticket, plus all government-imposed charges, taxes, and fees and certain carrier charges, as proportionately attributable, which shall be reasonably determined by Frontier.

B.  In addition to the provisions of Section 20.A, in situations other than No-Show Cancellations, the provisions of this Section (20.B) shall apply with respect to refunds for tickets under this Contract of Carriage:

    1)  For refundable tickets that are canceled prior to flight departure, passengers should fill out an online request, available at www.FlyFrontier.com.

    2)  For tickets that are canceled up to 24 hours after the time of purchase (excluding tickets purchased within seven days before travel, which will be held as a credit, less the applicable cancellation fee and certain carrier charges), passengers should cancel their tickets online at www.FlyFrontier.com.

    3)  <u>Payment</u> - A refund will be provided only to the original purchaser's form of payment. However, if, at the time of the application for refund, evidence is submitted that a company purchased the ticket on behalf of its employee or a travel agency has made a refund to its client, the refund will be made directly to the employee's company or the travel agency. The Table below illustrates other rules respecting payment:

| Payment Type | Refunded To |
|---|---|
| Universal Air Travel Plan | The subscriber against whose account the ticket was charged |
| Transportation Request issued by a government agency other than a U.S. government agency | The government agency that issued the transportation request |
| U.S. Government Transportation Request | The U.S. government agency that issued the U.S. Government Transportation Request with a check payable to the "Treasurer of the United States" |
| Card | The account of the person to whom the credit or debit card was issued |
| Electronic Travel Voucher | The original voucher value will be reinstated if the cancellation is within 90 days of the voucher issue date |

    4)  <u>Identity</u> - Frontier does not assume responsibility to confirm that the person using or presenting a ticket for refund is the true owner of the ticket.

C.  In situations involving a No-Show Cancellation, in addition to the provisions of Section 20.A, the provisions of this Section (20.C) shall apply with respect to refunds for tickets under this Contract of Carriage.

    1)  Automatic Refund; No Additional Submission Required – In the case of a No-Show Cancellation, the refund described in Section 20.A shall be automatically refunded to the purchaser.

    2)  Automatic Imposition of a No-Show Cancellation Service Charge.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                           Rev83 04/10/23

---

a) Refund – The refund described in Section 20.A shall be given, but will be netted against the No-Show Cancellation Service Charge in a separate transaction.

b) Imposition of a No-Show Cancellation Service Charge – A No-Show Cancellation Service Charge will apply with respect to the ticket (or the segment for which the No-Show Cancellation applies) in the amount of the fare plus all ancillary purchases plus all government-imposed charges, taxes and fees and certain carrier charges attributable to the fare and ancillary purchases.

c) The payment of the No-Show Cancellation Service Charge shall not entitle the purchaser (and, if different, the passenger or other party to whom a refund would otherwise be due) to transportation.

D. To the extent required by applicable law, including Code § 6415(a) and the regulations promulgated thereunder, the purchaser (and, if different, the passenger or other party to whom a refund would otherwise be due) hereby consents to Frontier recovering any allowance of a credit or refund of any overpayment of governmental fees or tax imposed, including pursuant to Code § 4261, including in each case which overpayment arises directly or indirectly as a result of a No-Show Cancellation as contemplated in this Contract of Carriage.

## 20. Currency and Mode of Payment and Fees

A. Fares, fees, charges, and taxes charged or collected by Frontier are due in United States dollars, except for bookings made through available Canadian online travel sites, which are due in Canadian dollars. Any purchases made in connection with such bookings would also be due in Canadian dollars.

B. All amounts due to Frontier must be paid with a credit or debit card; Frontier may require that each passenger have a card on file with Frontier to purchase a ticket and complete transport on Frontier. Frontier does not accept cash for any transactions, including those on Frontier's aircraft, except that Frontier may accept cash at certain international locations.

C. Frontier does not accept personal checks, traveler's checks, certified (cashier's) checks, or money orders.

D. A service charge will apply to any improper chargeback on a credit or debit card and may be charged to the same card via which the chargeback is made.

## 21. Miscellaneous

A. Subordination to Law - In all cases, this Contract of Carriage will be subordinate to any applicable law.

B. Metric References - Conversion of British units to metric units are approximate and for reference only. The British unit will apply.

C. Change Without Notice - Except as may be required by applicable laws, government regulations, orders, and requirements, Frontier reserves the right to amend this Contract of Carriage without notice, provided that no such change shall apply to carriage that has commenced.

D. No Waiver/Modification of Terms - No employee or agent of Frontier has the authority to waive, modify, or alter any provisions of the Contract of Carriage unless authorized by a corporate officer of Frontier. Accommodations provided beyond what is required by the Contract of Carriage do not alter the Contract of Carriage. Frontier's employees and agents, including third party travel agents and online travel sites, are only authorized to sell tickets for air transportation on Frontier subject to the Contract of Carriage.

---

**FRONTIER**

**CONTRACT OF CARRIAGE**                                                    Rev83 04/10/23

E. Changes in Rules, Fares, and Charges - Unless otherwise provided within specific fare rules, transportation is subject to the rules, fares, and charges in effect on the date a ticket is issued, determined by the validation stamped or imprinted on the ticket, or valid electronic ticket.

F. Use of Images - Passengers (or in the case of minors, their parents or legal guardians) consent to the unpaid use of any photos, videos, or other images taken of them by or for Frontier, for advertising or marketing purposes.

G. Taxes and Charges - When the ticket is issued for the effective date, all government, airport, vendor, or other charges that apply to passenger travel into foreign countries are the responsibility of the passenger to whom the ticket was originally issued and are in addition to the published fare and charges.

H. Fares/Charges - Specific fares and charges information is available through Frontier reservations offices and at www.FlyFrontier.com.

I. No Class Action - Any case brought pursuant to this Contract of Carriage, Frontier's Tarmac Delay Plan, or Frontier's Customer Service Plan may be brought in a party's individual capacity and not as a plaintiff or class member in any purported class or representative proceeding.

J. Time Limit for Action - No legal action may be brought by a passenger against Frontier unless commenced within 6 months from the date of the alleged incident.

K. Choice of Law - This Contract of Carriage will be governed by and construed in accordance with the laws of the United States of America and the State of Colorado without regard to conflict of law principles or law. All right to trial by jury in any action, proceeding or counterclaim arising out of or in connection with this Contract of Carriage is irrevocably waived.

L. Codeshare Flights – Except for baggage policies (see section 12. , section 13. , and section 14. ), the policies, rules, and procedures of the operating airline will apply on any codeshare flight.

## 22. Contingency Plan for Extended Tarmac Delays

The safety of our passengers is our #1 priority at Frontier Airlines. With that in mind, Frontier works hard to avoid extended tarmac delay situations. However, occasionally these situations do arise. Frontier maintains a plan to resolve the extended tarmac delays as quickly as possible as well as mitigating the impact and inconvenience to our passengers.

For all flights that remain at the gate or other disembarkation area with the main cabin door open 30 minutes after scheduled departure time (including any revised departure time that passengers were notified about before boarding) from which there is an opportunity to deplane, Frontier will notify passengers that they have the opportunity to deplane from the aircraft and repeat that notice at least every 30 minutes thereafter while that opportunity continues to exist.

A. For all flights that have departed from a gate without taking off or after a flight has landed without arriving at a gate ("Delay"), Frontier will notify passengers of the status of the Delay every 30 minutes while the aircraft is Delayed, including the reasons for the Delay, if known.

B. No later than 120 minutes after a Delay begins, Frontier will ensure that all passengers have been afforded the opportunity to receive food and water, unless the pilot-in-command determines that safety or security considerations preclude such service.

C. At 150 minutes (210 for international flights) after a delay begins, unless the pilot in command deems that departure is imminent, Frontier will look to return the aircraft to a gate or move to a remote parking location where passengers can be afforded the opportunity to deplane.

---

**Contingency Plan for Extended Tarmac Delays**                    **Pg. 24 of 25**

**FRONTIER**

**CONTRACT OF CARRIAGE**                                                      Rev83 04/10/23

D.  By no later than 180 (240 for international flights) minutes after a Delay begins Frontier will return the aircraft to a gate or other location where passengers will have the opportunity to deplane, unless:

E.  The pilot in command determines there is a safety related or security related reason (e.g., weather, a directive from an appropriate government agency) why the aircraft cannot leave its position on the tarmac to deplane passengers; or

F.  Air traffic control advises the pilot in command that returning to the gate or another disembarkation point elsewhere in order to deplane passengers would significantly disrupt airport operations.

G.  During any Delay, Frontier will ensure that a comfortable temperature is maintained throughout the passenger cabin.

H.  During any Delay, Frontier will ensure access to medical attention is available to meet all requests, including the use of a third-party medical consultation service.

I.  During any Delay, Frontier will ensure that operable lavatory facilities are available provided the pilot-in-command determines that it is safe and secure for passenger to move about the aircraft cabin.

J.  At each airport where Frontier flies, including diversion airports, this plan has been coordinated with airport authorities, Customs & Border Protection, and the Transportation Security Administration.

K.  Frontier has ensured that it has adequate resources available to administer this plan.

Frontier would also like our passengers to be aware of certain the following that will apply in the case of a Delay:

A.  If a flight returns to a gate or diverts from its planned destination, in most cases, the delayed or diverted flight will attempt to continue to its final destination. The right to deplane in such cases will be determined in accordance with the above.

B.  Frontier maintains information and arrangements with both airports and other airlines to secure additional gate space if needed during a tarmac delay. If allowed by the airport, the deplaning of passengers may take place when it is safe and secure to do so, either at a gate or at an approved remote parking position via stairs and ground transportation.

C.  Any passengers who choose to deplane from a flight that has experienced a delay and make alternative travel arrangements may do so when it is determined to be safe and secure, after the aircraft has been moved into position for deplaning, all operational requirements for deplaning have been completed, and the pilot-in-command has allowed customer deplaning to begin.

D.  Passengers should be aware that if they choose to deplane, they do so at their own risk and the flight may depart without them. Frontier will make reasonable attempts, e.g., via airport announcements, to communicate the new departure time of the flight. In cases where an aircraft that has returned to a gate, passengers may be advised how long the aircraft will remain at the gate to determine how much time (if any) passengers may spend inside the terminal prior to having to re-board the aircraft for the continuation of the flight. Such time may, however, be shorted in which case an announcement will be made to return to the aircraft.

E.  Passengers who choose to deplane and/or make alternative travel arrangements should be aware that on most domestic flights their checked baggage will remain on the aircraft. In cases where a flight returns to the gate and is canceled baggage will be returned to the baggage claim area.

F.  In instances where passengers are permitted to deplane at a remote aircraft parking position, reboarding the aircraft may not be possible.

Amarsingh v. Frontier, Case No. 1:23-cv-01875-GPG-KAS

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
11/13/2023
JEFFREY P. COLWELL, CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF COLORADO

Case No. 1:23-cv-01875-GPG-KAS

KUSMIN L. AMARSINGH

      District Judge Gordon P. Gallagher

    Plaintiff,          Magistrate Judge Kathryn A. Starnella

v.

FRONTIER AIRLINES, INC.

    Defendant.

_____

### PLAINTIFF'S RESPONSE TO MOTION TO DISMISS[1]

_____

    **NOW COMES** Plaintiff Kusmin L. Amarsingh, by Pro Se representation, responding to Defendant, Frontier Airline's Inc. (hereafter Frontier) Motion To Dismiss pursuant to 12(b)(6), and in support thereof states as follows:

## I:  CLAIMS:

### A)  BREACH OF CONTRACT:

    1. First, this case is about a breach of contract by Frontier Airlines when they knowingly, and intentionally overbooked Ms. Amarsingh's flight to her detriment; Frontier overbooked the flight with more passengers than there were seats and knew that some passengers would be left behind.  Most importantly, Frontier Airlines had the ability to prevent this Breach of Contract but chose not to.

    2.  Second, when an Airline chooses to overbook a flight, they assume the responsibility of accommodating their passengers lawfully, reasonably, and, in good faith, guided by their Carrier Contract and applicable laws and regulations.  Additionally, an Airline must inform its affected passengers by providing notice of the selection criteria and of their rights.

    3.  Third, Frontier Airlines denied Ms. Amarsingh from boarding her flight through an unlawful selection process.

    4.  Four, Frontier Airlines failed to adequately inform Ms. Amarsingh of the remedies available to her resulting from their breach of contract.

### B)  CLAIM 2:  RACIAL DISCRIMINATION

    1. After Frontier breached their contract with Ms. Amarsingh, they then denied her priority travel by relying on unlawful selection criteria; Ms. Amarsingh checked in to her flight first, arrived at the gate first, and Frontier knew her travel was more complex than the other passengers.  There were no other flights from Philadelphia to St. Louis for 7 days, a fact Ms. Amarsingh learned when the Agents first announced that they were overbooked.

---

[1] Plaintiff adopts all facts and law previously asserted in her original complaint to this Response.

Amarsingh v. Frontier, Case No. 1:23-cv-01875-GPG-KAS

2. Frontier did have another direct flight from Philadelphia to Orlando 1 hour later at the same gate. Frontier deliberately and knowingly approached and selected African American passengers and escorted them to the front of the line for boarding. The reasonable conclusion, considering all facts and circumstances, is that Ms. Amarsingh was denied boarding because she was not African American.

3. Assuming arguendo, that Frontier's assertion is true, and they did make a plausible determination to Board certain groups to keep them together, they had an obligation to inform Ms. Amarsingh of that determination, which they did not.

4. Frontier disregarded any lawful, reasonable, appropriate, or, common sense approach to the selection criteria; and then, humiliated Ms. Amarsingh for trying to assist. Ms. Amarsingh was not, as Defense asserts, trying to take a seat away from someone, rather, she was trying to make sure everyone had a seat, and with the least disruption to their travel, including her own.

## LAW[2] / ARGUMENT

1. Plaintiff must only satisfy simple pleading requirements of Fed. R. Civ. P. 8(a) to survive a motion to dismiss; Plaintiff must only set forth short and plain statement of the claim(s) showing that she is entitled to relief, and need only give respondent fair notice of the nature of the claim and petitioner's basis for it; given Federal Rules' simplified standard for pleading, a court may dismiss a complaint only if it is clear that no relief <u>could</u> be granted under any set of facts that <u>could</u> be proved consistent with the allegations. PSA, Inc. v. P.R. Tel. Co., 336 F. Supp. 2d 173, 2004 U.S. Dist. LEXIS 21407 (D.P.R. 2004). Plaintiff need not cite proper statute for relief in her pleading nor a statement of her legal theory. <u>See</u> Northrop v. Hoffman of Simsbury, Inc., 134 F.3d. 41, 39 Fed. R. Serv. 3d et al. USCS Fed Rules Civ Proc R 8.

2. Frontier Airlines requests dismissal because Frontier can come up with a plausible explanation other than race for leaving Ms. Amarsingh behind. That standard puts Rule 8(a) on its head. Ms. Amarsingh pleads facts to support her allegation that Frontier racially profiled her by disregarding all lawful selection criteria, confirming that she was not African American by calling her and another Indian passenger to the front desk, then, proceeded to hand-select only African American passengers from the waiting area, leaving all the non-African American passengers behind to fend for themselves. *The one mixed-race gentleman was called to the front desk and provided some information outside the earshot of the other passengers just before he departed the Airport.*

3. Frontier also states that Ms. Amarsingh's racial discrimination claim is all in her head (based on speculation). No it is not; it is in Frontier's computer preserved for this Court to examine, and, to determine the truth. An examination of the check-in roster, security-check timestamps, video footage, itinerary, testimony by the other bumped passengers, and race of the passengers boarded vs. those bumped, will support Ms. Amarsingh's claims that she was discriminated against based on her race.

4. Frontier provided its Carrier Contract and directed this Court's attention to Section 18 which states: *Involuntary denial of accommodation: If insufficient passengers volunteer, passengers who cannot be accommodated on the flight will be denied boarding and Frontier will provide transportation on a Frontier flight to the same destination.*

---

[2] Australian Law: my apologies to the Court and opposing Counsel on this embarrassing error if I misguided either.

Amarsingh v. Frontier, Case No. 1:23-cv-01875-GPG-KAS

     5. Ms. Amarsingh respectfully directs the Court's attention to the following excerpts of the Defendant's contract which demonstrates that Frontier violated its own covenant of good faith and reasonableness.

*Section 8(B). Tickets.  Tickets are honored <u>only</u> in the order in which they are issued.*

*Section 18(A)(B)(C):  Denied Boarding Compensation (A) Voluntary – passengers on a flight with an overbooking will be encouraged to voluntarily relinquish their seats in exchange for alternate travel…(B) Involuntary: (see above) (C) Amount of Compensation – which provides a formula for determining compensation rates based on inconvenience of the passenger by considering arrival times, length of delay etc.*

*Section 18(E):  Involuntary Denied Boarding:  A passenger may accept or deny compensation offered in exchange for being bumped and negotiate further with the Airline.*

     6. The Department of Transportation (hereafter DOT) regulates Air Travel to ensure fair and safe accommodation and transportation.  In so doing DOT provides the procedures that Airlines MUST follow in instances of overbooking.   *See* attached Bumping & Oversales | US Department of Transportation.

*<u>Involuntarily Giving Up Your Seat (Bumping)</u>: Sometimes, when an airline asks for volunteers to give up their seats and fly on a different flight, there are not enough volunteers.  When this occurs, the airline will select passengers to give up their seats.  This is called "involuntary denied boarding" or "bumping."*

*<u>How does an airline determine who has to give up their seat?</u>  While it is legal for airlines to involuntarily bump passengers from an oversold flight when there are not enough volunteers, it is the airline's responsibility to determine its own <u>fair</u> boarding priorities. If there are not enough passengers who are willing to give up their seats voluntarily, an airline may deny you a seat on an aircraft based on criteria that it establishes, such as the passenger's check-in time, the fare paid by the passenger, or the passenger's frequent flyer status.  However, the criteria cannot subject a passenger to any unjust or unreasonable prejudice or disadvantage.  For example, an airline could not lawfully use a passenger's race or ethnicity as a criterion.*

*<u>Do airlines have to tell me my rights when I'm involuntarily bumped?</u>  Yes.  DOT requires airlines to give all passengers who are bumped involuntarily a written statement describing their rights and explaining how the carrier decides the selection criteria for who gets bumped.*

     7. Frontier Airlines intentionally disobeyed and disregarded all laws of logic, common sense, their own contract, the Federal Guidelines, and, commonly held notions of fairness and reasonable standards.  They intentionally withheld notice of rights from Ms. Amarsingh, and subsequently harassed her when she tried to learn them.

## CONCLUSION

     1. The Defendant's motion to dismiss is unresponsive to the clearly outlined facts in Ms. Amarsingh's complaint.  The issue was never whether she had a regular contract with Frontier Airlines, the issue was whether Frontier failed in their duty to provide her with fair and reasonable accommodation because of their breach.  The facts are the facts, and Defense can very easily determine the truth of the assertions here by following its own trail of records, and, by upholding the terms of their Contract of Carriage provided to the Court.

Amarsingh v. Frontier, Case No. 1:23-cv-01875-GPG-KAS

    2. To speak plainly, Ms. Amarsingh has stated sufficient facts, based on reasonably available evidence in the Defendant's control, which will substantiate her claims.

    3. As to the Defense's inquiry regarding Ms. Amarsingh's Pro Se representation, she has never practiced in Federal District Court, and for judicial economy would ask that the Court permit some leniency in procedural aspects of her case.  She has no objection as to treatment on the pleadings and legal standards.  As to damages and relief, she request attorneys' costs and fees.

    4. As to the Defense categorizing Ms. Amarsingh as a 'Stand-by' passenger, they are wrong.  A Standby passenger is boarded subject to availability of seat space at departure time and only after all passengers having confirmed reservations for the flight have been boarded.  The distinction is Ms. Amarsingh had a confirmed reservation, therefore she was a 'bumped' passenger not on standby.  See Frontier Airlines Carrier Contract, Page 1, Section 2 Definitions at I.

    5. Finally, this experience has caused Ms. Amarsingh great emotional distress both because of her own treatment by Frontier and witnessing the treatment of other passengers.  Considering Ms. Amarsingh's 16 plus years of military service, she has a deep sense of responsibility to assist others.  She saw something, tried to do something about it, and continues to do so.  This Court should as well.

### RELIEF/DAMAGES

    **WHEREFORE**, Ms. Amarsingh hereby renews her request for Summary Judgement on both claims.  However, if the Court is not so inclined to grant summary judgement on Ms. Amarsingh's Racial Discrimination Claim, she respectfully asks that this Court grants Summary Judgement as to Claim 1 for Breach of Contract, and award half the requested damages in compensation, emotional distress, costs, and, fees.

### CERTIFICATE OF SERVICE

    I, Kusmin L. Amarsingh, the Plaintiff in this action, do hereby certify that I have electronically filed this response with the United States District Court for the District of Colorado via email to the Clerk of Court, and that I have served a copy of the same to Frontier Airlines' attorney, Mr. Brian Maye via electronic mail on November 12, 2023.

Kusmin L. Amarsingh
Plaintiff
4 Shady Lane Dr.
Mary Esther, FL 32569
Email:  lindaamarsingh@gmail.com
Tel:  862-201-1305

 An official website of the United States government Here's how you know ⌄

Home \ Aviation Consumer Protection

## In This Section

**Related Links**

- Press Release: DOT Relaunches Air Consumer Website

**Tags**

- Air Consumer

### Bumping & Oversales

## Bumping

The vast majority of the time, passengers don't have any problems boarding their flights.  But occasionally, airlines may "bump" passengers and have them give up their seats.  Bumping, also known as "denied boarding," happens when there are more passengers scheduled to fly on an airplane than available seats.

The business practice of bumping is not illegal.  Airlines oversell their scheduled flights to a certain extent in order to compensate for "no-shows."  Most of the time, airlines correctly predict the "no shows" and everything goes smoothly.  But sometimes, passengers are bumped as a result of oversales practices.

Not all airlines engage in the practice of selling more tickets than available seats on an aircraft.  Some airlines simply sell enough tickets to fill every seat.  Although this practice significantly reduces the chances that a passenger will be bumped, the airline may still bump passengers in rare circumstances - such as when the seat is needed for a Federal Air Marshall.

It's important for passengers to understand why they may be asked to give up their seats and what rights they may have.  Before an airline forces a passenger to give up his/her seat due to overbooking, the airline must ask passengers on the flight if they are willing to give up their seat voluntarily in exchange for compensation.

## Voluntarily Giving Up Your Seat

When a flight has more passengers who are ready to fly than there are seats available, airlines must first ask passengers to give up their seats voluntarily, in exchange for compensation, before bumping anyone involuntarily.  Airlines may offer passengers incentives, such as money or vouchers, to volunteer.  There is no limit to the amount of money or vouchers that the airline may offer, and passengers are free to negotiate with the airline.

- If an airline offers a reduced rate ticket, free ticket, or voucher to passengers in exchange for volunteering to fly on a different flight, the airline must tell passengers about any and all restrictions that may apply to the use of the reduced rate ticket, free ticket, or voucher before passengers decide whether or not to give up their confirmed reserved space on the currently oversold flight.

If you decide to give your seat back to the airline in exchange for compensation and a later flight, you may want to get answers to these important questions:

- When is the next flight on which the airline can confirm your seat?  The alternate flight may be just as acceptable to you.  On the other hand, if the airline offers to put you on standby on another flight that's full, you could be stuck at your departure airport for a long time.

- Will the airline provide other amenities such as free meals, a hotel room, transfers between the hotel and the airport, and a phone card?  If not, you might have to spend the money it offers you on food or lodging while you wait for the next flight.

Case 1:23-cv-01875-GPG-KAS    Document 24-1    Filed 11/13/23    Page 2 of 6

Appellate Case: 24-1391    Document: 10-1    Date Filed: 11/06/2024    Page: 114
Amarsingh v. Frontier
Case: 1:23-cv-01875-GPG-KAS, pg 2 of 6

- How long is the ticket or voucher good for?

- Is the ticket or voucher unusable during holiday periods when you might want to use it?

- Can it be used for international flights?

# Involuntarily Giving Up Your Seat (Bumping)

Sometimes, when an airline asks for volunteers to give up their seats and fly on a different flight, there are not enough volunteers. When this occurs, the airline will select passengers to give up their seats. This is called "**involuntary denied boarding**" or "**bumping.**"

**How does an airline determine who has to give up their seat?**

- While it is legal for airlines to involuntarily bump passengers from an oversold flight when there are not enough volunteers, it is the airline's responsibility to determine its own fair boarding priorities.

- If there are not enough passengers who are willing to give up their seats voluntarily, an airline may deny you a seat on an aircraft based on criteria that it establishes, such as the passenger's check-in time, the fare paid by the passenger, or the passenger's frequent flyer status. However, the criteria cannot subject a passenger to any unjust or unreasonable prejudice or disadvantage. For example, an airline could not lawfully use a passenger's race or ethnicity as a criterion.

**Do airlines have to tell me my rights when I'm involuntarily bumped?**

- Yes. DOT requires airlines to give all passengers who are bumped involuntarily a written statement describing their rights and explaining how the carrier decides who gets bumped.

**Can airlines involuntarily bump me after I have boarded the flight?**

- Generally, no. If you have met the following conditions, airlines are not allowed to deny you permission to board, or remove you from the flight if you have already boarded the flight:
  - You have checked-in for your flight before the check-in deadline set by the airlines; and
  - A gate agent has accepted your paper boarding pass or electronically scanned your boarding pass and let you know that you may proceed to board.

- However, airlines may deny boarding or remove you from a flight even after accepting your boarding pass and informing you that you may proceed to board if the denial or removal is due to a safety, security, or health risk, or due to a behavior that is considered obscene, disruptive, or otherwise unlawful.

**Are airlines required to pay me money when I'm involuntarily bumped?**

- It depends. An airline is required to compensate you after involuntarily bumping you from an oversold flight in certain situations. However, there are many situations where you are not entitled to compensation.

**Bumped passengers are NOT eligible for compensation in the following situations:**

- Aircraft Change - A smaller plane is substituted for the larger one the airline originally planned on using due to operational or safety reasons.

- Weight and Balance - Weight or balance restrictions that apply to planes with 60 or fewer seats for operational or safety reasons.

- Downgrading - A passenger is downgraded from a higher class of seating to a lower class. In this case, the passenger is entitled to a refund for the difference in price.

- Charter Flights - A flight contracted for a specific trip that is not part of an airline's regular schedule.

- Small Aircraft - Scheduled flights on planes holding fewer than 30 passengers.

- Flights Departing a Foreign Location. International flights to the United States. However, some airlines on these routes may provide compensation voluntarily. Also, the European Commission has a rule on bumping passengers from flights that apply to passengers departing from a European Union member state; ask the airline for details, or <u>visit this page</u>.

**Situations when bumped passengers ARE eligible for compensation:**

- If you are not bumped from a flight for one of the reasons above, you qualify for involuntary denied boarding compensation if an airline requires you to give up your seat on an oversold flight and:

  - You have a confirmed reservation,

  - You checked-in to your flight on time,

  - You arrived at the departure gate on time, and

  - The airline cannot get you to your destination within one hour of your flight's original arrival time.

**If I am entitled to compensation, how is the amount of compensation calculated?**

- Passengers who are denied boarding involuntarily due to oversales are entitled to compensation that is based on the price of their ticket, the length of time that they are delayed in getting to their destination because of being denied boarding, and whether their flight is a domestic flight or an international flight leaving from the United States. This is called "denied boarding compensation" or "DBC" for short.

- Most bumped passengers who experience short delays on flights will receive compensation equal to double the one-way price of the flight they were bumped from, but airlines may limit this amount to up to $775. Passengers experiencing longer delays on flights will receive payments of four times the one-way value of the flight they were bumped from, but airlines may limit this amount to up to $1,550. Please see the tables below.

**Domestic - Denied Boarding Compensation (DBC)**

| Length of Delay | Compensation |
|---|---|
| 0 to 1 hour arrival delay | No compensation |
| 1 to 2 hour arrival delay | 200% of one-way fare (airlines may limit the compensation to $775 if 200% of the one-way fare is higher than $775) |
| Over 2 hour arrival delay | 400% of one-way fare (airlines may limit the compensation to $1,550 if 400% of the one-way fare is higher than $1,550) |

**International - Denied Boarding Compensation (DBC)**

| Length of Delay | Compensation |
|---|---|
| 0 to 1 hour arrival delay | No compensation |

| Length of Delay | Compensation |
|---|---|
| 1 to 4 hour arrival delay | 200% of one-way fare (airlines may limit the compensation to $775 if 200% of the one-way fare is higher than $775) |
| Over 4 hour arrival delay | 400% of one-way fare (airlines may limit the compensation to $1,550 if 400% of the one-way fare is higher than $1,550) |

**When will I receive compensation if I am eligible to receive it?**

- Following a bumping incident, airlines must offer passengers compensation at the airport on the same day.

- If the airline provides substitute transportation that leaves the airport before the airline can pay the passenger, the airline must pay the passenger within 24 hours of the bumping incident.

**Is there is a limit on how much money airlines are allowed to give me when I am involuntarily bumped?**

- No.  Although airlines are required to give you a certain amount of money by law, airlines are free to give you more money than is required if they want to.

## Other Reasons You May Be Removed From a Flight

An airline can refuse to transport a passenger for the reasons listed in its contract of carriage, a legal agreement between the passenger and airline, so long as the refusal is not discriminatory, such as:

- Being intoxicated or under the influence of illegal drugs.

- Attempting to interfere with the duties of a flight crew member.

- Disrupting flight operations or engaging in unruly behavior.

- Having an offensive odor that is not caused by a disability or illness.

FAA regulations state that "no person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated."

To read the federal regulation implementing these rules, click here.





DOT Relaunches Air Consumer Website

Last updated: Thursday, April 15, 2021

**U.S. DEPARTMENT OF TRANSPORTATION**

1200 New Jersey Avenue, SE
Washington, DC 20590
855-368-4200

   

**WANT TO KNOW MORE?**

Receive email updates about the latest in Safety, Innovation, and Infrastructure.

SUBSCRIBE NOW

**ABOUT DOT**

Meet the Secretary

Mission

Newsroom

Medium Blog

Social Media

Leadership

Regulations

Transit Benefit Policy

Careers

Contact Us

**OPERATING ADMINISTRATIONS**

FAA

FHWA

FMCSA

FRA

FTA

GLS

MARAD

NHTSA

OIG

OST

PHMSA

**RESEARCH AND TECHNOLOGY**

Office of the Assistant Secretary for Research and Technology

Bureau of Transportation Statistics

Volpe Center

Ask-A-Librarian

**PRIORITIES**

Bipartisan Infrastructure Law

Climate and Sustainability

Equity

Safety

Transformation

**POLICIES, RIGHTS, AND LEGAL**

USA.gov

Privacy Policy

FOIA

Budget and Performance

No FEAR Act

Cummings Act Notices

Ethics

Web Policies and Notices

Vulnerability Disclosure Policy

Accessibility

Amarsingh v. Frontier
Case:  1:23-cv-01875-GPG-KAS, pg 6 of 6